## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OUTER HARBOR TERMINAL, LLC,[1] | ) | Case No. 16-10283 (LSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING ON A SUPER-PRIORITY AND SENIOR SECURED BASIS, (B) PERMITTING USE OF CASH COLLATERAL, (C) PROVIDING ADEQUATE PROTECTION, AND (D) GRANTING RELATED RELIEF; (II) MODIFYING THE AUTOMATIC STAY; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Outer Harbor Terminal, LLC, the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby files this motion (the "Motion"), seeking entry of an interim order substantially in the form annexed hereto as **Exhibit A** (the "Interim Financing Order") and a final order (the "Final Financing Order" and, together with the Interim Financing Order, the "Financing Orders"), pursuant to sections 105, 361, 362, 363, 364, and 507 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia*:

    (i)    authorizing the Debtor to obtain post-petition loans and advances (the "DIP Facility") of up to the aggregate principal amount of $3.5 million dollars ($3,500,000), of which the Debtor may draw the full amount on an interim basis, which DIP Facility, to the extent of post-petition advances, fees and interest are to

---

[1] The last four digits of the Debtor's federal tax identification number are 2070.  The Debtor's principal place of business is located at 1599 Maritime Street, Oakland, CA 94607.

be secured by liens (as defined in § 101(37) of title 11, U.S.C., as amended (the "<u>Bankruptcy Code</u>") and referred to herein as "<u>DIP Liens</u>") in favor of HHH Oakland, Inc., as agent under the DIP Facility (in such capacity, the "<u>Agent</u>"), upon all of the Collateral (as hereinafter defined) of the Debtor's estate pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code and with priority, as to administrative expenses, as provided in § 364(c)(1) of the Bankruptcy Code;

(ii)    approving terms and conditions of the DIP Facility among the Debtor and HHH Oakland, Inc. and Terminal Investment Ltd. (each a "<u>Lender</u>" and together the "<u>Lenders</u>") as set forth in that certain Term Sheet for Senor Secured Post Petition Debtor-in Possession Financing (the "<u>DIP Term Sheet</u>") attached hereto as **Exhibit B**;

(iii)    granting to the Agent for the benefit of the Lenders the DIP Liens upon the Debtor's property, pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code, as provided in and as contemplated by the DIP Loan Documents (as defined in the DIP Term Sheet), as supplemented by this Interim Financing Order, subject to the Carve-Out (as defined below);

(iv)    granting the Agent for the benefit of the Lenders a super-priority administrative claims over any and all administrative expenses pursuant to Bankruptcy Code § 364(c)(1);

(v)    modifying the automatic stay in favor of the Agent and Lenders, to the extent necessary and contemplated by the DIP Facility and the DIP Loan Documents, as set forth in this Interim Financing Order;

(vi)     granting adequate protection to the Agent for the benefit of the Lenders of its interest in "cash collateral" within the meaning of Bankruptcy Code § 363(a) derived from the Collateral; and

(vii)    scheduling a final hearing (the "Final Hearing") to consider the entry of the Final Financing Order authorizing the DIP Facility and the DIP Loan Documents on a final basis, as set forth in the Financing Motion and approve the form of notice with respect to the Final Hearing.

In support of this Motion, the Debtor submits the *Declaration of Heather Stack, Chief Financial Officer, in Support of Chapter 11 Petition and First Day Pleadings of Outer Harbor Terminal, LLC, Debtor and Debtor in Possession* (the "First Day Declaration").   In further support of this Motion, the Debtor respectfully states as follows:

### Preliminary Statement

1.      As discussed in detail in the First Day Declaration, the Debtor commenced this Chapter 11 Case as part of the Debtor's ongoing efforts to implement an orderly and efficient wind down of its business and liquidation of its assets (the "Wind Down").  Given the Debtor's projected liquidity needs, the DIP Facility is a critical component of the Wind Down.

2.      Prior to filing this Chapter 11 Case, the Debtor negotiated the DIP Facility, which provides for $3.5 million of financing, all of which is available on an interim basis.  The DIP Facility will be secured by a first priority lien on the Debtor's unencumbered assets and a junior lien on the Debtor's assets that are already subject to valid, perfected and unavoidable prepetition liens.  The DIP Facility also provides for superpriority administrative expense claims.  The DIP Facility does not contain any priming feature.

3

3.     The proceeds of the DIP Facility will be used to support the Debtor's wind down operations as set forth in the Approved Budget (as defined below).  The DIP Facility proceeds, among other things, will be used to fund the wages, salaries and benefits of the Debtor's employees, procure necessary goods and services (and maintain trade terms with the Debtor's vendors), finance the costs of this Chapter 11 Case, and meet certain other working capital needs.  Payment of such expenses is necessary to ensure that the Debtor is able to wind down its operations in a safe, efficient, and expeditious manner.

4.     As discussed in greater detail in the First Day Declaration, the Debtor believes that the DIP Facility is the only source of financing available to the Debtor at this time.  Although the Lenders each own 50% of the Debtor's membership interests, the Lenders and the Debtor entered into the DIP Facility after arm's length and good faith negotiations, with both sides represented by sophisticated counsel.  The Debtor identified the Lenders as the most likely source of post-petition financing, given the wind down nature of the Chapter 11 Case and the Lenders' detailed knowledge of the Debtor's assets and history.  The Debtor had limited time in advance of its chapter 11 filing to negotiate and document the DIP Facility—and it is extremely unlikely, if not impossible, that a another DIP lender would have been able to complete the necessary due diligence and enter into a DIP facility within the available time period.  Accordingly, the Debtor requests that the Court approve the DIP Facility.

## Jurisdiction

5.     This court (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

6.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

**Background**

8.      On February 1, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").  The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner and no committee has been appointed or designated in this chapter 11 case.

9.      Formed in 2009, the Debtor is a privately-owned, limited liability company headquartered in Oakland, California that provides container terminal operations and stevedore services at the Port of Oakland (the "Port"), the fourth largest port on the west coast of the United States.  The Debtor's principal operations consist of: (i) the offloading and onloading of containers from cargo ships that berth at the Port; (ii) loading the offloaded containers on to trucks so that they may delivered from the Port to their ultimate domestic destination; and (iii) providing various logistical services to the Debtor's customers in connection with the foregoing. The Debtor operates from leased berths and terminal space that are owned by the Port.

10.      Prior to the Petition Date, following years of the Debtor operating at a loss and sustaining material, negative cash flows, the Debtor's members voted to terminate and wind down the Debtor's business operations.  The Debtor commenced the Wind Down on or about January 19, 2016 and intends to continue that process through the chapter 11 case.

11.    Additional information regarding the Debtor's business, assets, capital structure, and the circumstances leading to the filing of this chapter 11 case is set forth in the First Day Declaration.

**Terms and Conditions of the Proposed DIP Facility**

12.    The following chart contains a summary of the essential terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2.[2]

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| Borrower<br>Bankr. R.<br>4001(c)(1)(B) | Outer Harbor Terminal, LLC, a Delaware limited liability company<br><br>*See* DIP Term Sheet under "Debtor" |
| Guarantors<br>Bankr. R.<br>4001(c)(1)(B) | None |
| Lenders<br>Bankr. R.<br>4001(c)(1)(B) | HHH Oakland, Inc. and Terminal Investment Ltd.<br><br>*See* DIP Term Sheet under "Lenders" |
| Administrative Agent<br>Bankr. R.<br>4001(c)(1)(B) | HHH Oakland, Inc.<br><br>*See* DIP Term Sheet under "Agent" |
| Commitment<br>Bankr. R.<br>4001(c)(1)(B);<br>Local R. 4001-2(a)(ii) | The DIP Facility shall be in the maximum principal amount of $3.5 million. Each Lender's commitment ("Commitment") to make advances shall not at any time exceed $1.75 million (the "Maximum Commitment"). The Maximum Commitment amount of each Lender would be available as a debtor-in-possession multi-draw term credit facility (the "DIP Facility") to, or for the benefit of the Debtor.<br><br>*See* DIP Term Sheet under "DIP Facility Commitment Amount" |
| Interest Rates<br>Bankr. R.<br>4001(c)(1)(B);<br>Local R. 4001-2(a)(ii) | The unpaid principal amount of the advances under the DIP Facility shall accrue interest at a rate equal to 10% *per annum*.<br><br>*See* DIP Term Sheet under "Interest Rate" |

---

[2]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined shall have the meanings ascribed to them in the DIP Loan Documents or the Interim Financing Order, as applicable.

| | |
|---|---|
| Term<br>Bankr. R.<br>4001 (b)(l)(B)(iii),<br>4001(c)(1)(B);<br>Local R. 4001-2(a)(ii) | Subject to the entry of the Interim Financing Order and the terms of the DIP Facility Documents, the Debtor's obligations owing to the Lenders under the DIP Facility are due and payable upon the earliest to occur of the following:<br><br>(a) thirty (30) days after the Petition Date, unless each of the following shall have occurred by such date: (i) the Final Order shall have been entered; (ii) Debtor shall have filed its Plan of Liquidation and related disclosure statement, together with a motion seeking to combine the confirmation hearing with a hearing on the adequacy of such disclosure statement; and (iii) an order granting Debtor's motion to reject the Concession Agreement and the Berth 25-26 occupancy agreement with the Port, effective not later than March 31, 2016 shall have been entered;<br><br>(b) sixty (60) days after the Petition Date, unless (i) the Debtor shall have turned over to the Port possession of all premises on or before March 31, 2016; and (ii) the Debtor shall have obtained from the Court a hearing date prior to the hundred fifteenth (115th) day after the Petition Date to consider confirmation of the Plan of Liquidation and approval of such disclosure statement;<br><br>(c) one hundred fifteen (115) days after the Petition Date, unless the Debtor shall have obtained from the Court an order confirming the Plan of Liquidation and approving of such disclosure statement;<br><br>(d) the occurrence of an Event of Default (as defined in the DIP Term Sheet);<br><br>(e) the indefeasible payment in full in cash of the Debtor's obligations owing to the Lenders under the DIP Facility;<br><br>(f) one hundred twenty (120) days from the Petition Date; or<br><br>(g) the effective date of the Debtor's Plan of Liquidation.<br><br>*See* DIP Term Sheet under "Maturity Date/Term" |
| Use of DIP Facility and Cash Collateral Bankr. R. 4001(b)(l)(B)(ii); Local R. 4001-2(a)(ii) | To fund the Debtor's projected business wind-down expenditures expressly approved under and pursuant to the terms, conditions and limitations of the Financing Orders, consistent with the Approved Budget, respecting amount and timing, and the DIP Loan Documents.<br><br>*See* DIP Term Sheet under "Use of Proceeds" |

| Entities with Interests in Cash Collateral Bankr. R. 4001(b)(l)(B)(i) | Aside from the liens and security interests granted under the DIP Facility, the Debtor does not believe that any other party has an interest in cash collateral.[3] |
|---|---|
| Fees Bankr. R. 4001(c)(1)(B) Local R. 4001-2(a)(ii) | None |
| Conditions of Borrowing Bankr. R. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | The commitment of each Lender to provide the DIP Facility shall be conditioned upon satisfaction of the following conditions precedent as well as other conditions customary for transactions of this type:<br><br>(a) the Debtor shall file its Voluntary Petition under Chapter 11 of the Bankruptcy Code, on or before February 1, 2016 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");<br><br>(b) all necessary consents and approvals for the initial funding under the DIP Facility shall have been obtained by both Lenders;<br><br>(c) approval by the Lenders of the budget (as amended and approved by the Lenders from time to time, the "Approved Budget"), for the period commencing on the Petition Date, and continuing through the date that is 120 days after the Petition Date; and, receipt, thereafter, on or before each Wednesday of a comparison of actual disbursements and obligations incurred for the preceding week ending on the preceding Saturday to the disbursements and requirements scheduled for such week in the Approved Budget and any proposed changes to the Approved Budget; provided, that, notwithstanding anything to the contrary, the financing provided under the Interim Financing Order shall only relate to the period (the "Interim Period") from the Petition Date to the date of the hearing on final approval, which shall be no more than thirty (30) days after the Petition Date;<br><br>(d) any other information (financial or otherwise) reasonably requested by the Agent and the Lenders shall have been received by Agent and the Lenders and shall be in form reasonably satisfactory to the Agent and the Lenders and shall not reflect the existence of an Event of Default;<br><br>(e) the Agent and the Lenders shall have received post-petition reports in form and in such detail as reasonably requested by the Agent and the Lenders;<br><br>(f) each Lender shall have committed to fund its Maximum Commitment; and |

---

[3] Nothing in this Motion shall constitute an admission by the Debtor regarding the asserted liens and claims of any party (including whether such asserted liens are valid and perfected) and in connection therewith, the rights of all parties are expressly reserved.

| | |
|---|---|
| | (g) if requested by the Agent, execution and delivery of such documentation (to include financing statements, security agreements, and account control agreements with respect to any existing or new bank accounts opened by the Debtor, tax lien and litigation searches, good standing certificate, customary representations, warranties, covenants, events of default, indemnification, instruments, insurance and such other acts as the Agent may reasonably request in order to obtain the Lenders' legal approval to effect the completion of the financing arrangements herein contemplated) reasonably satisfactory in form and substance to the Lenders and their respective counsel.. |
| | Each Lender's commitment to lend as stated herein is expressly subject to the entry of all necessary and appropriate Bankruptcy Court orders, which order or orders (the "<u>Orders</u>") must be (i) not subject to any stay, modification, or reversal; and (ii) acceptable to each Lender in its reasonable discretion. |
| | *See* DIP Term Sheet under "Conditions Precedent" |
| Budget Bankr. R. 4001 (c)(1)(B); Local R. 4001-2(a)(ii) | The use of the DIP Facility proceeds and cash collateral are subject to the Approved Budget.<br><br>*See* DIP Term Sheet under "Use of Proceeds" |
| Reporting Information Bankr. R. 4001(c)(1)(B) Local R. 4001-2(a)(ii) | The Debtor must deliver a report on or before each Wednesday of a comparison of actual disbursements and obligations incurred for the preceding week ending on the preceding Saturday to the disbursements and requirements scheduled for such week in the Approved Budget and any proposed changes to the Approved Budget.<br><br>*See* DIP Term Sheet under "Conditions Precedent" |
| Variance Covenant Bankr. R. 4001(c)(l)(B)Local R. 4001-2(a)(ii) | The Debtor agrees that during each Measurement Period (as defined below):<br><br>(a) the aggregate amount of Debtor's actual *cash expenses and disbursements* during such Measurement Period shall not be more than 115% of the projected cash expenses and disbursements for such Measurement Period as set forth in the Approved Budget (which disbursements shall not include amounts disbursed by the Debtor with respect to the Debtor's professionals, including all of its attorneys, accountants, and financial advisors);<br><br>(b) the aggregate amount of Debtor's actual *cash receipts* during such Measurement Period shall not be less than 65% of the projected cash receipts for such Measurement Period as set forth in the Approved Budget; and<br><br>(c) the Debtor's outstanding *loan balance* owing to the Lenders as of the end of such Measurement Period shall not be more than 110% of the projected amount of such outstanding loan balance as of such date as set forth in the Approved Budget; provided, however, that the outstanding principal amount owing to the Lenders shall at no time exceed $3.5 million..<br><br>For purposes of the foregoing, "<u>Measurement Period</u>" shall mean a rolling four week period reflected on the Approved Budget.  A condition precedent |

| | |
|---|---|
| | to the entry of the Final Financing Order shall be that the Debtor is in compliance with the foregoing financial covenant on the date of such entry.<br><br>*See* DIP Term Sheet under "Financial Covenants" |
| Chapter 11 Milestones Bankr. R. 4001(c)(1)(B)Local R. 4001-2(a)(ii) | See above description under "Term" |
| Liens and Priorities Bankr. R. 4001(c)(l)(B)(i) Local R. 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | Agent shall be granted for its benefit and for the benefit of the Lenders (collectively, "<u>DIP Liens</u>"), subject to the Carve-Out, (i) a first priority lien on all existing and after acquired unencumbered property of the Debtor and Debtor's estate under section 364(c)(2), which shall include, without limitation, all encumbered property of the Debtor and its estate that becomes unencumbered as a result of any such asserted lien being determined to be invalid, unenforceable, unperfected or avoidable (for the avoidance of doubt Debtor's avoidance of any lien or other transfer, or recovery of any property, shall inure to the benefit of Lenders; Debtor waives in favor of Lenders the rights and benefits of section 551 of the Bankruptcy Code), and (ii) a junior lien on all existing and after acquired property of the Debtor and its estate that is subject to a valid, enforceable and unavoidable lien ("<u>Permitted Encumbrances</u>").  The DIP Liens are granted to HHH Oakland, Inc. for itself and as agent for Terminal Investment Ltd., which shall hold the DIP Liens for the Lenders' ratable benefit as further described below.  The DIP Liens shall be deemed perfected automatically upon the entry of the Interim Financing Order, without the Lenders, or either of them, filing or recording any document, instrument or notice of any kind.<br><br>*See* DIP Term Sheet under "Lien Priority" |
| Events of Default Bankr. R. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | Each of the following shall be an "Event of Default" under the DIP Facility:<br><br>i.    the Debtor's failure to pay any amount under the DIP Facility in full when due;<br><br>ii.    the Debtor's failure to comply with the covenants contained in the DIP Loan Documents, the Interim Financing Order, or the Final Financing Order, subject to notice and cure periods, where applicable;<br><br>iii.    the Debtor's breach of its obligations to comply with the financial covenants set forth above, subject to notice and three-day cure right for up to two (2) occasions if failure results solely from a failure to timely deliver related reporting;<br><br>iv.    the Debtor's violation of any of the material terms of the Interim Financing Order;<br><br>v.    the Debtor's failure to obtain entry of the Final Financing Order within thirty (30) days after the Petition Date;<br><br>vi.    the occurrence and continuance of any "Event of Default" under the DIP Loan Documents; |

vii.    the termination or non-renewal of the DIP Loan Documents as provided for in the Interim Financing Order;

viii.   the conversion of the Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

ix.     the appointment of a Trustee pursuant to section 1104 of the Bankruptcy Code in the Case;

x.      the appointment of an examiner, with expanded powers, under the Bankruptcy Code in the Case;

xi.     the dismissal of the Debtor's Chapter 11 Case;

xii.    the entry of any order materially and adversely modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim Financing Order (and thereafter, the Final Financing Order) without the express prior written consent of the Lenders (and no such consent shall be inferred from any other action, inaction, or acquiescence by either Lender);

xiii.   the transfer of venue for the Case from the Bankruptcy Court (as defined below) to any other jurisdiction;

xiv.    the filing (and confirmation) of a plan by the Debtor (or any other party) that is materially inconsistent with the terms of the DIP Facility, Interim Financing Order (and thereafter, the Final Financing Order) or that is not in form and substance reasonably acceptable to the Lenders; unless such Plan and Disclosure Statement provides for the indefeasible payment in full in cash of the Post-Petition Lender Debt to the Lenders on the effective date of such Plan and such effective date shall occur prior to the Maturity Date;

xv.     the Debtor's (i) filing any motion or document in connection with its bankruptcy case that is not consistent in any material respect with the terms of the DIP Facility, the Interim Financing Order (or later, the Final Financing Order), and any documents or pleadings related to the foregoing, including, without limitation, a disclosure statement motion, a proposed disclosure statement and a proposed plan, or (ii) proposing a sale motion or a sale order that does not provide for the payment of the Lenders' claims consistent with the Interim Financing Order (or later, the Final Financing Order) or is not otherwise approved by the Agent;

xvi.    the failure of the Debtor to maintain exclusivity to file and seek approval of its Disclosure Statement and Plan;

xvii.   the failure of the Debtor to file its Plan, consistent with the terms hereof, on or before thirty (30) days following the Petition Date;

xviii.  the failure of the Debtor to commence the hearing on its Disclosure Statement and confirmation of its Plan, on or

11

| | |
|---|---|
| | before one hundred fifteen (115) days following the Petition Date; |
| | xix. the failure of the Debtor to confirm its Plan and have its Plan become effective, on or before, 120 days following the Petition Date; |
| | xx. the entry of any order which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code, which order permits any creditor, other than the Agent, to realize upon, or to exercise any right or remedy with respect to, any material asset of the Debtor; or |
| | xxi. the filing by the Debtor or any other party in interest of a motion, complaint or other proceeding seeking to challenge the validity, enforceability, or priority of any of the DIP Liens in favor of the Agent for the benefit of the Lenders, or the Agent's rights and remedies under the Interim Financing Order (or later, the Final Financing Order) or the filing by the Debtor or any other party in interest of a motion, complaint or other proceeding seeking to assert any claim for damages, injunctive relief or seeking any equitable remedy against the Agent or either Lender or any of the Lenders' respective affiliates, related entities or any of any of the foregoing party's respective shareholders, subsidiaries, affiliates, members, managers, directors, officers, employees, professionals or advisors, agents, successors or assigns. |
| | *See* DIP Term Sheet under "Events of Default" |
| Carve Out Bankr. R. 4001(c)(1)(B) Local R. 4001-2(a)(i)(f) | Lenders' DIP Liens on the Collateral shall be subject and subordinate only to the following, in each instance: <br><br> (a) use of Cash Collateral and DIP Facility advances to pay the following, subject to the Carve-Out Proviso (as defined below): <br><br> (i) professional fees and expenses of Debtor's professionals accrued prior to the date of Agent's declaration of any Event of Default under the DIP Facility, and allowed by the Court at any time, whether by interim order, procedural order or otherwise (provided, however, such interim allowance and payments shall remain subject to final allowance by a final order on each such professional's final fee application), in an amount not to exceed the amounts set forth on the line item for Debtor's Professional Fees in the Approved Budget through such date of declaration (the "Pre-Default Debtor's Professional Fee Carve-Out"), less any payments of such professional fees and expenses actually made prior to such declaration of any Event of Default; plus <br><br> (ii) the following amount after the date Agent declares an Event of Default: up to $200,000 (inclusive of the amount of all retainers held by Debtor's professionals) with respect to the Debtor's professionals' fees and expenses and allowed by the Court at any |

time, whether by interim order, procedural order or otherwise (provided, however, such interim allowance and payments shall remain subject to final allowance by a final order on each such professional's final fee application), in respect of periods after such declaration of any Event of Default (the "Post-Default Debtor's Professional Fee Carve-Out"), as further described in the Interim Financing Order (the aggregate of the foregoing Debtor's professional's fees and expenses referred to in clauses (i) and (ii) is a cap not to exceed the sum of the Pre-Default Debtor's Professional Fee Carve-Out as of the date the Agent declares an Event of Default plus the Post-Default Debtor's Professional Fee Carve-Out, which capped sum shall be reduced dollar for dollar for each payment of Debtor's professionals' fees and reimbursement of expenses made at any time before or after an Event of Default, and is referred to as the "Professional Fee Carve-Out");

(b) other requirements expressly set forth in the Interim Financing Order and the Final Financing Order, as applicable (i.e., such as claims agent fees, senior ad valorem tax liens and other senior liens); and

(c) the fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a) (the "Trustee's Fee Carve-Out" and, together with the Professional Fee Carve-Out and the amounts for requirements referred to in clause (b) above, the "Carve-Out").

*See* DIP Term Sheet under "Carve-Out" and the Interim Financing Order ¶ 22-24

| | |
|---|---|
| 506(c) Waiver<br>Bankr. R. 4001(c)(l)(B)(x)<br>Local R. 4001-2(a)(i)(C) | The DIP Facility provides for a section 506(c) waiver upon entry of a final order.<br><br>*See* DIP Term Sheet under "Conditions Precedent" and the Interim Financing Order ¶ 31 |
| Section 552(b)<br>Bankr. R. 4001(c)(l)(B)<br>Local R. 4001-2(a)(i)(h) | The DIP Facility provides for a section 506(c) waiver upon entry of a final order.<br><br>*See* Interim Financing Order ¶ 31 |
| Stipulations to Prepetition Liens and Claims<br>Bankr. R. 4001(c)(1)(B)(iii)<br>Local R. 4001-2(a)(i)(B) | None |

| | |
|---|---|
| Adequate Protection<br>Bankr. R.<br>4001(b)(l)(B)(iv),<br>4001(c)(1)(B)(ii) | This Interim Financing Order is intended to provide the Agent and Lenders with adequate protection of their interest in the Collateral.  To the extent that the protection provided under this Interim Financing Order proves to be inadequate as the result of the diminution of the Agent and Lenders' interest in the Collateral, the Agent and Lenders shall be entitled to a claim in the amount of that diminution that is a priority claim pursuant to Bankruptcy Code § 507(b).<br><br>*See* Interim Financing Order ¶ 13 |
| Waiver/Modification of the Automatic Stay<br>Bankr. R.<br>4001(c)(1)(B)(iv) | After the three day required notice period, the Automatic Stay provided for pursuant to Section 362 of the Bankruptcy Code shall be automatically and completely vacated as to each Lender without further order of the Bankruptcy Court<br><br>*See* Interim Financing Order ¶ 36 |
| Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens<br>Bankr. R.<br>4001(c)(1)(B)(vii) | The Interim Financing Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens granted to the Agent on behalf of itself and the Lenders upon the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens of the Agent in and to the Collateral or to entitle the Agent to the priorities granted herein; <u>provided</u>, <u>however</u>, the Agent may file of record financing statements or other instruments to evidence and to provide further notice of the perfection of the DIP Liens authorized hereby; <u>provided further</u>, <u>however</u>, no such filing or recordation shall be necessary or required in order to create or perfect any such Lien.<br><br>*See* Interim Financing Order ¶ 16 |
| Release<br>Bankr. R.<br>4001(c)(1)(B)(viii) | The DIP Facility provides that upon the entry of the Final Financing Order that the Debtor and its estate generally release the Agent and the Lenders in all capacities.<br><br>*See* Interim Financing Order ¶ 45 |
| Indemnification<br>Bankr. R.<br>4001(c)(1)(B)(ix) | The DIP Loan Documents may provide for certain indemnification provisions.<br><br>*See* DIP Term Sheet under "Conditions Precedent" |
| Liens on Avoidance Actions<br>Bankr. R.<br>4001(c)(l)(B)(xi);<br>Local R.<br>4001-2(a)(i)(D) | Upon entry of the Final Financing Order, the DIP Facility provides for a lien on proceeds of avoidance actions.<br><br>*See* Interim Financing Order ¶ 6 and DIP Term Sheet under "Collateral" |
| Challenge Period<br>Bankr. R.<br>4001(c)(l)(B)<br>Local R.<br>4001-2(a)(i)(B) | None |

| No Priming or Pari Passu Liens Bankr. R. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | None |
|---|---|

13. In accordance with Local Rule 4001-2, the following provisions of the DIP Facility are highlighted below. As discussed in detail herein, the Debtor believes these provisions are reasonable in light of the facts and circumstances of this chapter 11 case and should be approved.

    (i)     **Local Rule 4001-2(a)(i)(A)—*Cross-Collateralization Protection.*** None.

    (ii)     **Local Rule 4001-2(a)(i)(B)—*Challenge Period.*** None.

    (iii)     **Local Rule 4001-2(a)(i)(C)—*506(c) Waiver.*** The DIP Facility provides for a section 506(c) waiver upon entry of a final order.

    (iv)     **Local Rule 4001-2(a)(i)(D)—*Liens on Avoidance Actions.*** Upon entry of the Final Financing Order, the DIP Facility provides for a lien on proceeds of avoidance actions. *See* Interim Financing Order ¶ 6 and DIP Term Sheet under "Collateral".

    (v)     **Local Rule 4001-2(a)(i)(E)—*Repayment Features.*** The DIP Facility does not provide for any "roll up" or similar feature.

    (vi)     **Local Rule 4001-2(a)(i)(F)—*Disparate Carve Out Treatment.*** None.

    (vii)     **Local Rule 4001-2(a)(i)(G)—*Nonconsensual Priming.*** None.

    (viii)     **Local Rule 4001-2(a)(i)(H)—*Section 552(b)(1).*** The DIP Facility provides for a section 506(c) waiver upon entry of a final order.

### Relief Requested

14. The Debtor seeks entry of the Interim Financing Order and, pending the Final Hearing, the Final Financing Order, in each case:

    (a) authorizing the Debtor to obtain post-petition loans and advances under the DIP Facility of up to the aggregate principal amount of $3.5 million dollars ($3,500,000), of which the Debtor may draw the full amount on an interim basis,

which DIP Facility, to the extent of post-petition advances, fees and interest are to be secured by the DIP Liens in favor of the Agent on behalf of the Lenders upon all of the Collateral (as hereinafter defined) of the Debtor's estate pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code and with priority, as to administrative expenses, as provided in § 364(c)(1) of the Bankruptcy Code;

(b) approving of the terms and conditions of the DIP Facility among the Debtor, Agent and Lenders as set forth in the DIP Term Sheet;

(c) granting to the Agent for the benefit of the Lenders the DIP Liens upon the Debtor's property, pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code, as provided in and as contemplated by the DIP Loan Documents, as supplemented by this Interim Financing Order, subject to the Carve-Out;

(d) granting to the Agent on behalf of the Lenders super-priority administrative claims over any and all administrative expenses pursuant to Bankruptcy Code § 364(c)(1);

(e) modifying the automatic stay in favor of the Agent and Lenders, as applicable, to the extent necessary and contemplated by the DIP Facility and the DIP Loan Documents, as set forth in this Interim Financing Order;

(f) granting adequate protection to the Agent on behalf of the Lenders of their interest in "cash collateral" within the meaning of Bankruptcy Code § 363(a) derived from the Collateral; and

(g) scheduling the Final Hearing to consider the entry of the Final Financing Order authorizing the DIP Facility and the DIP Loan Documents on a final basis, as set

forth in the Financing Motion and approve the form of notice with respect to the Final Hearing.

## Basis for Relief

### A.  The Debtor Should be Authorized to Enter into the DIP Facility

15.    The Court should authorize the Debtor, as an exercise of the Debtor's sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility and use the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re Trans World Airlines*, *Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores*, *Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

16.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

17.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the debtor offered by a proposed postpetition facility. For example, in *In re Ion Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

18.    The Debtor's determination to move forward with the DIP Facility is an exercise of its sound business judgment following an arms'-length process and careful evaluation of alternatives. Specifically, and in the face of limited cash on hand, the Debtor determined that it would require significant postpetition financing to fund the safe and expeditious wind-down of

its operations.  Further, while the Debtor's vendors historically have allowed the Debtor to purchase goods on credit, the Debtor's ability to continue this practice is dependent upon their having access to sufficient liquidity to assure business counterparties that the Debtor is not a credit risk notwithstanding the wind-down.  Accordingly, the Debtor negotiated the DIP Loan Documents with the Lenders in good faith, at arms' length, and with the assistance of its advisors, and the Debtor believes that they have obtained the best financing available under the circumstances.

### B.  The Debtor Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.

19.     The Debtor proposes to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]."  11 U.S.C. § 364(c).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(1)     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

(2)     the credit transaction is necessary to preserve the assets of the estate; and

(3)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

20.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Moreover, in

19

circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

21.    The Debtor, together with its advisors, considered other sources of postpetition financing to determine whether the Debtor could obtain debtor in possession financing on better terms.  Based on the Debtor's cash needs, the short amount of time that would have been available to complete the necessary due diligence and negotiate and document a DIP facility, and the wind-down nature of the Chapter 11 Case, the Debtor determined that no third-party lender would have been able to provide DIP financing in time to meet the Debtor's liquidity demands. Moreover, in light of the fact that the Debtor is winding down its operations, any form of postpetition financing on an unsecured basis would plainly have been unobtainable. Nevertheless the Debtor has an acute and pressing need for postpetition financing in order to continue to implement the safe and expeditious wind-down of operations—for the benefit of all stakeholders.  Given the Debtor's circumstances, the Debtor believes that the terms of the DIP Facility are fair, reasonable, and adequate to meet the Debtor's liquidity needs.

22.     In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]."  As described above, unsecured credit would be unavailable to the Debtor under these circumstances.  Therefore, approving the superpriority claims in favor of the Lenders is reasonable and appropriate.  Further, section 364(c)(2) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by liens on property of the estate that is not otherwise subject to a lien and section 364(c)(3) permits such credit to be secured by junior liens on property that is otherwise subject to a lien.

23.     The DIP Liens sought herein are senior only with respect to the Debtor's unencumbered property.  As the Debtor would be unable to obtain the critical financing it needs to administer the Chapter 11 Case from any other source, it respectfully represents that granting DIP Liens to the Agent on its behalf and on behalf of the Lenders is warranted under the circumstances.

**C.  The Automatic Stay Should Be Modified on a Limited Basis**

24.     The proposed Interim Financing Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Debtor to grant the liens and security interests contemplated by the DIP Loan Documents and proposed Interim Financing Order further provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified, to allow the DIP Parties to exercise remedies as set forth in the Financing Orders.

25.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtor's business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases.  *See*, *e.g.*, *In re the Standard Register Co.*, *et al.*, No. 15-10541 (BLS) (Bankr. D. Del. Apr. 16, 2015) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Cache, Inc. et al.,* No. 15-10172 (MFW) (Bankr. D. Del. May 20, 2015) (same);  *In re Chassix Holdings, Inc.*, No. 15-10578 (MEW) (Bankr. S.D.N.Y. Apr. 10, 2015) (same).

**D. Immediate Interim Access to the DIP Facility and Cash Collateral Should be Approved**.

26.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

27.     The Debtor requests that the Court hold and conduct a hearing to consider entry of the Interim Financing Order authorizing the Debtor from and after entry of the Interim Financing Order until the Final Hearing to use the Cash Collateral and to withdraw and borrow funds under the DIP Facility.  The Debtor has a critical need to access these funds prior to the Final Hearing and entry of the Final Financing Order to continue to implement the wind-down and the amount sought prior to the Final Hearing represents those amounts necessary to continue the Debtor's wind-down operations and meet their obligations during the period prior to entry of the Final Order.  Thus, absent authorization to immediately use these funds, the Debtor's estate and its creditors would suffer immediate and irreparable harm.

### E.  The DIP Facility Will Ensure Economic and Expeditious Administration of the Debtor's Estate

28.     Entry of an interim order and final order authorizing the Debtor to obtain postpetition financing, on a senior secured and superpriority basis, authorizing the use of cash collateral, and granting related relief will best assure an economic and expeditious administration of the Debtor's estate.

### Request for Final Hearing

29.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

30.     To implement the foregoing successfully, the Debtor respectfully requests a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the use of property proposed herein is essential to prevent potentially irreparable damage to the Debtor's operations during the wind-down.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### Notice

31.     The Debtor shall provide notice of this Motion on the date hereof via first class mail to:  (i) the Office of the U.S. Trustee for the District of Delaware; (ii) the holders of the 20 largest unsecured claims on a consolidated basis; (iii) the Port and its counsel, if known, (iv) any

23

banking or financial institutions that hold the Debtor's accounts; and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002(i). The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

32.     The Debtor has not previously sought the relief requested herein from this or any other Court.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

Dated:  February 1, 2016
Wilmington, Delaware

Respectfully submitted,

**RICHARDS, LAYTON & FINGER, P.A.**

/s/ Mark D. Collins
Mark D. Collins (No. 2981)
Marisa A. Terranova Fissel (No. 5396)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:          collins@rlf.com
                   terranova@rlf.com

-and-

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Gregory A. Bray (*pro hac vice* admission pending)
Thomas R. Kreller (*pro hac vice* admission pending)
Haig M. Maghakian (*pro hac vice* admission pending)
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone:    (213) 892-4000
Facsimile:    (213) 629-5063
Email:          gbray@milbank.com
                   tkreller@milbank.com
                   hmaghakian@milbank.com

-and-

Dennis F. Dunne
Samuel A. Khalil
28 Liberty Street
New York, NY 10005
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
Email:          ddunne@milbank.com
skhalil@milbank.com

*Proposed Counsel to Debtor and Debtor in Possession*

# **EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| **In re:** | Case No. 16-10283(LSS ) |
| **OUTER HARBOR TERMINAL, LLC,** | Chapter 11 |
| **Debtor.** | **Related Docket No. _____** |

---

### INTERIM ORDER: (I) AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING ON A SUPER-PRIORITY AND SENIOR SECURED BASIS, (B) PERMITTING USE OF CASH COLLATERAL, (C) PROVIDING ADEQUATE PROTECTION, AND (D) GRANTING RELATED RELIEF; (II) MODIFYING THE AUTOMATIC STAY; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

THIS MATTER having come before this Court upon the *Debtor's Motion for Entry of Interim and Final Orders:  (I) Authorizing Debtor to (A) Obtain Post-Petition Financing On A Super-Priority and Senior Secured Basis; (B) Permitting Use Cash Collateral, (C) Providing Adequate Protection, And (D) Granting Related Relief; (ii) Modifying The Automatic Stay; And (iii) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001* (the "Financing Motion"), filed by Outer Harbor Terminal, LLC, a Delaware limited liability company (the "Debtor"), as debtor in possession, seeking the entry of interim (this "Interim Financing Order") and final orders:

(i)        Granting the Debtor authority to obtain post-petition loans and advances (the "DIP Facility") of up to the aggregate principal amount of Three and One Half Million Dollars ($3,500,000), which DIP Facility, to the extent of post-petition advances, fees and interest are to be secured by liens (as defined in § 101(37) of title 11, U.S.C., as amended (the "Bankruptcy

Code") and referred to herein as "Liens") upon all of the Collateral (as hereinafter defined) of the Debtor's estate pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code to HHH Oakland, Inc. as agent under the DIP Facility (in such capacity, the "Agent") and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code;

(ii)    Approving the terms and conditions of the DIP Facility among the Debtor and HHH Oakland, Inc. and Terminal Investment Ltd., S.A. (each a "Lender" and together the "Lenders") as set forth in that certain Term Sheet for Senior Secured Post Petition Debtor-in-Possession Financing (the "DIP Term Sheet") attached hereto as "Exhibit B";

(iii)    Granting to the Agent Liens upon the Debtor's property, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, as provided in and as contemplated by the DIP Loan Documents (as defined below), as supplemented by this Interim Financing Order, subject to the Carve-Out (as defined below);

(iv)    Granting the Lenders super-priority administrative claims over any and all administrative expenses pursuant to Bankruptcy Code § 364(c)(1);

(v)    Modifying the automatic stay in favor of the Agent, to the extent necessary and contemplated by the DIP Facility and the DIP Loan Documents, as set forth in this Interim Financing Order;

(vi)    Granting adequate protection to the Agent of its interest in "cash collateral" within the meaning of Bankruptcy Code § 363(a) derived from the Collateral; and

(vii)    Scheduling a final hearing (the "Final Hearing") to consider the entry of an order (the "Final Financing Order") authorizing the DIP Facility and the DIP Loan Documents on a final basis, as set forth in the Financing Motion and approving the form of notice with respect to the Final Hearing.

2

## I. POST-PETITION FINANCING

Based upon the agreements between the Debtor and the Lenders, the *Declaration of Heather Stack, Chief Financial Officer, in Support of Chapter 11 Petition and First Day Pleadings of Outer Harbor Terminal, LLC, Debtor and Debtor in Possession* (the "First Day Declaration"), the pleadings and the proffers of evidence and the representations of counsel, this Court hereby accepts said agreements as findings of fact and conclusions of law to permit financing of the Debtor on an interim basis, and it appearing that absent the relief requested herein, the Debtor will suffer immediate and irreparable harm; and it further appearing that notice of this interim hearing is sufficient under the circumstances and complies with the requirements of Bankruptcy Rules 4001(c), 4001(d), and 6003; and for good cause shown:

## IT IS HEREBY FOUND THAT:

A.      On February 1, 2016 (the "Petition Date"), the Debtor filed its Voluntary Petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware (this "Court").

B.      The Debtor is a limited liability company organized in the state of Delaware.

C.      The Debtor continues in the management and operation of its business and properties as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.  No trustee or examiner has been appointed, and no Official Unsecured Creditors' Committee (the "Creditors' Committee") has been appointed as of the date hereof.

D.      This Court has jurisdiction, pursuant to 28 U.S.C. § 1334, over the Debtor, all property of the Debtor's estate, these proceedings, and over the persons and properties affected hereby.  Consideration of the Financing Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D),(G), (K), (M), and (O).

3

E.      The Debtor has an immediate need to obtain funds with which to continue its operations during the wind down of its business operations and administer and preserve and maximize the value of its estate and its assets, in light of the (1) Debtor's lack of sufficient liquidity to sustain its business absent the funding to be made available under the DIP Facility; (2) time constraints arising from current carrying costs, and (3) the desire to avoid the loss of value that would arise from a forced liquidation sale of Debtor's assets and wind down of Debtor's business in other than an orderly manner.  The Debtor does not have sufficient working capital to fund its business during the wind down, and the Debtor's ability to finance its operations during the wind down requires the additional availability of working capital, the absence of which would immediately and irreparably harm the Debtor, its estate, and its creditors and significantly impede the Debtor's ability to propose a successful plan of liquidation.

F.      The Debtor has been unable to obtain adequate unsecured credit allowable under Bankruptcy Code §503(b)(1) as an administrative expense.

G.      The Debtor has been unable to obtain secured credit, allowable only under Bankruptcy Code §§ 364(c)(2) and 364(c)(3) on more favorable terms and conditions than those provided in the DIP Facility, the DIP Loan Documents and this Interim Financing Order.  The Debtor is unable to obtain credit for borrowed money without the Debtor's granting to the Agent (i) pursuant to § 364(c)(1) of the Bankruptcy Code claims having priority over any and all administrative expenses of the kind specified in Bankruptcy Code §§ 503(b) and 507(b) (subject to the Carve-Out, as defined below), and (ii) pursuant to Bankruptcy Code §§ 364(c)(2) and 364(c)(3) Liens of the Agent securing the obligations to the Lenders arising under the DIP Loan Documents and this Interim Financing Order on all of the assets of the Debtor and its estate described below as "Collateral" (subject to the Carve-Out, and the Permitted Encumbrances).

H.       The ability of the Debtor to finance its business and the availability of sufficient working capital through the DIP Facility and the DIP Loan Documents are vital to the Debtor's wind down efforts and ability to preserve and maintain the Debtor's assets and to avoid the immediate liquidation of the Debtor's assets in less than an orderly manner.

I.        The relief requested in the Financing Motion (with respect to the interim financing sought therein) is necessary, essential, and appropriate for the continued operation of the Debtor's businesses, the management of its properties and the orderly wind down of the Debtor's business to maximize value for Debtor's estate and creditors.

J.       Each Lender, severally, has agreed to provide post-petition loans and advances to or for the benefit of the Debtor, in accordance with the Approved Budget (as defined below), but in no event to exceed $1.75 million (the amount of each Lender's Maximum Commitment, as defined in the DIP Loan Documents), the full amount of which shall be committed by each Lender pursuant to the terms of the DIP Facility, and that certain DIP Term Sheet and any additional loan, financing, and security agreements executed and delivered by the Debtor with, to, or in favor of the Lenders (all of such DIP Term Sheet, Approved Budget, any loan documents, security agreements, and financing statements, and all other related agreements, documents, notes, instruments, and guarantees creating or evidencing indebtedness of the Debtor to the Lenders or granting collateral security of the Debtor in favor of the Agent, as the same now exist or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, being referred to herein collectively as the "<u>DIP Loan Documents</u>").

K.       Without the financing made available through the DIP Facility, as authorized herein, the Debtor will not have sufficient funds necessary to pay (i) its post-petition payroll,

payroll taxes, and overhead expenses, including its vendors, (ii) ad valorem taxes assessed on any real or personal property owned or leased by the Debtor, (iii) insurance premiums, and (iv) other expenses attendant to the conduct of the Debtor's business as set forth in the Approved Budget attached hereto as <u>Exhibit "A"</u>, all of the foregoing being necessary for the continued operation of the Debtor's business, an orderly wind down of the business and the management and preservation of the Debtor's assets and properties.   The Debtor's wind down operations require financing to fund the Debtor's working capital needs and for other general company purposes, as set forth in and consistent with the terms of the Approved Budget, to avoid the loss of value which would result from the liquidation of the Debtor's assets in less than an orderly manner.

L.      The Debtor has requested that the Lenders make loans and advances to or for the benefit of the Debtor, to provide funds to be used for such purposes described in <u>Paragraph K</u> above.

M.      It is in the best interest of the Debtor's estate for the Debtor to be allowed to establish the DIP Facility contemplated by the DIP Loan Documents.

N.      The terms and conditions of the DIP Facility are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

O.      Credit to be extended under the DIP Facility will be extended in good faith, in consequence of which the Lenders are entitled to the protections and benefits of Bankruptcy Code section 364(e), and the Lenders will be entitled to the protections provided in

section 364(e) of the Bankruptcy Code notwithstanding a subsequent reversal, modification, vacatur, amendment, or reconsideration of this Interim Financing Order.

       P.      No source of sufficient financing exists other than the DIP Facility being provided by the Lenders except as otherwise provided in connection with the DIP Facility and this Interim Financing Order. The Debtor's only means of obtaining the funding necessary to continue and commence an orderly wind down of its business is through a debtor-in-possession loan facility pursuant to section 364 of the Bankruptcy Code.

       Q.      The notice of the hearing to consider entry of this Interim Financing Order has been provided by the Debtor to (i) the United States Trustee, (ii) each Lender and its counsel, (iii) all parties claiming a Lien or possessory interest in any of the Debtor's assets, as reflected in the books and records of the Debtor, including the taxing authorities with Liens to secure ad valorem taxes and equipment lenders and lessors, and (v) the twenty (20) largest unsecured creditors of the Debtor, and such notice complies with the notice requirements of Bankruptcy Rule 4001(c) and Bankruptcy Code § 102(1), as required by Bankruptcy Code section 364(c), in light of the emergency nature of the relief requested in the Financing Motion (with respect to the interim financing sought therein). No further notice of the relief sought in the Financing Motion is required for the entry of this Interim Financing Order.

       R.      Good and sufficient cause has been shown for the entry of this Interim Financing Order. Among other things, the entry of this Interim Financing Order will enable the Debtor to continue the operation of its businesses during the wind down; increase the possibility for maximizing the value of the Debtor's estate and avoiding the immediate forced liquidation of the Debtor's assets, and will be in the best interest of the Debtor, its creditors, and its estate.

**NOW, THEREFORE,** based on the Debtor's Financing Motion and the record before this Court with respect to the Financing Motion (with respect to the interim financing sought therein), and with the consent of the Debtor and the Lenders to the form and entry of this Interim Financing Order, and good cause appearing.

**IT IS HEREBY, ORDERED, ADJUDGED, AND DECREED** that:

1.     The Financing Motion (to the extent of the interim financing sought therein) is granted on an emergency basis in accordance with the terms of this Interim Financing Order.  All objections and reservations of rights (if any) to the entry of this Interim Financing Order are hereby overruled on the merits.

## II.  APPROVAL OF AND AUTHORIZATION TO BORROW

2.     The Debtor is hereby authorized and empowered from the date of entry of this Interim Financing Order on the docket through the conclusion of the Final Hearing on the Financing Motion, to borrow from the Lenders in accordance with the DIP Loan Documents, pursuant to the terms of this Interim Financing Order, in such amount or amounts as may be made available to or for the benefit of the Debtor, from the Lenders, in accordance with the Approved Budget for that period, but in no event to exceed the aggregate of the Maximum Commitment of each Lender.

3.     During the term of this Interim Financing Order, the Debtor shall use the proceeds of the DIP Facility to fund the Debtor's working capital needs and for other general corporate purposes, consistent with the Approved Budget and the DIP Loan Documents.

4.     To the extent necessary to achieve the intent and purpose of the DIP Facility, the Debtor is authorized and directed to execute, deliver, perform, and comply with the terms and

conditions of the DIP Loan Documents, pursuant to which the Debtor shall agree to be bound by, perform and comply with the terms and conditions of the DIP Loan Documents.

5.     To the extent necessary to achieve the intent and purpose of the DIP Facility, the terms and conditions of the DIP Loan Documents shall be deemed to be incorporated into the terms and conditions of this Interim Financing Order and shall be sufficient and conclusive evidence of the borrowing arrangements by the Debtor, the Agent, and the Lenders, and of the Debtor's adoption of the terms and conditions of the DIP Loan Documents, for all purposes, including the payment of all post-petition current and accruing interest, fees and Lenders' expenses that arise under the DIP Facility, all as more fully set forth in the DIP Loan Documents.

6.     To induce the Lenders to provide the DIP Facility, the Debtor hereby grants to the Agent on its behalf and on the behalf of the Lenders pursuant to the DIP Loan Documents and this Interim Financing Order, the following, whether now owned or hereafter acquired, effective as of the Petition Date, subject to the Carve-Out: (a) pursuant to Bankruptcy Code section 364(c)(2), valid, binding, enforceable and automatically perfected first-priority Liens on the Collateral not encumbered as of the Petition Date and any Collateral that is encumbered as of the Petition Date but that becomes unencumbered following the Petition Date (Debtor waives the benefit of section 551 of the Bankruptcy Code in favor of the Lenders); and (b) pursuant to Bankruptcy Code section 364(c)(3), valid, binding, enforceable and automatically perfected junior Liens on the Collateral which are subject to valid, binding, senior, perfected, enforceable and non-avoidable Liens immediately prior to the Petition Date expressly permitted under the DIP Loan Documents.  "Collateral" for purposes of this Interim Financing Order shall have the meaning set forth in the DIP Term Sheet.  The Liens granted herein shall be subject to the Carve-Out  and shall secure all obligations incurred by the Debtor to the Lenders incurred by the Debtor

pursuant to the DIP Loan Documents and this Interim Financing Order, including, without limitation the costs the Lenders incurred prior to and following the Petition Date in connection with negotiating and drafting of the Financing Motion, the DIP Loan Documents and this Interim Financing Order.

7.      Each Lender is entitled to the full protections of section 364(e) of the Bankruptcy Code with respect to debts, obligations, liens, security interests, and other rights created or authorized under the DIP Facility provided hereunder.

8.      The automatic stay imposed under Bankruptcy Code section 362 is hereby modified to the extent necessary to (i) permit the Debtor to grant the aforesaid Liens, (ii) permit the Debtor to incur the liabilities and comply with the covenants and obligations to the Lenders under the DIP Facility, (iii) pay the Lenders' costs incurred prior to the Petition Date, (iv) permit the Agent and the Lenders to implement the financing of the Debtor under the DIP Facility and the provisions of the DIP Loan Documents and this Interim Financing Order, and (v) for Lien perfection, which Liens shall perfected by operation of the entry of this Interim Financing Order.

9.      The Agent shall have all rights and remedies with respect to the Debtor's obligations to the Lenders and the Collateral as are set forth in the DIP Loan Documents, subject to the terms of this Interim Financing Order.

10.      Each Lender's commitment to loan shall be subject to termination at either Lender's option as to any future loans, advances, and other credit accommodations to be made or provided by the Lenders to the Debtor, immediately upon such written notice as provided in the DIP Loan Documents following the occurrence and the continuation of any Event of Default (as defined below), the occurrence of the Termination Date (as defined in the DIP Loan Documents) or immediately upon the expiration or termination of the Debtor's authorization to borrow from

the Lenders pursuant to this Interim Financing Order and the DIP Loan Documents. Notwithstanding anything to the contrary, each Lender shall have the right to cease future loans and advances upon the occurrence of or during the continuation of an Event of Default, subject to its obligations hereunder with respect to funding the Carve-Out.

11.    The Debtor has submitted to the Lenders a proposed budget, setting forth, inter alia, expected cash needs and proposed necessary disbursements for the respective period indicated thereon.  Each Lender has approved the proposed budget (the "Approved Budget"). The Approved Budget is attached as Exhibit "A" hereto and is incorporated herein for all purposes.  The Lenders approve the Approved Budget, to the extent such disbursements stated therein shall be made during the period covered under this Interim Financing Order; provided, however, the term of the financing under this Interim Financing Order shall in no respects extend past the conclusion of the Final Hearing on the Financing Motion unless the Court enters the Final Financing Order extending the authority to borrow from the Lenders.  Each proposed revised budget shall set forth the proposed use of cash for the purposes and in the amounts stated therein, shall generally state such proposed disbursements by line item, and shall be in a form similar to and consistent with the Approved Budget attached hereto as Exhibit "A".  No revised, proposed budget shall be an Approved Budget unless and until agreed to in writing by each Lender.  If any of the following occurs:

(a)    the Debtor fails to comply with its limits on expenditures set forth in the Approved Budget;

(b)    the Debtor otherwise breaches the terms of this Interim Financing Order; or

(c)    an Event of Default occurs;

then the Debtor shall be in default of this Interim Financing Order and the DIP Loan Documents. Each Lender's right to cease making advances (other than the professional fees to be advanced pursuant to the Carve-Out) and to exercise its rights and remedies shall both be subject to the terms, conditions, notice and limitations set forth in this Interim Financing Order below.

12.    Subject to the Approved Budget, the proceeds of the Collateral shall be applied in reduction of the obligations owing at any time by the Debtor to the Lenders, arising on and after the Petition Date and whether arising on or after the conversion or dismissal of this Case, or before, during and after the effective date of a confirmed and consummated plan in this Case and any case to which the Case may be converted or by which it may be succeeded, and whether arising under or in connection with the Financing Orders, or any of the other DIP Loan Documents, whether absolute or contingent, secured or unsecured, due or not, and whether arising by operation of law or otherwise, including, without limitation, all principal of advances made on or after the Petition Date and interest accrued thereon, reimbursement obligations, fees, expenses, indemnities, costs, charges and other amounts payable under any of the DIP Loan Documents (including the Lenders' costs incurred prior to the Petition Date in connection with the Financing Motion, the DIP Loan Documents, review and approval of the Approved Budget and this Interim Financing Order).

13.    This Interim Financing Order is intended to provide the Agent and Lenders with adequate protection of their interest in the Collateral.  To the extent that the protection provided under this Interim Financing Order proves to be inadequate as the result of the diminution of the Agent and Lenders' interest in the Collateral, the Agent and Lenders shall be entitled to a claim in the amount of that diminution that is a priority claim pursuant to Bankruptcy Code § 507(b).

14.     Each officer of the Debtor acting singly, and such other individuals as may be so authorized by the officers of the Debtor, likewise acting singly, is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of its respective authority to act in the name of and on behalf of the Debtor.

15.     The Debtor is hereby authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the above DIP Loan Documents, as the Agent may reasonably require as evidence, and for the protection, of the Agent's and each Lender's claims and the Collateral or which may be otherwise deemed necessary by the Agent to effectuate the terms and conditions of this Interim Financing Order and the DIP Loan Documents, each of such documents, instruments, and agreements being included in the definition of "DIP Loan Documents" contained herein.

16.     This Interim Financing Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Liens granted to the Agent upon the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Agent in and to the Collateral or to entitle the Agent to the priorities granted herein; provided, however, the Agent may file of record financing statements or other instruments to evidence and to provide further notice of the perfection of the Liens authorized hereby; provided further, however, no such filing or recordation shall be necessary or required in order to create or perfect any such Lien.

17.     The Agent, in its discretion, may file a copy of this Interim Financing Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor is organized or has

real or personal property, and in such event, the subject filing or recording officer shall file or record such copy of this Interim Financing Order, which shall not be subject to stamp tax, recording tax, registration tax or similar tax as set forth in § 1146 of the Bankruptcy Code, as may be permitted under applicable law.  Upon the Agent's request, the Debtor shall, and shall cause its depository banks to, enter into an account control agreement in favor of the Agent on terms mutually acceptable to the Agent and such depository banks, consistent with the terms hereof, with respect to Debtor's depository, escrow and other accounts at such institution(s).

18.    The DIP Loan Documents and the DIP Facility provided thereunder, together with the obligations reflected in the Lenders' books and records, shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable against the Debtor, in accordance with its respective terms.

19.    The Debtor is authorized and directed: (a) to exercise its reasonable best efforts to collect all proceeds of the Collateral; (b) to immediately deposit all proceeds of the Collateral received by the Debtor into its depository accounts that are subject to an account control agreement in favor of the Lenders; (c) upon the direction of the Agent following a declaration of an Event of Default, to instruct all account debtors and other parties, now or hereafter obligated to pay the Debtor on account of property of the estate of the Debtor in which the Lenders hold a security interest or Lien, to remit such payments to its depository accounts that are subject to an account control agreement in favor of the Lenders; and (d) enter into such agreements as may be necessary to effectuate such arrangements.  By this Interim Financing Order, this Court confirms that the Agent is granted on its behalf and on behalf of the Lenders, and shall continue to have, a first-priority, perfected security interest in and Lien on Debtor's depository accounts without

regard to whether each such account is subject to an account control agreement in favor of the Agent, and all deposits, interest, and other earnings therein, together with all funds therein.

20.     The Debtor is authorized and directed, without further order of this Court, to pay or reimburse the Lenders promptly for all present and future reasonable fees, costs and expenses charged, paid or incurred by either Lender to effectuate the financing transactions as provided in and contemplated by this Interim Financing Order and the DIP Loan Documents, all of which unpaid fees, commissions, costs, and expenses shall be and are included as part of the principal amount of the Maximum Commitments.  Counsel to the Agent will provide monthly statements of fees, costs and expenses subject to payment by the Debtor, pursuant to this Paragraph 21 to the Debtor, and the Office of the United States Trustee, which monthly statements shall be subject to review by the Debtor and the United States Trustee (collectively, the "Notice Parties") for a period of ten (10) days prior to the payment thereof by the Debtor.  If no objection shall be made by the Notice Parties to the payment of such amounts within such ten (10)-day period, such amounts shall be paid to the Agent promptly after the expiration of the applicable review period, with such funds advanced by the respective Lender to or for the benefit of the Debtor, pursuant to the DIP Facility.  If an objection to any particular amount shall be filed by the Notice Parties within the ten (10)-day review period applicable to any statement, the Debtor, shall pay all amounts owed to the Agent (less only the amounts subject to objection or dispute) and the Debtor and the Agent shall seek to have the Court schedule and conduct a hearing at the next available hearing date to determine whether all or any portion of the particular amount with respect to which an objection has been made shall be paid due to the reasonableness of such fees and expenses.  Following such adjudication by this Court (to the extent this Court finds such

amounts to be reasonable), the Lenders shall make such advances under the DIP Facility promptly thereafter consistent with such terms.

## ADMINISTRATIVE CLAIM

21.    Any and all funds advanced by the Lenders post-petition to, or for the benefit of, the Debtor, including all amounts approved or advanced post-petition by the Lenders before the entry of this Interim Financing Order, plus all accrued interest, costs, and fees (including the pre-petition costs incurred by the Lenders in connection with the Financing Motion, DIP Facility, DIP Loan Documents, the Approved Budget and this Interim Financing Order), shall be defined for purposes of this Interim Financing Order as the "Post-Petition Debt" and shall be treated as advances hereunder and under the DIP Loan Documents.  To secure the repayment of the Post-Petition Debt, the Agent on its behalf and on behalf of the Lenders is hereby granted, pursuant to § 364(c)(1) of the Bankruptcy Code, an allowed super-priority administrative claim (the "Super-Priority Claim") having priority in right of payment over any and all other unsecured obligations, liabilities, and indebtedness of the Debtor, now in existence or hereafter incurred by the Debtor and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, Bankruptcy Code §§ 105, 326, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), and 1114, subject to the Carve-Out.  Except for (a) the Carve-Out, when paid; and (b) valid, binding, perfected, enforceable and non-avoidable Permitted Encumbrances, including any senior ad valorem tax liens secured by liens on real or personal property of the Debtor, no costs or expenses of administration including, without limitation, professional fees allowed and payable under Bankruptcy Code §§ 330 and 331 that have been or may be incurred in these proceedings, or in any case pursuant to chapter 7 of the Bankruptcy Code into which this Case may be converted, or in any other successor case hereto, or in any other proceedings related

16

thereto, and no priority claims to the Collateral are, or will be, senior to, prior to, or on a parity with the Post-Petition Debt, or with any other claims of either Lender arising hereunder.

**CARVE-OUT**

22.     The Debtor is authorized, for so long as no Event of Default has been declared by the Agent to use proceeds of the DIP Facility for purposes authorized by this Interim Financing Order, subject to the Approved Budget.  The Debtor agrees that each week (a) the Debtor's actual cash disbursements for the Measurement Period then-ending shall not be more than 115% of the projected cash disbursements in the aggregate for such Measurement Period as set forth in the Approved Budget, (b) the Debtor's actual cash receipts for the Measurement Period then-ending shall not be less than 65% of the projected cash receipts in the aggregate for such Measurement Period as set forth in the Approved Budget, and (c) the Debtor's actual Post-Petition Debt owing to the Lenders through such Measurement Period then-ending shall not be more than 115% of the projected amount of such Post-Petition Debt through such Measurement Period as set forth in the Approved Budget.  "Measurement Period" means for purposes of the DIP Facility the four immediately preceding weekly budget periods set forth in the DIP Budget on a rolling basis. Each week the Debtor shall provide such reports to the Lenders, evidencing such compliance with the foregoing obligations.  The Debtor shall also promptly provide to the Agent upon request additional supporting detail (the "Supporting Detail") as to the items of proposed disbursements made under the Approved Budget.

23.     Except as provided in Paragraph 30 below, notwithstanding any provision of this Interim Financing Order or the DIP Loan Documents to the contrary, the Liens and Super-Priority Claims granted to the Agent pursuant to the DIP Loan Documents and this Interim Financing Order are subject and subordinate to the "Carve-Out," (i) professional fees and

17

expenses of Debtor's professionals accrued prior to the date of Agent's declaration of any Event of Default under the DIP Facility, and allowed by the Court at any time, whether by interim order, procedural order or otherwise (provided, however, such interim allowance and payments shall remain subject to final allowance by a final order on each such professional's final fee application), in an amount not to exceed the amounts set forth on the line item for Debtor's Professional Fees in the Approved Budget through such date of declaration (the "Pre-Default Debtor's Professional Fee Carve-Out"), less any payments of such professional fees and expenses actually made prior to such declaration of any Event of Default; *plus* (ii) the following amount after the date Agent declares an Event of Default: up to $200,000 (inclusive of the amount of all retainers held by Debtor's professionals) with respect to the Debtor's professionals' fees and expenses and allowed by the Court at any time, whether by interim order, procedural order or otherwise (provided, however, such interim allowance and payments shall remain subject to final allowance by a final order on each such professional's final fee application), in respect of periods after such declaration of any Event of Default (the "Post-Default Debtor's Professional Fee Carve-Out"), as further described in the Interim Financing Order (the aggregate of the foregoing Debtor's professional's fees and expenses referred to in clauses (i) and (ii) is a cap not to exceed the sum of the Pre-Default Debtor's Professional Fee Carve-Out as of the date the Agent declares an Event of Default plus the Post-Default Debtor's Professional Fee Carve-Out, which capped sum shall be reduced dollar for dollar for each payment of Debtor's professionals' fees and reimbursement of expenses made at any time before or after an Event of Default, and is referred to as the "Professional Fee Carve-Out"); (b) other requirements expressly set forth in the Interim Financing Order and the Final Financing Order, as applicable (i.e., such as claims agent fees, senior ad valorem tax liens and other senior liens); and (c) the fees payable

18

to the United States Trustee pursuant to 28 U.S.C. § 1930(a) (the "Trustee's Fee Carve-Out" and, together with the Professional Fee Carve-Out and the amounts for requirements referred to in clause (b) above, the "Carve-Out").   Also, the super-priority claim to secure post-petition advances and extensions of credit under 11 U.S.C. § 364(c)(1) with priority over any and all administrative expenses specified in Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1114, or otherwise, granted to the Lenders shall be subject and subordinate only to the Carve-Out.

24.    For the avoidance of doubt, so long as a notice of an Event of Default has not been issued, subject to the Approved Budget the Debtor shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable, the same shall reduce the Pre-Default Professional Fee Carve-Out dollar for dollar and the same shall not reduce the Post-Default Professional Fee Carve-Out.   Upon issuance of a notice of an Event of Default, subject to the Approved Budget the Debtor shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals that accrued through the date of the issuance of the notice of an Event of Default and are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable, the same shall reduce the Pre-Default Professional Fee Carve-Out dollar for dollar, the Pre-Default Professional Fee Carve-Out shall be capped at the amount set forth in the Approved Budget through the date of the issuance of a notice of an Event of Default, subject to the Approved Budget the Debtor shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals on account of fees and

expenses that accrue and are incurred following the date of the issuance of a notice of an Event of Default that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable, and the same shall reduce the Post-Default Professional Fee Carve-Out.

25.      The Debtor shall use the amounts advanced pursuant to this paragraph solely to pay such fees and expenses.  No portion of the Carve-Out or any advances made under the DIP Facility shall be used to pay or reimburse (and the Carve-Out shall exclude) any fees and expenses (hereafter, the "Carve-Out Proviso"): (a) incurred in connection with the investigation of, assertion of, joinder in, or prosecution of, any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (i) invalidating, setting aside, avoiding, disallowing, recharacterizing, subordinating, challenging, in whole or in part, or objecting to the validity, priority, extent, perfection, priority or enforceability of (A) all or any portion of the obligations owing to the Lenders, or (B) the DIP Liens on the Collateral; or (ii) preventing, hindering, or delaying (whether directly or indirectly) Agent's assertions or enforcement of the DIP Liens, security interest or realization upon any Collateral; or (b) incurred in connection with the sale or other disposition of any other Collateral or the proceeds thereof, or the incurrence of any Indebtedness not permitted under the DIP Facility, without the prior written consent of the Lenders; or (c) arising after the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code or the dismissal of the Case.

26.      The Agent shall have the right, but not the obligation, to establish and fund, in whole or in part, from time to time, a reserve in respect of the Carve-Out (the "Carve-Out Reserve").   Notwithstanding the establishment of the Carve-Out Reserve, payments of

professional fees and expenses as described in the Carve-Out Section of this Term Sheet above may be made by the Lenders, and such ordinary course payments shall reduce the Carve-Out Reserve dollar for dollar.  From and after a declaration of any Event of Default, the Lenders may release the Carve-Out Reserve to facilitate payment of fees and expenses, subject to the Carve-Out and the Carve-Out Proviso.

27.    The Carve-Out, the Carve-Out Reserve, pre-petition retainers, if any remaining, and any post-petition retainers held by such professionals shall not be used by the professionals to fund, nor shall the Lenders be responsible for the funding, financing, payment, or reimbursement of any fees or disbursements of any of the professionals in connection with such activities described in the Carve-Out Proviso.

28.    Except as otherwise provided in this section, nothing contained in the Interim Financing Order shall be deemed a consent by Lenders to any charge, lien, assessment or claim against the Collateral under Bankruptcy Code Sections 506(c) or 552(b) or otherwise.  The foregoing shall not be construed as consent by Lenders to the allowance of any Professional Fees and Expenses and shall not affect the right of the Lenders to object to the allowance and payment of such amounts.

29.    If, as the result of an order compelling any professional of the Debtor to disgorge fees or expenses previously paid, the sum of all final fees and expenses awarded to all of the Debtor's professionals is less than the amounts advanced by the Lenders to pay such amounts, then the Liens and security interests of the Agent shall reattach to such disgorge excess advances and such excess shall be returned to the Lenders to be applied to the Post-Petition Debt.

30.    Notwithstanding any other provisions set forth in this Interim Financing Order or the DIP Loan Documents, the pre-petition retainers or post-petition payments provided for

pursuant to the Interim Financing Order, the Final Financing Order, and any Approved Budget received by the Debtor's professionals, once such funds are actually received by such parties, such funds shall (i) not be subject to any Liens, claims or encumbrances of the Agent, (ii) shall reduce the Carve-Out (in accordance with the terms of this Order), and (iii) shall be used solely to pay the respective fees and expenses of the Debtor's professionals, subject only to final review and allowance by the Court (and notice and an opportunity to object to same) pursuant to Sections 327 and 330 of the Bankruptcy Code.  Neither the Approved Budget nor the Carve-Out shall be a cap on the fees and expenses allowable to the professionals retained in this Case, but both shall limit the aggregate amount that (a) the Lenders are obligated to advance to the Debtor under the DIP Facility prior to the declaration of an Event of Default and (b) from the proceeds derived from the Collateral the Debtor may use for such purpose.

31.    Except as otherwise provided in Paragraphs 22-30 (with respect to the Carve-Out as provided therein) or in the DIP Loan Documents, and subject to the entry of a Final Financing Order, no costs or expenses of administration that have been or may be incurred in the Case, whether in connection with or on account of the preservation and/or disposition of any Collateral or otherwise, or which otherwise could be chargeable to the Lenders or the Collateral pursuant to Bankruptcy Code §§ 105, 506(c), 552 or otherwise, shall be so chargeable, without the prior written consent of each Lender, and no such consent shall be implied from any action, inaction, or acquiescence by either Lender.  The Debtor stipulates and agrees that the amounts set forth in the Approved Budget are sufficient to maintain its estate administratively solvent and to preserve its assets.  Neither Lender shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

32.     The Debtor shall not seek any order which authorizes the Debtor to obtain credit or incur indebtedness that is secured by a security interest, mortgage, or collateral interest or other Lien on all or any portion of the Collateral and/or entitled to priority administrative status which is equal or senior to that granted to the Agent herein (other than the Permitted Encumbrances).  Subject to the foregoing, if the Debtor (or any Trustee of the Debtor's estate that may be appointed hereafter) obtains credit or otherwise incurs any indebtedness pursuant to the authority granted in Bankruptcy Code §§ 364(b), 364(c) or 364(d) with priority equal to or senior to the priority of the Liens securing the Post-Petition Debt, all cash proceeds obtained by the Debtor from such credit or indebtedness must be immediately drawn and applied to the payment of the Post-Petition Debt in the manner required by this Interim Financing Order.  The provisions of this Paragraph 27 shall apply at all times prior to the indefeasible repayment in full of the Post-Petition Debt and the termination of each Lender's obligation to make loans and advances under the DIP Loan Documents, and shall continue to apply at all such times notwithstanding the confirmation of any plan respecting the Debtor or the appointment of any Trustee of the Debtor's estate, whether under Chapter 7 or Chapter 11 of the Bankruptcy Code. The provisions of this Paragraph 27 do not limit the provisions and protections of Paragraph 26 above.

33.     The Post-Petition Debt shall be due and payable upon the earliest to occur of:

(a)     thirty (30) days after the Petition Date, unless each of the following shall have occurred by such date: (i) the Final Order shall have been entered; (ii) Debtor shall have filed its Plan of Liquidation and related disclosure statement, together with a motion seeking to combine the confirmation hearing with a hearing on the adequacy of such disclosure statement; and (iii) an order granting Debtor's motion to reject the Concession Agreement and the Berth 25-26 occupancy agreement with the Port, effective not later than March 31, 2016, shall have been entered;

23

(b)      sixty (60) days after the Petition Date, unless (i) the Debtor shall have turned over to the Port possession of all premises on or before March 31, 2016; and (ii) the Debtor shall have obtained from the Court a hearing date prior to the ninetieth (90th) days after the Petition Date to consider confirmation of the Plan of Liquidation and approval of such disclosure statement;

(c)      one hundred, fifteen (115) days after the Petition Date, unless the Debtor shall have obtained from the Court an order confirming the Plan of Liquidation and approving of such disclosure statement;

(d)      the occurrence of an Event of Default (as defined below);

(e)      the indefeasible payment in full in cash of the Debtor's obligations owing to the Lenders under the DIP Facility;

(f)      one hundred twenty (120) days from the Petition Date; or

(g)      the effective date of the Debtor's Plan of Liquidation.

Unless and until the Post-Petition Debt is indefeasibly repaid in full in cash, the protections afforded to the Agent and Lenders under the DIP Loan Documents and this Interim Financing Order, and any actions taken pursuant thereto, shall survive the entry of any order confirming a plan or converting this Case into a successor case, and the Liens in and to the Collateral and the Super-Priority Claim shall continue in this proceeding and in any successor case, and such Liens and Super-Priority Claim shall maintain their priority as provided by this Interim Financing Order until the Post-Petition Debt has been indefeasibly satisfied in full in cash.

34.      The time and manner of payment of the Post-Petition Debt pursuant to the DIP Loan Documents and the Liens in and to the Collateral and the Super-Priority Claim granted to the Agent and Lenders, as applicable, shall not be altered or impaired by any plan that may hereafter be confirmed or by any further order which may hereafter be entered.

35.    Absent the written consent of the Lenders, the Debtor may use the proceeds of the loans and advances made pursuant to the DIP Facility only for the purposes specifically set forth in the DIP Loan Documents and Approved Budget.

## EVENTS OF DEFAULT

36.    The occurrence of any one or more of the following events or circumstances immediately shall constitute an "Event of Default" under the terms of this Interim Financing Order (any of the following being referred to in this Interim Financing Order, individually, as an "Event of Default" and, collectively, as "Events of Default"):

(a)    the Debtor's failure to pay any amount under the DIP Facility in full when due;

(b)    the Debtor's failure to comply with the covenants contained in the DIP Loan Documents, this Interim Financing Order, or the Final Financing Order, subject to notice and cure periods, where applicable;

(c)    the Debtor's breach of its obligations to comply with the financial covenants set forth above, subject to notice and three-day cure right for up to two (2) occasions if failure results solely from a failure to timely deliver related reporting;

(d)    the Debtor's violation of any of the terms of the Interim Financing Order;

(e)    the Debtor's failure to obtain entry of the Final Financing Order within thirty (30) days after the Petition Date;

(f)    the occurrence of any "Event of Default" under the DIP Loan Documents;

(g)    the termination or non-renewal of the DIP Loan Documents as provided for in the Interim Financing Order;

(h)    the conversion of the Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(i)     the appointment of a Trustee pursuant to section 1104 of the Bankruptcy Code in the Case;

(j)     the appointment of an examiner, with expanded powers, under the Bankruptcy Code in the Case;

(k)     the dismissal of the Debtor's Chapter 11 Case;

(l)     the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim Financing Order (and thereafter, the Final Financing Order) without the express prior written consent of the Lenders (and no such consent shall be inferred from any other action, inaction, or acquiescence by either Lender);

(m)     the transfer of venue for the Case from the Bankruptcy Court (as defined below) to any other jurisdiction;

(n)     the filing (and confirmation) of a plan by the Debtor (or any other party) that is inconsistent with the terms of the DIP Facility, Interim Financing Order (and thereafter, the Final Financing Order) or that is not in form and substance acceptable to the Lenders; unless such Plan and Disclosure Statement provides for the indefeasible payment in full in cash of the obligations owing by the Debtor to the Lenders on the effective date of such Plan and such effective date shall occur prior to the Maturity Date;

(o)     the Debtor's (i) filing any motion or document in connection with its bankruptcy case that is not consistent in any material respect with the terms of the DIP Facility, the Interim Financing Order (or later, the Final Financing Order), and any documents or pleadings related to the foregoing, including, without limitation, a disclosure statement motion, a proposed disclosure statement and a proposed plan, or (ii) proposing a sale motion or a sale order that does not provide for the payment of the Lenders' claims consistent with

26

the Interim Financing Order (or later, the Final Financing Order) or is not otherwise approved by the Agent;

(p)    the failure of the Debtor to maintain exclusivity to file and seek approval of its Disclosure Statement and Plan;

(q)    the failure of the Debtor to file its Plan, consistent with the terms hereof, on or before thirty (30) days following the Petition Date;

(r)    the failure of the Debtor to commence the hearing on its Disclosure Statement and confirmation of its Plan, on or before one hundred, fifteen (115) days following the Petition Date;

(s)    the failure of the Debtor to confirm its Plan and have its Plan become effective, on or before, 120 days following the Petition Date;

(t)    the entry of any order which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code, which order permits any creditor, other than the Agent, to realize upon, or to exercise any right or remedy with respect to, any material asset of the Debtor;  or

(u)    the filing by the Debtor of a motion, complaint or other proceeding seeking to challenge the validity, enforceability, or priority of any of the DIP Liens in favor of the Lenders, or the Lenders' rights and remedies under the Interim Financing Order (or later, the Final Financing Order) or the filing by the Debtor of a motion, complaint or other proceeding seeking to assert any claim for damages, injunctive relief or seeking any equitable remedy against either Lender or any of the Lenders' respective affiliates, related entitioes or any of any of the foregoing party's respective shareholders,

27

subsidiaries, affiliates, members, managers, directors, officers, employees, professionals or advisors, agents, successors or assigns.

From and after the occurrence of any Event of Default and at all times thereafter (unless such Event of Default is specifically waived in writing by each Lender, which waiver shall not be inferred from any other action, inaction, or acquiescence by either Lender):

(1)    Each Lender has no further obligation to make advances under the DIP Facility, other than to fund the Carve-Out that have not previously been advanced, pro-rated for the month in which the date of either Lender's declaration of an Event of Default has occurred, the Lender's respective remaining Commitments shall terminate, and the Debtor shall have no right to use funded advances under the DIP Facility or the proceeds of Collateral, unless otherwise consented to in writing by the Lenders in connection with the immediate preservation of the Collateral in amounts approved in writing by the Lenders,

(2)    after three (3) business days' notice following the failure to comply with any provisions, covenants, or requirements under the DIP Facility, the Interim Financing Order, or the Final Financing Order (the "Required Notice"), all of the obligations of Debtor under the DIP Facility shall become immediately due and payable,

(3)    after the Required Notice, the Automatic Stay provided for pursuant to Section 362 of the Bankruptcy Code shall be automatically and completely vacated as to each Lender without further order of the Bankruptcy Court,

(4)    the Agent may by written notice to the Debtor instruct and thereby require the Debtor to file a motion immediately seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the Agent, and consistent with

an approved budget for the Debtor's administrative costs incurred, implementing any such transactions (and with due credit for the Carve-Out to be funded hereunder following the declaration of an Event of Default), as may be agreed upon in writing by the Agent and the Debtor; and to the extent no agreement can be reached by such parties after reasonable and good faith efforts to resolve such issues, the Lenders will request that chapter 11 be converted or dismissed or that the Bankruptcy Court make such determination; and/or

(5)      after the Required Notice, the Agent without further notice, hearing, or approval of the Bankruptcy Court shall be authorized, at its option, to take any and all actions and remedies that the Agent may deem appropriate to proceed against, take possession of, protect, and realize upon the collateral and any other property of the estate of the Debtor upon which the Agent has been or may hereafter be granted DIP Liens and security interests to obtain repayment of the indebtedness to the Lenders.

Required Notice shall mean three (3) business days' written notice by the Agent of its declaration of an Event of Default, served by overnight delivery service or facsimile or email upon the Debtor, the Debtor's counsel  and the United States Trustee, and the Agent shall have the relief set forth above.  Following the giving of notice by the Agent of the occurrence of an Event of Default, the Debtor may seek an emergency hearing before this Court solely for the purpose of contesting whether an Event of Default has occurred.  If the Debtor does not contest the right of the Agent to exercise its remedies within such time period, or if the Debtor does timely contest Agent's rights and this Court, after hearing, declines to stay the enforcement thereof, the automatic stay, as to the Agent, shall automatically terminate at the end of such applicable period.  Notwithstanding the right of the Debtor to contest the existence of an Event of Default,

after the Agent declares a default and furnishes such notice of an Event of Default, (w) the Debtor, shall continue to deliver and cause the delivery of the proceeds of the Collateral to the Lenders as provided in this Interim Financing Order; (x) the Agent shall continue to apply such proceeds and exercise control over the bank accounts in accordance with the provisions of this Interim Financing Order; (y) the Debtor shall have no right to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of the Post-Petition Debt and the Carve-Out, to the extent unpaid or unfunded; and (z) each Lender's Commitment and any obligation otherwise imposed on the Lenders to provide any loan or advance to the Debtor, pursuant to the DIP Facility shall be terminated.  Notwithstanding the foregoing, neither Lender shall have any obligation to lend or advance any additional funds to the Debtor, or provide other financial accommodations to the Debtor, upon or after the occurrence of or during the continuation of a Default, or thereafter upon the occurrence of an Event of Default.

37.    If the Agent exercises any of its rights and remedies upon the occurrence of an Event of Default, the Agent may retain one or more agents to sell, lease, or otherwise dispose of the Collateral.  In any exercise of its rights and remedies upon an Event of Default, the Agent is authorized to proceed under or pursuant to the DIP Loan Documents and other applicable law.

38.    In connection with the Agent's exercise of its rights and remedies hereunder after the automatic stay is lifted, the Agent shall be entitled to the appointment of a receiver in state court, without bond, to dispose of the Collateral, and the Agent (and, to the extent applicable, its receiver) may enter upon, occupy, and use any premises owned or occupied by the Debtor, and may exclude the Debtor from such business premises or a portion thereof, as may have been so entered upon, occupied, or used by the Agent.  In no event shall the Agent be liable to the Debtor for the use or occupancy of any business premises (including the use of equipment, fixtures and

equipment (including, without limitation, computers used with respect thereto) and alarms), nor for any charges incurred, in connection with the Agent's exercise of such rights and remedies, except for rental charges, on a per diem basis, from and after the date that the Agent enters upon, occupies, and uses such business premises to assist in the sale of the Debtor's assets.  In addition, the Debtor hereby grants to the Agent a royalty-free, non-exclusive irrevocable license to use, apply, and affix any trademark, tradename, logo, or the like, in which the Debtor now or hereafter has rights, such license being with respect to the Agent's exercise of its rights hereunder.

39.    Nothing included herein shall prejudice, impair, or otherwise affect either Lender's rights to seek any other or supplemental relief in respect of the Lenders' rights, as provided in the DIP Loan Documents, to suspend or terminate the making of loans under the DIP Facility.

### MISCELLANEOUS PROVISIONS

40.    The Debtor shall provide to the Lenders one business days' prior written notice that the Debtor seeks an advance from the Lenders under the DIP Facility.

41.    Until the Post-Petition Debt is indefeasibly paid in full, in cash, either Lender and their respective agents shall have the right to visit the Debtor's business from time to time during regular business hours, upon reasonable notice, and upon reasonable frequency as counsel for the Debtor and the Lenders may agree among themselves, to (a) inspect the Collateral; (b) visit and audit the Debtor's business, (c) take copies and extracts from the Debtor's books and records and inspect the Debtor's facilities during these bankruptcy proceedings, (d) subject to further consent by the Debtor as to the reasonableness thereof, conduct on-site monitoring thereof, and (e) obtain information requested by the Lenders from knowledgeable employees, agents, and

representatives of the Debtor as to such matters relating to the Debtor's business operations, subject to further consent by the Debtor as to the reasonableness thereof.   Subject to further consent by the Debtor as to the reasonableness thereof, the Debtor's officers and employees shall fully cooperate in such efforts.  Subject to further consent by the Debtor as to the reasonableness thereof, the Agent shall have the right to place a consultant, together with an auditor, on-site at the Debtor's premises to evaluate the Debtor's assets and wind down of Debtor's business operations, and assist the Debtor with managing cash and generating realistic cash flow projections and recommendations, and the Debtor and its officers and employees shall cooperate with the Agent and its agents.

42.    From time to time, subject to Court approval and after notice and a hearing, the Debtor in the exercise of its business judgment shall exercise best efforts to market, sell and otherwise dispose of the Collateral.

43.    In determining to make any loan under DIP Facility, the DIP Loan Documents or any Financing Order, or in exercising any rights or remedies as and when permitted pursuant to the DIP Loan Documents or any Financing Order, neither Lender nor the Agent, as applicable, shall be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or Operator" with respect to either Lender's  or Agent's role, if any, as a mortgagee in possession, or on account of the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. § 9601 et seq., as amended, or any similar federal or state statute).

44.    If any provision of this Interim Financing Order is hereafter modified, vacated or stayed by subsequent order of this or any other Court for any reason, such modification,

vacation, or stay shall not affect (a) the validity of any liability incurred pursuant to this Interim

Financing Order prior to the later of (i) the effective date of such modification, vacation, or stay,

or (ii) the entry of the order pursuant to which such modification, vacation, or stay was

established, nor (b) the validity, priority, or enforceability of any Lien granted by the Debtor to

the Agent.

45.    Release.  Subject to the entry of the Final Financing Order and as further set forth

in the DIP Loan Documents, the Debtor, on behalf of itself and its estate (including any

successor trustee or other estate representative in this Case or any Successor Case) and any party

acting by, through, or under the Debtor or its estate, hereby stipulates and agrees that they

forever and irrevocably (a) release, discharge, waive, and acquit the Agent and the Lenders, in all

capacities, and each of their respective affiliates, and their respective former, current, or future

officers, employees, directors, agents, representatives, owners, members, partners, financial

advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates,

successors, assigns and predecessors in interest (collectively, the "Released Parties"), from any

and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action,

indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies,

proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every

type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued,

unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and

equitable theories of recovery, arising under common law, statute or regulation or by contract, of

every nature and description, arising out of, in connection with, or relating to the DIP Facility,

the DIP Loan Documents, their interests in the Debtor, or the transactions and relationships

contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender

liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the Agent and the Lenders, and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the DIP Liens and the obligations under the DIP Loan Documents.  For the avoidance of doubt, the foregoing release shall not constitute a release of any rights arising under the DIP Loan Documents, provided, that nothing contained herein shall limit the release granted pursuant to section [__] of the DIP Term Sheet.

46.     The Court hereby finds that (a) the DIP Facility, the DIP Loan Documents and the Financing Orders have been negotiated in good faith and at arms length between the Debtor, the Agent, and the Lenders and (b) credit to be extended under the DIP Facility will be so extended in good faith.  As a result of the foregoing findings, the Agent and the Lenders are entitled to the protections and benefits of Bankruptcy Code § 364(e) as to all matters set forth in this Interim Financing Order.  Accordingly, the payments made, and the Liens and Super-Priority Claims granted to the Agent under the DIP Facility and this Interim Financing Order, and the priority thereof, shall be binding on the Debtor, any successor trustee for the Debtor, and all creditors of the Debtor, as provided in Bankruptcy Code § 364(e).

47.     All depository banks shall comply, for the benefit of the Agent on its behalf and on behalf of the Lenders, with the terms and conditions of any account control agreements received or furnished in connection with the DIP Loan Documents in addition to the provisions of this Interim Financing Order.

48.    The Agent's failure to seek relief or otherwise exercise any of its rights and remedies under the DIP Facility or this Interim Financing Order shall not constitute a waiver of any of its rights hereunder, thereunder, or otherwise.

49.    This Interim Financing Order does not create any rights for the benefit of any third party, creditor, or any direct, indirect, or incidental beneficiary. The provisions of this Interim Financing Order shall inure to the benefit of, and be binding upon, the Debtor or any representative of the Debtor's estate, and the Agent and the Lenders, each in their capacity as such, and any assignee or successor to any of the foregoing, including any trustee thereafter appointed in this Case, and shall also be binding upon all creditors of the Debtor, the Debtor's estate, and other parties in interest.

50.    The Debtor and the Agent may amend or waive any provision of the DIP Facility, provided that such amendment or waiver, in the judgment of the Debtor (after consultation with Lenders' counsel) is either non-prejudicial to the rights of third parties or is not material. The Debtor shall provide notice to the UST of any proposed written amendment or waiver. The foregoing shall not apply to the exercise of elections or discretion as provided for in such DIP Facility by its agreed terms. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof or the DIP Facility shall be effective unless set forth in writing, signed by the Agent and the Debtor and approved by this Court.

51.    Notwithstanding anything to the contrary contained herein or in the DIP Loan Documents, nothing herein shall in any way amend, modify, or affect the terms, provisions, and restrictions of the Joint Venture Agreement, among HHH Oakland, Inc., Terminal Investment Ltd., S.A. and the Debtor, dated as of February 17, 2009.

52.     The Debtor shall be bound to provide the Agent and the Lenders (subject to confidentiality, to the extent applicable) with all reports reasonably requested by the Agent and the Lenders and in accordance with the DIP Loan Documents, including, without limitation: (i) all reports regarding the Collateral, in such detail and within such time intervals, as such reports were required to be supplied to the Lenders prior to the Petition Date; (ii) monthly financial statements, balance sheets, monthly income statements, (iii) the Debtor's actual performance and results of operations as compared to the Approved Budget to be provided to the Lenders and their counsel as required by the terms and conditions of the DIP Facility; (iv) the Debtor's report and explanation of the variance, if any, between the actual performance and results of operations as compared to the Approved Budget as required by the terms and conditions of the DIP Facility; and (v) copies of the Debtor's check register, together with copies of all reports made to the United States Trustee and any financial records or statements regularly generated in the normal course of its business.  From time to time, the Agent shall have the right to visit the Debtor's offices after reasonable notice and accompanied by an officer of the Debtor.

53.     The Debtor irrevocably waives any right to seek any modification of this Interim Financing Order or any extension of this Interim Financing Order beyond 30 days after the Petition Date.

54.     In the event of any inconsistency between the terms and conditions of any DIP Loan Document and of this Interim Financing Order, the provisions of this Interim Financing Order shall govern and control.

55.     The Debtor shall within 48 hours of its entry by the Bankruptcy Court serve by U.S. mail a copy of the Notice of Entry of this Interim Financing Order, together with a copy of this Interim Financing Order, upon the appropriate parties in interest in accordance with the

36

Federal Rules of Bankruptcy Procedures and the Local Rules.  The Notice of Entry of this Interim Financing Order shall state that any party in interest objecting to the DIP Facility or the terms of the Final Financing Order shall file written objections, stating with particularity the basis for any objection, with the United States Bankruptcy Court Clerk for the District of Delaware, _____ Wilmington, Delaware _____, no later than _____, 2016, which objections shall be served so that same are received by no later than 4:00 p.m. (Eastern time) on such date by the following:  (i) proposed counsel for the Debtor:  _____; counsel for the Lenders: DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (Attn: Stuart Brown) and Reed Smith LLP, 599 Lexington Avenue, New York, NY 10022 (Attn.: Michael J. Venditto); and (iii) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 .  In the event that no timely objections are filed to the Financing Motion, in connection with financing on a final basis, this Court may enter the Final Financing Order in the form substantially as set forth in this Interim Financing Order, subject to the Lenders providing the Debtor with their written consent to the form of Final Financing Order.

56.    The Final Hearing to consider the Financing Motion, on a final basis, and the Final Financing Order in connection therewith, shall be held on _____, 2016 at _____ before the Honorable _____, United States Bankruptcy Judge, Courtroom ____, ___ Floor, United States Bankruptcy Court, Wilmington, Delaware 19801.

57.    This Interim Financing Order shall be effective upon signature by this Court, and entry into the docket sheet of this case and notwithstanding the possible application of Bankruptcy Rules 4001(a)(3), 6004(h), 7062, 9014, or otherwise.  Cause exists to waive all applicable stays of the effectiveness of this Interim Financing Order.

58.     This Court hereby expressly retains jurisdiction over all persons and entities, co-extensive with the powers granted to the United States Bankruptcy Court under the Bankruptcy Code, to enforce the terms of this Interim Financing Order and to adjudicate any and all disputes in connection herewith.

Dated:  February _____, 2016
            Wilmington, Delaware

_____
THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY COURT JUDGE

**<u>Exhibit "A"</u>**

**Approved Budget**

**Outer Harbor Terminal LLC**
**Weekly Cash Flow Projection, Debtor-in-Posession Financing**
*(Amounts in US Dollars)*

| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended | 2/5/16 | 2/12/16 | 2/19/16 | 2/26/16 | 3/4/16 | 3/11/16 | 3/18/16 | 3/25/16 | 4/1/16 | 4/8/16 | 4/15/16 | 4/22/16 | 4/29/16 |
| **Receipts** | $1,755,363 | $1,609,138 | $1,233,413 | $1,367,120 | $1,813,794 | $1,813,794 | $1,813,794 | $2,850,344 | $2,700,344 | $2,700,344 | $2,397,541 | $690,570 | $790,570 |
| **Operating Disbursements:** | | | | | | | | | | | | | |
| Wages Paid | 4,027,469 | 1,516,020 | 2,096,769 | 2,139,019 | 1,092,324 | 1,315,324 | 1,156,751 | 2,625,242 | – | 410,811 | 182,505 | – | – |
| Vendor Payments | 1,223,279 | – | – | – | 1,245,265 | 472,517 | 380,000 | 380,000 | 380,000 | 1,023,421 | 472,517 | – | – |
| Equipment Lease Payments | – | – | 72,871 | 262,844 | – | – | 72,871 | – | 262,844 | – | 72,871 | – | – |
| PMA Tonnage Payment | – | – | – | 270,000 | – | – | – | – | 135,000 | – | – | – | – |
| Other Expenses | – | – | – | – | – | – | – | – | – | – | – | – | – |
|   **Total Operating Disbursements:** | $5,250,748 | $1,516,020 | $2,169,640 | $2,671,863 | $2,337,589 | $1,787,841 | $1,609,622 | $3,005,242 | $777,844 | $1,434,233 | $727,893 | – | – |
| **Operating Cash Flow** | ($3,495,385) | $93,118 | ($936,228) | ($1,304,743) | ($523,795) | $25,953 | $204,172 | ($154,898) | $1,922,500 | $1,266,111 | $1,669,648 | $690,570 | $790,570 |
| **Non-Operating Disbursements:** | | | | | | | | | | | | | |
| Debtors' Professional Fees | – | – | – | – | 575,000 | – | – | – | 575,000 | – | – | – | – |
| Claims Agent | – | – | – | – | 30,000 | – | – | – | 30,000 | – | – | – | – |
| UST Fees | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Estimated Utility Deposits | 120,000 | – | – | – | – | – | – | – | – | – | – | – | – |
|   **Total Non-Operating Disbursements:** | $120,000 | – | – | – | $605,000 | – | – | – | $605,000 | – | – | – | – |
| **Net Cash Flows** | ($3,615,385) | $93,118 | ($936,228) | ($1,304,743) | ($1,128,795) | $25,953 | $204,172 | ($154,898) | $1,317,500 | $1,266,111 | $1,669,648 | $690,570 | $790,570 |
| Less: DIP Interest Expense | – | – | ($811) | ($2,880) | ($5,228) | ($6,318) | ($6,318) | ($6,318) | ($6,318) | ($6,318) | ($6,318) | ($6,318) | ($6,318) |
| Less: Minimum Cash Balance | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) |
| Plus: Beginning Cash Balance | 4,115,385 | 500,000 | 593,118 | 500,000 | 500,000 | 500,000 | 519,635 | 717,488 | 556,271 | 1,867,453 | 3,127,245 | 4,790,575 | 5,474,827 |
|   **Cash Surplus / (Deficit)** | – | $93,118 | ($843,921) | ($1,307,623) | ($1,134,023) | $19,635 | $217,488 | $56,271 | $1,367,453 | $2,627,245 | $4,290,575 | $4,974,827 | $5,759,078 |
| **Financing Assumptions** | | | | | | | | | | | | | |
| **Loan Funding Schedule** | | | | | | | | | | | | | |
| Total Operating Cash Flows | ($3,615,385) | $93,118 | ($936,228) | ($1,304,743) | ($1,128,795) | $25,953 | $204,172 | ($154,898) | $1,317,500 | $1,266,111 | $1,669,648 | $690,570 | $790,570 |
| Less: DIP Interest Expense | – | – | (811) | (2,880) | (5,228) | (6,318) | (6,318) | (6,318) | (6,318) | (6,318) | (6,318) | (6,318) | (6,318) |
|   **Net Cash Provided / (Used)** | ($3,615,385) | $93,118 | ($937,039) | ($1,307,623) | ($1,134,023) | $19,635 | $197,853 | ($161,217) | $1,311,182 | $1,259,793 | $1,663,330 | $684,251 | $784,251 |
| Less: Min Cash Balance | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) | (500,000) |
| Plus: Beginning Cash Balance | 4,115,385 | 500,000 | 593,118 | 500,000 | 500,000 | 500,000 | 519,635 | 717,488 | 556,271 | 1,867,453 | 3,127,245 | 4,790,575 | 5,474,827 |
| Cash Available for Operations | – | 93,118 | (843,921) | (1,307,623) | (1,134,023) | 19,635 | 217,488 | 56,271 | 1,367,453 | 2,627,245 | 4,290,575 | 4,974,827 | 5,759,078 |
| External Funding Needed / Requested | – | – | 843,921 | 1,307,623 | 1,134,023 | – | – | – | – | – | – | – | – |
|   **Change in Cash** | ($3,615,385) | $93,118 | ($93,118) | – | – | $19,635 | $197,853 | ($161,217) | $1,311,182 | $1,259,793 | $1,663,330 | $684,251 | $784,251 |
| Beginning Cash Available | 4,115,385 | 500,000 | 593,118 | 500,000 | 500,000 | 500,000 | 519,635 | 717,488 | 556,271 | 1,867,453 | 3,127,245 | 4,790,575 | 5,474,827 |
|   **Ending Cash Available** | $500,000 | $593,118 | $500,000 | $500,000 | $500,000 | $519,635 | $717,488 | $556,271 | $1,867,453 | $3,127,245 | $4,790,575 | $5,474,827 | $6,259,078 |
| DIP Beginning Balance | – | – | – | 843,921 | 2,151,544 | 3,285,567 | 3,285,567 | 3,285,567 | 3,285,567 | 3,285,567 | 3,285,567 | 3,285,567 | 3,285,567 |
| DIP Drawdown | – | – | 843,921 | 1,307,623 | 1,134,023 | – | – | – | – | – | – | – | – |
|   **Ending Balance** | – | – | $843,921 | $2,151,544 | $3,285,567 | $3,285,567 | $3,285,567 | $3,285,567 | $3,285,567 | $3,285,567 | $3,285,567 | $3,285,567 | $3,285,567 |

**Outer Harbor Terminal LLC**
**Professional Fees Accrued**
*(Amounts in US Dollars)*

| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended | 2/5/16 | 2/12/16 | 2/19/16 | 2/26/16 | 3/4/16 | 3/11/16 | 3/18/16 | 3/25/16 | 4/1/16 | 4/8/16 | 4/15/16 | 4/22/16 | 4/29/16 | Total |
| **Milbank** | | | | | | | | | | | | | | |
| Accrued | $118,750 | $118,750 | $118,750 | $118,750 | $118,750 | $118,750 | $118,750 | $118,750 | $118,750 | $118,750 | $118,750 | $118,750 | $118,750 | $1,543,750 |
| Paid | | | | | (475,000) | | | | (475,000) | | | | | (950,000) |
| Accrued and Unpaid Fees | $118,750 | $237,500 | $356,250 | $475,000 | $118,750 | $237,500 | $356,250 | $475,000 | $118,750 | $237,500 | $356,250 | $475,000 | $593,750 | $593,750 |
| **Richards Layton:** | | | | | | | | | | | | | | |
| Accrued | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $325,000 |
| Paid | | | | | (100,000) | | | | (100,000) | | | | | (200,000) |
| Accrued and Unpaid Fees | $25,000 | $50,000 | $75,000 | $100,000 | $25,000 | $50,000 | $75,000 | $100,000 | $25,000 | $50,000 | $75,000 | $100,000 | $125,000 | $125,000 |
| **Claims Agent:** | | | | | | | | | | | | | | |
| Accrued | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $97,500 |
| Paid | | | | | (30,000) | | | | (30,000) | | | | | (60,000) |
| Accrued and Unpaid Fees | $7,500 | $15,000 | $22,500 | $30,000 | $7,500 | $15,000 | $22,500 | $30,000 | $7,500 | $15,000 | $22,500 | $30,000 | $37,500 | $37,500 |
| **Total Professional Payments:** | | | | | ($605,000) | | | | ($605,000) | | | | | ($1,210,000) |

**<u>Exhibit "B"</u>**

**Term Sheet**

**TERM SHEET**
**FOR SENIOR SECURED POST PETITION DEBTOR-IN-POSSESSION FINANCING**

**TO**

**OUTER HARBOR TERMINAL, LLC, a Delaware limited liability company ("OHT" or the "Debtor")**

**FROM**

**HHH OAKLAND, INC. and TERMINAL INVESTMENT LTD., S.A. (each a "Lender" and together with their respective successors and assigns, "Lenders")**

**Petition Date:  February 1, 2016**

**THIS TERM SHEET DOES NOT CONSTITUTE A COMMITMENT, UNLESS AND UNTIL IT IS FULLY EXECUTED AND DELIVERED BY ALL PARTIES HERETO AND ALL CONDITIONS PRECEDENT HAVE BEEN SATISFIED OR WAIVED.**

**ALL TERMS SET FORTH HEREIN ARE SUBJECT TO THE FOLLOWING:**

**(1)    CERTAIN CONDITIONS PRECEDENT;**

**(2)    THE NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTS, UNLESS WAIVED ON AN INTERIM BASIS;**

**(3)    APPROVAL BY EACH LENDER OF ALL MATERIAL FIRST-DAY PLEADINGS, INTERIM AND FINAL FINANCING MOTION AND ORDERS, AND OTHER DOCUMENTATION EXPECTED TO BE FILED OR PREPARED IN CONNECTION WITH ANY FILING UNDER THE BANKRUPTCY CODE; AND**

**(4)    THE APPROVAL BY EACH LENDER OF THE "APPROVED BUDGET" SHOWING PROJECTED CASH RECEIPTS, CASH DISBURSEMENTS, AND OTHER FINANCIAL INFORMATION REQUIRED BY LENDERS FOR EACH WEEK FROM THE PETITION DATE (AS DEFINED BELOW) THROUGH THE PERIOD ENDING APPROXIMATELY THIRTEEN (13) COMPLETE CALENDAR WEEKS THEREAFTER, SUBJECT TO THE TERMS AND CONDITIONS OF THE INTERIM FINANCING ORDER AND FINAL FINANCING ORDER, INCLUDING THAT THE INTERIM FINANCING ORDER SHALL ONLY BE EFFECTIVE WITH RESPECT TO FINANCING FOR A PERIOD FROM THE PETITION DATE AND CONTINUING FOR TWENTY-FIVE (25) DAYS THEREAFTER.**

## TERMS OF PROPOSED DIP CREDIT FACILITY

Debtor:                    Outer Harbor Terminal, LLC, a Delaware limited liability company.

Lenders:                   HHH Oakland, Inc. and Terminal Investment Ltd., S.A., severally.

Agent:                     HHH Oakland, Inc.

Financing Orders:          All references to the Interim Financing Order and Final Financing Order, as applicable, shall refer to such orders in form and substance acceptable to each Lender in its sole option and any modifications thereto acceptable to each Lender in its sole option.

DIP Facility
Commitment Amount:         The DIP Facility shall be in the maximum principal amount of $3.5 million. Each Lender's commitment ("Commitment") to make advances shall not at any time exceed $1.75 million (the "Maximum Commitment"). The Maximum Commitment amount of each Lender would be available as a debtor-in-possession multi-draw term credit facility (the "DIP Facility") to, or for the benefit of the Debtor.

Lien Priority:             The Agent shall be granted (collectively, "DIP Liens"), subject to the Carve-Out, (i) a first priority lien on all existing and after acquired unencumbered property of the Debtor and Debtor's estate under section 364(c)(2), which shall include, without limitation, all encumbered property of the Debtor and its estate that becomes unencumbered as a result of any such asserted lien being determined to be invalid, unenforceable, unperfected or avoidable (for the avoidance of doubt Debtor's avoidance of any lien or other transfer, or recovery of any property, shall inure to the benefit of Lenders; Debtor waives in favor of Lenders the rights and benefits of section 551 of the Bankruptcy Code), and (ii) a junior lien on all existing and after acquired property of the Debtor and its estate that is subject to a valid, enforceable and unavoidable lien ("Permitted Encumbrances"). The DIP Liens are granted to HHH Oakland, Inc. for itself and as agent for Terminal Investment Ltd., which shall hold the DIP Liens for the Lenders' ratable benefit as further described below. The DIP Liens shall be deemed perfected automatically upon the entry of the Interim Financing Order, without the Lenders, or either of them, filing or recording any document, instrument or notice of any kind.

Collateral:                All property of the Debtor and the Debtor's bankruptcy estate, including without limitation, accounts, equipment, notes, fixtures, real estate interests of any kind, general intangibles, including, without limitation, all money, cash or cash equivalents; all books, records and information relating to any of the foregoing and/or to the operation of the Debtor's businesses, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded, and maintained; any account

established and maintained to hold any deposits to provide utility providers with adequate assurance of payment, and any residual amounts in the utility deposit accounts after satisfaction of any payments to any utility provider; tax refunds; trademarks, and tradenames, instruments, documents, investment property, chattel paper, commercial torts, and goods (respectively as defined in the Uniform Commercial Code), all real estate, all leaseholds, together with any proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing; all of the foregoing now owned or hereafter acquired (and without regard to whether acquired prior or subsequent to the Petition Date) ; and the products and proceeds thereof, including together with, following the entry of the Final Financing Order, all net proceeds of Chapter 5 causes of action (the "Avoidance Action Proceeds"); provided, however, that Lenders' lien on the Collateral shall be subject and subordinate to (i) the Carve-Out, and (ii) Permitted Encumbrances (collectively, the "Collateral").

Lenders' DIP Liens on the Collateral shall secure any and all funds advanced by Lenders, or either of them, post-petition to, or for the benefit of, the Debtor, including all amounts approved or advanced post-petition by Lenders before the entry of the Interim Financing Order (the "Post-Petition Lender Debt") incurred by the Debtor pursuant to the Interim Financing Order.

Each Lender is entitled to the full protections of section 364(e) of the Bankruptcy Code with respect to debts, obligations, liens, security interests, and other rights created or authorized under the Term Sheet, DIP Facility and Financing Orders.

Notwithstanding anything to the contrary set forth above, the DIP Liens granted to the Agent for the benefit of the Lenders upon the Collateral is without prejudice to the rights of the Debtor, or any other party in interest, including each Lender, to object to the validity, priority, or extent of any asserted third-party liens, or the allowance of such third-party debts secured thereby, or institute any actions or adversary proceedings with respect thereto.

Also, the Agent for the benefit of the Lenders will receive a super-priority claim to secure post-petition advances and extensions of credit under 11 U.S.C. § 364(c)(1) with priority over any and all administrative expenses specified in Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1114, or otherwise, subject only to the Carve-Out and the quarterly fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930.

Interest Rate:    The unpaid principal amount of the advances under the DIP Facility shall accrue interest at a rate equal to 10% per annum.

<u>Maturity Date/Term:</u>          Subject to the entry of the Interim Financing Order and the terms of the DIP Facility Documents, the Debtor's obligations owing to the Lenders under the DIP Facility are due and payable upon the earliest to occur of the following:

 (a) thirty (30) days after the Petition Date, unless each of the following shall have occurred by such date: (i) the Final Order shall have been entered; (ii) Debtor shall have filed its Plan of Liquidation and related disclosure statement, together with a motion seeking to combine the confirmation hearing with a hearing on the adequacy of such disclosure statement; and (iii) an order granting Debtor's motion to reject the Concession Agreement and the Berth 25-26 occupancy agreement with the Port, effective not later than March 31, 2016 shall have been entered;

 (b) sixty (60) days after the Petition Date, unless (i) the Debtor shall have turned over to the Port possession of all premises on or before March 31, 2016; and (ii) the Debtor shall have obtained from the Court a hearing date prior to the one hundred fifteenth (115th) day after the Petition Date to consider confirmation of the Plan of Liquidation and approval of such disclosure statement;

 (d) one hundred fifteen (115) days after the Petition Date, unless the Debtor shall have obtained from the Court an order confirming the Plan of Liquidation and approving of such disclosure statement;

 (e) the occurrence of an Event of Default (as defined below);

 (f) the indefeasible payment in full in cash of the Debtor's obligations owing to the Lenders under the DIP Facility;

 (g) one hundred twenty (120) days from the Petition Date; or

 (h) the effective date of the Debtor's Plan of Liquidation.

<u>Use of Proceeds:</u>          To fund the Debtor's projected business winddown expenditures expressly approved under and pursuant to the terms, conditions and limitations of the Financing Orders, consistent with the Approved Budget, respecting amount and timing, and the DIP Loan Documents (as defined in the Financing Orders).

Carve-Out:                    Lenders' DIP Liens on the Collateral shall be subject and subordinate only to the following, in each instance:

(a)    use of Cash Collateral and DIP Facility advances to pay the following, subject to the Carve-Out Proviso (as defined below):

(i)    professional fees and expenses of Debtor's professionals accrued prior to the date of Agent's declaration of any Event of Default under the DIP Facility, and allowed by the Court at any time, whether by interim order, procedural order or otherwise (provided, however, such interim allowance and payments shall remain subject to final allowance by a final order on each such professional's final fee application), in an amount not to exceed the amounts set forth on the line item for Debtor's Professional Fees in the Approved Budget through such date of declaration (the "Pre-Default Debtor's Professional Fee Carve-Out"), less any payments of such professional fees and expenses actually made prior to such declaration of any Event of Default; *plus*

(ii) the following amount after the date Agent declares an Event of Default: up to $200,000 (inclusive of the amount of all retainers held by Debtor's professionals) with respect to the Debtor's professionals' fees and expenses and allowed by the Court at any time, whether by interim order, procedural order or otherwise (provided, however, such interim allowance and payments shall remain subject to final allowance by a final order on each such professional's final fee application), in respect of periods after such declaration of any Event of Default (the "Post-Default Debtor's Professional Fee Carve-Out"), as further described in the Interim Financing Order (the aggregate of the foregoing Debtor's professional's fees and expenses referred to in clauses (i) and (ii) is a cap not to exceed the sum of the Pre-Default Debtor's Professional Fee Carve-Out as of the date the Agent declares an Event of Default plus the Post-Default Debtor's Professional Fee Carve-Out, which capped sum shall be reduced dollar for dollar for each payment of Debtor's professionals' fees and reimbursement of expenses made at any time before or after an Event of Default, and is referred to as the "Professional Fee Carve-Out");

(b)    other requirements expressly set forth in the Interim Financing Order and the Final Financing Order, as applicable (i.e., such as claims agent fees, senior ad valorem tax liens and other senior liens); and

(c)    the fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a) (the "Trustee's Fee Carve-Out" and, together with the Professional Fee Carve-Out and the amounts for requirements referred to in clause (b) above, the "Carve-Out").

Also, the super-priority claim to secure post-petition advances and extensions of credit under 11 U.S.C. § 364(c)(1) with priority over any and all administrative expenses specified in Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a),

507(b), 546(c), 546(d), 552(b), 726, 1114, or otherwise, granted to the Lenders shall be subject and subordinate only to the Carve-Out.

For the avoidance of doubt, so long as a notice of an Event of Default has not been issued, subject to the Approved Budget the Debtor shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable, the same shall reduce the Pre-Default Professional Fee Carve-Out dollar for dollar and the same shall not reduce the Post-Default Professional Fee Carve-Out.  Upon issuance of a notice of an Event of Default, subject to the Approved Budget the Debtor shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals that accrued through the date of the issuance of the notice of an Event of Default and are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable, the same shall reduce the Pre-Default Professional Fee Carve-Out dollar for dollar, the Pre-Default Professional Fee Carve-Out shall be capped at the amount set forth in the Approved Budget through the date of the issuance of a notice of an Event of Default, subject to the Approved Budget the Debtor shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals on account of fees and expenses that accrue and are incurred following the date of the issuance of a notice of an Event of Default that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable, and the same shall reduce the Post-Default Professional Fee Carve-Out.

Limitations on Use of the Carve-Out and Cash Collateral; Related Reserves:

No portion of the Carve-Out or any advances made under the DIP Facility shall be used to pay or reimburse (and the Carve-Out shall exclude) any fees and expenses (hereafter, the "Carve-Out Proviso"):

(a)    incurred in connection with the investigation of, assertion of, joinder in, or prosecution of, any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief

(i)    invalidating, setting aside, avoiding, disallowing, recharacterizing, subordinating, challenging, in whole or in part, or objecting to the validity, priority, extent, perfection, priority or enforceability of (A) all or any portion of the obligations owing to the Lenders, or (B) the DIP Liens on the Collateral; or

(ii)    preventing, hindering, or delaying (whether directly or indirectly) Agent's assertions or enforcement of the DIP Liens, security interest or realization upon any Collateral;  or

(b)    incurred in connection with the sale or other disposition of any other Collateral or the proceeds thereof, or the incurrence of any Indebtedness not permitted under the DIP Facility, without the prior written consent of the Lenders;  or

(c)    arising after the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code or the dismissal of the Case.

The Agent shall have the right, but not the obligation, to establish and fund, in whole or in part, from time to time, a reserve in respect of the Carve-Out (the "Carve-Out Reserve").    Notwithstanding the establishment of the Carve-Out Reserve, payments of professional fees and expenses as described in the Carve-Out Section of this Term Sheet above may be made by the Lenders, and such ordinary course payments shall reduce the Carve-Out Reserve dollar for dollar.  From and after a declaration of any Event of Default, the Lenders may release the Carve-Out Reserve to facilitate payment of fees and expenses, subject to the Carve-Out and the Carve-Out Proviso.

The Carve-Out, the Carve-Out Reserve, pre-petition retainers, if any remaining, and any post-petition retainers held by such professionals shall not be used by the professionals to fund, nor shall the Lenders be responsible for the funding, financing, payment, or reimbursement of any fees or disbursements of any of the professionals in connection with such activities described in the Carve-Out Proviso.

Except as otherwise provided in this section, nothing contained in the Interim Financing Order shall be deemed a consent by Lenders to any charge, lien, assessment or claim against the Collateral under Bankruptcy Code Sections 506(c) or 552(b) or otherwise.  The foregoing shall not be construed as consent by Lenders to the allowance of any Professional Fees and Expenses and shall not affect the right of the Lenders to object to the allowance and payment of such amounts.

Financial Covenants:    The Debtor shall be in compliance with, among other things, the following financial covenants:

(a)    Compliance with Approved Budget.  The Debtor agrees that during each Measurement Period (as defined below):

(i)    the aggregate amount of Debtor's actual *cash expenses and disbursements* during such Measurement Period shall not be more than 115% of the projected cash expenses and disbursements for such Measurement Period as set forth in the Approved Budget (which disbursements shall not include amounts disbursed by the Debtor with respect to the Debtor's professionals, including all of its attorneys, accountants, and financial advisors);

        (ii)    the aggregate amount of Debtor's actual *cash receipts* during such Measurement Period shall not be less than 65% of the projected cash receipts for such Measurement Period as set forth in the Approved Budget; and

        (iii)    the Debtor's outstanding *loan balance* owing to the Lenders as of the end of such Measurement Period shall not be more than 110% of the projected amount of such outstanding loan balance as of such date as set forth in the Approved Budget; provided, however, that the outstanding principal amount owing to the Lenders shall at no time exceed $3.5 million.

Each week the Debtor shall provide such reports to Lenders, evidencing the Debtor's compliance with the foregoing financial covenants.

For purposes of the foregoing, "<u>Measurement Period</u>" shall mean each rolling four week period reflected on the Approved Budget.  A condition precedent to the entry of the Final Financing Order shall be that the Debtor is in compliance with the foregoing financial covenant on the date of such entry.

| | |
|---|---|
| <u>Covenants Generally</u>: | Usual and customary affirmative and negative covenants for asset based facilities of this type.  The collections shall be applied, first, in reduction of Lenders' costs and expenses, second, in reduction of accrued interest, and third, in reduction of the outstanding principal balance owing to the Lenders under the DIP Facility.  Advances by each Lender under the DIP Facility shall act to permanently reduce each Lender's respective Commitment.  Funds advanced and repaid may not be reborrowed by the Debtor or readvanced by the Lenders. |
| <u>Events of Default</u>: | Each of the following shall be an "Event of Default" under the DIP Facility: |

        (a)    the Debtor's failure to pay any amount under the DIP Facility in full when due;

        (b)    the Debtor's failure to comply with the covenants contained in the DIP Loan Documents, the Interim Financing Order, or the Final Financing Order, subject to notice and cure periods, where applicable;

        (c)    the Debtor's breach of its obligations to comply with the financial covenants set forth above, subject to notice and three-day cure right for up to two (2) occasions if failure results solely from a failure to timely deliver related reporting;

        (d)    the Debtor's violation of any of the material terms of the Interim Financing Order;

(e) the Debtor's failure to obtain entry of the Final Financing Order within thirty (30) days after the Petition Date;

(f) the occurrence and continuance of any "Event of Default" under the DIP Loan Documents;

(g) the termination or non-renewal of the DIP Loan Documents as provided for in the Interim Financing Order;

(h) the conversion of the Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(i) the appointment of a Trustee pursuant to section 1104 of the Bankruptcy Code in the Case;

(j) the appointment of an examiner, with expanded powers, under the Bankruptcy Code in the Case;

(k) the dismissal of the Debtor's Chapter 11 Case;

(l) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim Financing Order (and thereafter, the Final Financing Order) without the express prior written consent of the Lenders (and no such consent shall be inferred from any other action, inaction, or acquiescence by either Lender);

(m) the transfer of venue for the Case from the Bankruptcy Court (as defined below) to any other jurisdiction;

(n) the filing (and confirmation) of a plan by the Debtor (or any other party) that is inconsistent with the terms of the DIP Facility, Interim Financing Order (and thereafter, the Final Financing Order) or that is not in form and substance reasonably acceptable to the Lenders; unless such Plan and Disclosure Statement provides for the indefeasible payment in full in cash of the Post-Petition Lender Debt to the Lenders on the effective date of such Plan and such effective date shall occur prior to the Maturity Date;

(o) the Debtor's (i) filing any motion or document in connection with its bankruptcy case that is not consistent in any material respect with the terms of the DIP Facility, the Interim Financing Order (or later, the Final Financing Order), and any documents or pleadings related to the foregoing, including, without limitation, a disclosure statement motion, a proposed disclosure statement and a proposed plan, or (ii) proposing a sale motion or a sale order that does not provide for the payment of the Lenders' claims consistent with the Interim Financing Order (or later, the Final Financing Order) or is not otherwise approved by the Agent;

(p) the failure of the Debtor to maintain exclusivity to file and seek approval of its Disclosure Statement and Plan;

(q)     the failure of the Debtor to file its Plan, consistent with the terms hereof, on or before thirty (30) days following the Petition Date;

(r)     the failure of the Debtor to commence the hearing on its Disclosure Statement and confirmation of its Plan, on or before one hundred fifteen (115) days following the Petition Date;

(s)     the failure of the Debtor to confirm its Plan and have its Plan become effective, on or before, 120 days following the Petition Date;

(t)     the entry of any order which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code, which order permits any creditor, other than the Agent, to realize upon, or to exercise any right or remedy with respect to, any asset of the Debtor;  or

(u)     the filing by the Debtor or any other party in interest of a motion, complaint or other proceeding seeking to challenge the validity, enforceability, or priority of any of the DIP Liens in favor of the Agent for the benefit of the Lenders, or the Agent's rights and remedies under the Interim Financing Order (or later, the Final Financing Order) or the filing by the Debtor or any other party in interest of a motion, complaint or other proceeding seeking to assert any claim for damages, injunctive relief or seeking any equitable remedy against the Agent or either Lender or any of the Lenders' respective affiliates, related entities or any of any of the foregoing party's respective shareholders, subsidiaries, affiliates, members, managers, directors, officers, employees, professionals or advisors, agents, successors or assigns.

| | |
|---|---|
| Exercise of Remedies: | Upon the occurrence of an Event of Default, |

(1)     Each Lender has no further obligation to make advances under the DIP Facility, other than to fund the Carve-Out that have not previously been advanced, pro-rated for the month in which the date of the Agent's declaration of an Event of Default has occurred, the Lender's respective remaining Commitments shall terminate, and the Debtor shall have no right to use funded advances under the DIP Facility or the proceeds of Collateral, unless otherwise consented to in writing by the Agent in connection with the immediate preservation of the Collateral in amounts approved in writing by the Agent,

(2)     after three (3) business days' notice from the Agent following the failure to comply with any provisions, covenants, or requirements under the DIP Facility, the Interim Financing Order, or the Final Financing Order (the "Required Notice"), all of the obligations of Debtor under the DIP Facility shall become immediately due and payable,

(3)    after the Required Notice, the Automatic Stay provided for pursuant to Section 362 of the Bankruptcy Code shall be automatically and completely vacated as to each Lender without further order of the Bankruptcy Court,

(4)    the Lenders may by written notice to the Debtor instruct and thereby require the Debtor to file a motion immediately seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the Lenders, and consistent with an approved budget for the Debtor's administrative costs incurred, implementing any such transactions (and with due credit for the Carve-Out to be funded hereunder following the declaration of an Event of Default), as may be agreed upon in writing by the Lenders and the Debtor; and/or

(5)    after the Required Notice, the Agent without further notice, hearing, or approval of the Bankruptcy Court shall be authorized, at its option and subject to applicable law, to take any and all actions and remedies that the Lenders may deem appropriate to proceed against, take possession of, protect, and realize upon the collateral and any other property of the estate of the Debtor upon which the Lenders have been or may hereafter be granted DIP Liens and security interests to obtain repayment of the Post-Petition Lender Debt to the Lenders.

Required Notice shall mean three (3) business days' written notice by Agent of the declaration of an Event of Default, served by overnight delivery service or facsimile or email upon the Debtor, the Debtor's counsel, and the United States Trustee, and Agent shall have the relief set forth above unless the Debtor contests the occurrence of an Event of Default and the Bankruptcy Court determines the same prior to the expiration of such applicable period.

Conditions Precedent:    The commitment of each Lender to provide the DIP Facility shall be conditioned upon satisfaction of the following conditions precedent as well as other conditions customary for transactions of this type:

the Debtor shall file its Voluntary Petition under Chapter 11 of the Bankruptcy Code, on or before February 1, 2016 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

all necessary consents and approvals for the initial funding under the DIP Facility shall have been obtained by both Lenders;

approval by the Lenders of the budget (as amended and approved by the Lenders from time to time, the "Approved Budget"), for the period commencing on the Petition Date, and continuing through the date that is 120 days after the Petition Date, attached hereto as Schedule 1; and, receipt, thereafter, on or before each Wednesday of a comparison of actual disbursements and obligations incurred for the preceding week ending on the preceding Saturday to the

disbursements and requirements scheduled for such week in the Approved Budget and any proposed changes to the Approved Budget; provided, that, notwithstanding anything to the contrary, the financing provided under the Interim Financing Order shall only relate to the period (the "Interim Period") from the Petition Date to the date of the hearing on final approval, which shall be no more than thirty (30) days after the Petition Date;

any other information (financial or otherwise) reasonably requested by the Agent and the Lenders shall have been received by Agent and the Lenders and shall be in form reasonably satisfactory to the Agent and the Lenders and shall not reflect the existence of an Event of Default;

the Agent and the Lenders shall have received post-petition reports in form and in such detail as reasonably requested by the Agent and the Lenders;

each Lender shall have committed to fund its Maximum Commitment; and

if requested by the Agent, execution and delivery of such documentation (to include financing statements, security agreements, and account control agreements with respect to any existing or new bank accounts opened by the Debtor, tax lien and litigation searches, good standing certificate, customary representations, warranties, covenants, events of default, indemnification, instruments, insurance and such other acts as the Agent may reasonably request in order to obtain the Lenders' legal approval to effect the completion of the financing arrangements herein contemplated) reasonably satisfactory in form and substance to the Lenders and their respective counsel.

Each Lender's commitment to lend as stated herein is expressly subject to the entry of all necessary and appropriate Bankruptcy Court orders, which order or orders (the "Orders") must be (i) not subject to any stay, modification, or reversal; and (ii) acceptable to each Lender in its reasonable discretion.

Without limiting in any way the Agent's and each Lender's reasonable discretion, such Orders shall provide for the following, among other things:

(a)     that all post-petition indebtedness, liabilities and obligations of the Debtor to the Lenders, whenever and however arising, including without limitation, the loans and all fees, charges and expenses contemplated by this Term Sheet or otherwise incurred, including, but not by way of limitation, fees and expenses of attorneys and other professionals, shall be secured by a first priority lien and security interest in all Collateral, subject to Permitted Encumbrances and the Carve-Out;

(b)     that adequate notice has been given to all necessary parties of the hearings pursuant to which the Bankruptcy Court has entered the Orders;

(c)     upon the entry of the Final Financing Order that no costs, expenses or other charges may be assessed against or attributed to the Lenders or the Collateral pursuant to Bankruptcy Code Sections 506(c) or 552(b) or otherwise; and

(d)     a finding that each Lender has acted in good faith and entitled to all the protections under Bankruptcy Code Section 364(e).

(e)     upon the entry of the Final Financing Order that the Debtor and its estate generally release the Agent and the Lenders in all capacities.

Agent:                    Appointment of Agent.    Each Lender irrevocably appoints HHH Oakland, Inc. as Agent to issue all of Lenders' notices, consents, approvals and waivers, together with any other actions and powers that are specifically delegated to the Agent, by or pursuant to the DIP Loan Documents.  Agent may perform any of its duties hereunder or under the other DIP Loan Documents by or through any one or more sub-agents or attorneys-in-fact appointed by Agent.  The exculpatory provisions set forth in this Term Sheet shall apply to any such sub-agent, or attorney-in-fact and shall apply to their respective activities in connection with the activities as Agent.

Nature of Duties of Agent.    Agent shall not have any duties or obligations except those expressly set forth in this Term Sheet and the other DIP Loan Documents.  Without limiting the generality of the foregoing, (a)  Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (b)  Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except those discretionary rights and powers expressly contemplated by the DIP Loan Documents that Agent is required to exercise in writing by the Lenders, and  (c) except as expressly set forth in the DIP Loan Documents, Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Debtor that is communicated to or obtained by Agent or any of its Affiliates in any capacity.  Agent shall not be liable for any action taken or not taken by it, its sub-agents or its attorneys-in-fact with the consent or at the request of the Lenders or in the absence of its own gross negligence or willful misconduct.  Agent shall not be responsible for the negligence or misconduct of any sub-agents or attorneys-in-fact selected by it with reasonable care.  Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof (which notice shall include an express reference to such event being a "Default" or "Event of Default" hereunder) is given to Agent by the Debtor or any Lender, and Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation

made in or in connection with any DIP Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements, or other terms and conditions set forth in any DIP Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any DIP Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in any DIP Loan Document, other than to confirm receipt of items expressly required to be delivered to Agent.  Agent may consult with legal counsel (including counsel for the Debtor) concerning all matters pertaining to such duties.

<u>Lack of Reliance on Agent</u>.  Each Lender acknowledges that it has, independently and without reliance upon Agent or the other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Term Sheet and the DIP Loan Documents.  Each Lender also acknowledges that it will, independently and without reliance upon Agent or the other Lender and based on such documents and information as it has deemed appropriate, continue to make its own decisions in taking or not taking any action under or based on this Term Sheet and the DIP Loan Documents.

<u>Certain Rights of Agent</u>.  If Agent shall request instructions from the Lenders with respect to any action or actions (including the failure to act), Agent shall be entitled to refrain from such act or taking such act unless and until it shall have received instructions from the Lenders, and Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting hereunder in accordance with the instructions of the Lenders where required by the terms of this Term Sheet.

<u>Reliance by Agent</u>.  Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it to be genuine and to have been signed, sent or made by the proper Person.  Agent may also rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person and shall not incur any liability for relying thereon.  Agent may consult with legal counsel (including counsel for the Debtor), independent public accountants and other experts selected by it and shall not be liable for any action taken or not taken by it in accordance with the advice of such counsel, accountants or experts.

<u>Agent in its Individual Capacity</u>.  The Lenders acknowledge that HHH Oakland, Inc. is acting as both Agent and as a Lender.  While serving as Agent HHH Oakland, Inc. shall have the same rights and powers under this Term Sheet and the DIP Loan Documents in its capacity as a Lender as the other Lender and may exercise or refrain from exercising the same

as though it were not Agent; and the terms "Lenders," "each Lender," or any similar terms shall, unless the context clearly otherwise indicates, include Agent in its individual capacity but not its capacity as Agent. HHH Oakland, Inc. agrees to act as Agent as a convenience to the Lenders and without compensation for such services, although HHH Oakland, Inc. will be entitled to reimbursement from the Debtor pursuant to the provisions of the DIP Loan Documents for any costs or expenses incurred by it while acting in its capacity as Agent.

Agent May File Proofs of Claim.

(a)    Agent shall be entitled and empowered:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the DIP Facility that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of Lenders and Agent allowed; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same.

(b)    Each Lender hereby authorizes the Debtor to make such payments to Agent and to reimburse Agent for any expenses, disbursements or advances incurred, or made, by Agent and its agents and counsel.

Nothing contained herein shall be deemed to authorize Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan affecting the Post-Petition Debt or the rights of any Lender or to authorize Agent to vote in respect of the claim of any Lender in any such proceeding.

No Third Party Beneficiaries. This is an agreement solely among Agent and Lenders and shall survive the indefeasible payment in full of the Post-Petition Debt. This section of the Term Sheet does not confer any rights or benefits upon the Debtor or any other person, and the Debtor shall not have any standing to enforce the agency provisions hereof. As between the Debtor and Agent, any action that Agent may take hereunder or under any DIP Loan Document or with respect to the Post-Petition Debt shall be conclusively presumed to have been authorized and directed by Lenders.

"Last In-First Out" provisions. Each Lender's ratable interest in the DIP Liens shall be equal so long as each Lender funds 50% of each advance under the DIP Facility. In the event either Lender funds none, or less than all, of any advance under the DIP Facility, then the Lender that funds its such committed advance in full (and in such funding Lender's sole option that funds up to the other Lender's committed advance) shall be treated as having made a "last in-first out" advance in the aggregate

amount of such advance, with such amount having priority in recovery and return in full, over the Lenders' equal ratable interests in DIP Facility advances; provided, however, that such right of recovery is on a non-recourse basis, except to the Debtor, its estate and the Collateral, and such Lender fudning a "last in-first out" advance shall not have a direct claim against the other Lender for the amount of such "last in-first out" advance. Each subsequent "last in-first out" advance, if any, shall have priority over all prior advances, such that the Lender funding the last such "last in-first out" advance shall have first priority in recovery of and return on such last "last in-first out" advance; provided, however, that such right of recovery is on a non-recourse basis, except to the Debtor, its estate and the Collateral, and such Lender fudning a "last in-first out" advance shall not have a direct claim against the other Lender for the amount of such "last in-first out" advance.

In the event either Lender funds an advance for the other Lender, the Lenders' aggregate Maximum Commitments shall remain unchanged, however, such funding Lender's Maximum Commitment shall increase, and the Maximum Commitment of the Lender not so funding shall decrease in like amounts.

| | |
|---|---|
| Governing Law: | New York. |
| DIP Loan Documents | The DIP Facility documents will be in form and substance mutually acceptable to each Lender and the Debtor and will contain representations and warranties; conditions precedent; affirmative, negative and financial covenants; indemnities; and events of default and remedies as set forth herein, or if not specifically set forth herein, in form and substance acceptable to the Lenders. All relevant documents, such as transaction documents, security agreements, pledge agreements, subordination agreements, intercreditor agreements, and other material agreements, will be in form and substance reasonably acceptable to the Agent and the Lenders. All orders of the Bankruptcy Court approving or authorizing the DIP Facility, and all other material motions filed in the Chapter 11 Case and orders entered by the Bankruptcy Court with respect thereto, will be in form and substance reasonably acceptable to the Agent and the Lenders. Notwithstanding anything to the contrary herein, the Lenders may elect to consider this Term Sheet as a binding commitment to lend and a loan and security agreement binding on and enforceable against the Debtor, together with the terms and conditions, and upon the entry, of the Interim Financing Order (and later, the Final Financing Order), in accordance with the terms and conditions set forth herein and in the Lender-approved and Bankruptcy Court-entered Interim Financing Order and the Final Financing Order, on an interim or a final basis, and together with any note and other instrument and document required by Lenders to be executed and delivered by the Debtor. |

Intending to be legally bound hereby, for and in consideration of the mutual covenants, terms and conditions set forth herein above, which consideration the parties acknowledge is good and sufficient, the undersigned parties agree to the provisions of this Term Sheet.

OUTER HARBOR TERMINAL, LLC


_____
By:
Name:
Title:

HHH OAKLAND, INC., As Agent and Lender


_____
By:
Name:
Title:

TERMINAL INVESTMENT, LTD., S.A., as Lender


_____
By:
Name:
Title:

# **EXHIBIT B**

TERM SHEET
FOR SENIOR SECURED POST PETITION DEBTOR-IN-POSSESSION FINANCING

TO

OUTER HARBOR TERMINAL, LLC, a Delaware limited liability company ("OHT" or
the "Debtor")

FROM

HHH OAKLAND, INC. and TERMINAL INVESTMENT LTD., S.A. (each a "Lender" and
together with their respective successors and assigns, "Lenders")


Petition Date:  February 1, 2016

THIS TERM SHEET DOES NOT CONSTITUTE A COMMITMENT, UNLESS AND UNTIL IT IS FULLY EXECUTED AND DELIVERED BY ALL PARTIES HERETO AND ALL CONDITIONS PRECEDENT HAVE BEEN SATISFIED OR WAIVED.

ALL TERMS SET FORTH HEREIN ARE SUBJECT TO THE FOLLOWING:

(1)     CERTAIN CONDITIONS PRECEDENT;

(2)     THE NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTS, UNLESS WAIVED ON AN INTERIM BASIS;

(3)     APPROVAL BY EACH LENDER OF ALL MATERIAL FIRST-DAY PLEADINGS, INTERIM AND FINAL FINANCING MOTION AND ORDERS, AND OTHER DOCUMENTATION EXPECTED TO BE FILED OR PREPARED IN CONNECTION WITH ANY FILING UNDER THE BANKRUPTCY CODE; AND

(4)     THE APPROVAL BY EACH LENDER OF THE "APPROVED BUDGET" SHOWING PROJECTED CASH RECEIPTS, CASH DISBURSEMENTS, AND OTHER FINANCIAL INFORMATION REQUIRED BY LENDERS FOR EACH WEEK FROM THE PETITION DATE (AS DEFINED BELOW) THROUGH THE PERIOD ENDING APPROXIMATELY THIRTEEN (13) COMPLETE CALENDAR WEEKS THEREAFTER, SUBJECT TO THE TERMS AND CONDITIONS OF THE INTERIM FINANCING ORDER AND FINAL FINANCING ORDER, INCLUDING THAT THE INTERIM FINANCING ORDER SHALL ONLY BE EFFECTIVE WITH RESPECT TO FINANCING FOR A PERIOD FROM THE PETITION DATE AND CONTINUING FOR TWENTY-FIVE (25) DAYS THEREAFTER.

## TERMS OF PROPOSED DIP CREDIT FACILITY

Debtor:                        Outer Harbor Terminal, LLC, a Delaware limited liability company.

Lenders:                       HHH Oakland, Inc. and Terminal Investment Ltd., S.A., severally.

Agent:                         HHH Oakland, Inc.

Financing Orders:              All references to the Interim Financing Order and Final Financing Order, as applicable, shall refer to such orders in form and substance acceptable to each Lender in its sole option and any modifications thereto acceptable to each Lender in its sole option.

DIP Facility
Commitment Amount:             The DIP Facility shall be in the maximum principal amount of $3.5 million. Each Lender's commitment ("Commitment") to make advances shall not at any time exceed $1.75 million (the "Maximum Commitment"). The Maximum Commitment amount of each Lender would be available as a debtor-in-possession multi-draw term credit facility (the "DIP Facility") to, or for the benefit of the Debtor.

Lien Priority:                 The Agent shall be granted (collectively, "DIP Liens"), subject to the Carve-Out, (i) a first priority lien on all existing and after acquired unencumbered property of the Debtor and Debtor's estate under section 364(c)(2), which shall include, without limitation, all encumbered property of the Debtor and its estate that becomes unencumbered as a result of any such asserted lien being determined to be invalid, unenforceable, unperfected or avoidable (for the avoidance of doubt Debtor's avoidance of any lien or other transfer, or recovery of any property, shall inure to the benefit of Lenders; Debtor waives in favor of Lenders the rights and benefits of section 551 of the Bankruptcy Code), and (ii) a junior lien on all existing and after acquired property of the Debtor and its estate that is subject to a valid, enforceable and unavoidable lien ("Permitted Encumbrances"). The DIP Liens are granted to HHH Oakland, Inc. for itself and as agent for Terminal Investment Ltd., which shall hold the DIP Liens for the Lenders' ratable benefit as further described below. The DIP Liens shall be deemed perfected automatically upon the entry of the Interim Financing Order, without the Lenders, or either of them, filing or recording any document, instrument or notice of any kind.

Collateral:                    All property of the Debtor and the Debtor's bankruptcy estate, including without limitation, accounts, equipment, notes, fixtures, real estate interests of any kind, general intangibles, including, without limitation, all money, cash or cash equivalents; all books, records and information relating to any of the foregoing and/or to the operation of the Debtor's businesses, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded, and maintained; any account

established and maintained to hold any deposits to provide utility providers with adequate assurance of payment, and any residual amounts in the utility deposit accounts after satisfaction of any payments to any utility provider; tax refunds; trademarks, and tradenames, instruments, documents, investment property, chattel paper, commercial torts, and goods (respectively as defined in the Uniform Commercial Code), all real estate, all leaseholds, together with any proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing; all of the foregoing now owned or hereafter acquired (and without regard to whether acquired prior or subsequent to the Petition Date) ; and the products and proceeds thereof, including together with, following the entry of the Final Financing Order, all net proceeds of Chapter 5 causes of action (the "Avoidance Action Proceeds"); provided, however, that Lenders' lien on the Collateral shall be subject and subordinate to (i) the Carve-Out, and (ii) Permitted Encumbrances (collectively, the "Collateral").

Lenders' DIP Liens on the Collateral shall secure any and all funds advanced by Lenders, or either of them, post-petition to, or for the benefit of, the Debtor, including all amounts approved or advanced post-petition by Lenders before the entry of the Interim Financing Order (the "Post-Petition Lender Debt") incurred by the Debtor pursuant to the Interim Financing Order.

Each Lender is entitled to the full protections of section 364(e) of the Bankruptcy Code with respect to debts, obligations, liens, security interests, and other rights created or authorized under the Term Sheet, DIP Facility and Financing Orders.

Notwithstanding anything to the contrary set forth above, the DIP Liens granted to the Agent for the benefit of the Lenders upon the Collateral is without prejudice to the rights of the Debtor, or any other party in interest, including each Lender, to object to the validity, priority, or extent of any asserted third-party liens, or the allowance of such third-party debts secured thereby, or institute any actions or adversary proceedings with respect thereto.

Also, the Agent for the benefit of the Lenders will receive a super-priority claim to secure post-petition advances and extensions of credit under 11 U.S.C. § 364(c)(1) with priority over any and all administrative expenses specified in Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1114, or otherwise, subject only to the Carve-Out and the quarterly fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930.

Interest Rate:                     The unpaid principal amount of the advances under the DIP Facility shall accrue interest at a rate equal to 10% per annum.

Maturity Date/Term:

Subject to the entry of the Interim Financing Order and the terms of the DIP Facility Documents, the Debtor's obligations owing to the Lenders under the DIP Facility are due and payable upon the earliest to occur of the following:

(a)      thirty (30) days after the Petition Date, unless each of the following shall have occurred by such date: (i) the Final Order shall have been entered; (ii) Debtor shall have filed its Plan of Liquidation and related disclosure statement, together with a motion seeking to combine the confirmation hearing with a hearing on the adequacy of such disclosure statement; and (iii) an order granting Debtor's motion to reject the Concession Agreement and the Berth 25-26 occupancy agreement with the Port, effective not later than March 31, 2016 shall have been entered;

(b)      sixty (60) days after the Petition Date, unless (i) the Debtor shall have turned over to the Port possession of all premises on or before March 31, 2016; and (ii) the Debtor shall have obtained from the Court a hearing date prior to the one hundred fifteenth (115th) day after the Petition Date to consider confirmation of the Plan of Liquidation and approval of such disclosure statement;

(d)      one hundred fifteen (115) days after the Petition Date, unless the Debtor shall have obtained from the Court an order confirming the Plan of Liquidation and approving of such disclosure statement;

(e)      the occurrence of an Event of Default (as defined below);

(f)      the indefeasible payment in full in cash of the Debtor's obligations owing to the Lenders under the DIP Facility;

(g)      one hundred twenty (120) days from the Petition Date; or

(h)      the effective date of the Debtor's Plan of Liquidation.

Use of Proceeds:

To fund the Debtor's projected business winddown expenditures expressly approved under and pursuant to the terms, conditions and limitations of the Financing Orders, consistent with the Approved Budget, respecting amount and timing, and the DIP Loan Documents (as defined in the Financing Orders).

Carve-Out:                     Lenders' DIP Liens on the Collateral shall be subject and subordinate only to the following, in each instance:

                               (a)      use of Cash Collateral and DIP Facility advances to pay the following, subject to the Carve-Out Proviso (as defined below):

                                        (i)    professional fees and expenses of Debtor's professionals accrued prior to the date of Agent's declaration of any Event of Default under the DIP Facility, and allowed by the Court at any time, whether by interim order, procedural order or otherwise (provided, however, such interim allowance and payments shall remain subject to final allowance by a final order on each such professional's final fee application), in an amount not to exceed the amounts set forth on the line item for Debtor's Professional Fees in the Approved Budget through such date of declaration (the "Pre-Default Debtor's Professional Fee Carve-Out"), less any payments of such professional fees and expenses actually made prior to such declaration of any Event of Default; *plus*

                                        (ii) the following amount after the date Agent declares an Event of Default: up to $200,000 (inclusive of the amount of all retainers held by Debtor's professionals) with respect to the Debtor's professionals' fees and expenses and allowed by the Court at any time, whether by interim order, procedural order or otherwise (provided, however, such interim allowance and payments shall remain subject to final allowance by a final order on each such professional's final fee application), in respect of periods after such declaration of any Event of Default (the "Post-Default Debtor's Professional Fee Carve-Out"), as further described in the Interim Financing Order (the aggregate of the foregoing Debtor's professional's fees and expenses referred to in clauses (i) and (ii) is a cap not to exceed the sum of the Pre-Default Debtor's Professional Fee Carve-Out as of the date the Agent declares an Event of Default plus the Post-Default Debtor's Professional Fee Carve-Out, which capped sum shall be reduced dollar for dollar for each payment of Debtor's professionals' fees and reimbursement of expenses made at any time before or after an Event of Default, and is referred to as the "Professional Fee Carve-Out");

                               (b)      other requirements expressly set forth in the Interim Financing Order and the Final Financing Order, as applicable (i.e., such as claims agent fees, senior ad valorem tax liens and other senior liens); and

                               (c)      the fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a) (the "Trustee's Fee Carve-Out" and, together with the Professional Fee Carve-Out and the amounts for requirements referred to in clause (b) above, the "Carve-Out").

                               Also, the super-priority claim to secure post-petition advances and extensions of credit under 11 U.S.C. § 364(c)(1) with priority over any and all administrative expenses specified in Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a),

507(b), 546(c), 546(d), 552(b), 726, 1114, or otherwise, granted to the Lenders shall be subject and subordinate only to the Carve-Out.

For the avoidance of doubt, so long as a notice of an Event of Default has not been issued, subject to the Approved Budget the Debtor shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable, the same shall reduce the Pre-Default Professional Fee Carve-Out dollar for dollar and the same shall not reduce the Post-Default Professional Fee Carve-Out.  Upon issuance of a notice of an Event of Default, subject to the Approved Budget the Debtor shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals that accrued through the date of the issuance of the notice of an Event of Default and are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable, the same shall reduce the Pre-Default Professional Fee Carve-Out dollar for dollar, the Pre-Default Professional Fee Carve-Out shall be capped at the amount set forth in the Approved Budget through the date of the issuance of a notice of an Event of Default, subject to the Approved Budget the Debtor shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals on account of fees and expenses that accrue and are incurred following the date of the issuance of a notice of an Event of Default that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable, and the same shall reduce the Post-Default Professional Fee Carve-Out.

| | |
|---|---|
| Limitations on Use of the Carve-Out and Cash Collateral; Related Reserves: | No portion of the Carve-Out or any advances made under the DIP Facility shall be used to pay or reimburse (and the Carve-Out shall exclude) any fees and expenses (hereafter, the "Carve-Out Proviso"): |

(a)     incurred in connection with the investigation of, assertion of, joinder in, or prosecution of, any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief

(i)     invalidating, setting aside, avoiding, disallowing, recharacterizing, subordinating, challenging, in whole or in part, or objecting to the validity, priority, extent, perfection, priority or enforceability of (A) all or any portion of the obligations owing to the Lenders, or (B) the DIP Liens on the Collateral; or

(ii)    preventing, hindering, or delaying (whether directly or indirectly) Agent's assertions or enforcement of the DIP Liens, security interest or realization upon any Collateral;  or

(b)    incurred in connection with the sale or other disposition of any other Collateral or the proceeds thereof, or the incurrence of any Indebtedness not permitted under the DIP Facility, without the prior written consent of the Lenders;  or

(c)    arising after the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code or the dismissal of the Case.

The Agent shall have the right, but not the obligation, to establish and fund, in whole or in part, from time to time, a reserve in respect of the Carve-Out (the "Carve-Out Reserve").    Notwithstanding the establishment of the Carve-Out Reserve, payments of professional fees and expenses as described in the Carve-Out Section of this Term Sheet above may be made by the Lenders, and such ordinary course payments shall reduce the Carve-Out Reserve dollar for dollar.  From and after a declaration of any Event of Default, the Lenders may release the Carve-Out Reserve to facilitate payment of fees and expenses, subject to the Carve-Out and the Carve-Out Proviso.

The Carve-Out, the Carve-Out Reserve, pre-petition retainers, if any remaining, and any post-petition retainers held by such professionals shall not be used by the professionals to fund, nor shall the Lenders be responsible for the funding, financing, payment, or reimbursement of any fees or disbursements of any of the professionals in connection with such activities described in the Carve-Out Proviso.

Except as otherwise provided in this section, nothing contained in the Interim Financing Order shall be deemed a consent by Lenders to any charge, lien, assessment or claim against the Collateral under Bankruptcy Code Sections 506(c) or 552(b) or otherwise.  The foregoing shall not be construed as consent by Lenders to the allowance of any Professional Fees and Expenses and shall not affect the right of the Lenders to object to the allowance and payment of such amounts.

Financial Covenants:    The Debtor shall be in compliance with, among other things, the following financial covenants:

(a)    Compliance with Approved Budget.  The Debtor agrees that during each Measurement Period (as defined below):

(i)    the aggregate amount of Debtor's actual *cash expenses and disbursements* during such Measurement Period shall not be more than 115% of the projected cash expenses and disbursements for such Measurement Period as set forth in the Approved Budget (which disbursements shall not include amounts disbursed by the Debtor with respect to the Debtor's professionals, including all of its attorneys, accountants, and financial advisors);

(ii)    the aggregate amount of Debtor's actual *cash receipts* during such Measurement Period shall not be less than 65% of the projected cash receipts for such Measurement Period as set forth in the Approved Budget; and

(iii)    the Debtor's outstanding *loan balance* owing to the Lenders as of the end of such Measurement Period shall not be more than 110% of the projected amount of such outstanding loan balance as of such date as set forth in the Approved Budget; provided, however, that the outstanding principal amount owing to the Lenders shall at no time exceed $3.5 million.

Each week the Debtor shall provide such reports to Lenders, evidencing the Debtor's compliance with the foregoing financial covenants.

For purposes of the foregoing, "Measurement Period" shall mean each rolling four week period reflected on the Approved Budget. A condition precedent to the entry of the Final Financing Order shall be that the Debtor is in compliance with the foregoing financial covenant on the date of such entry.

| | |
|---|---|
| Covenants Generally: | Usual and customary affirmative and negative covenants for asset based facilities of this type. The collections shall be applied, first, in reduction of Lenders' costs and expenses, second, in reduction of accrued interest, and third, in reduction of the outstanding principal balance owing to the Lenders under the DIP Facility. Advances by each Lender under the DIP Facility shall act to permanently reduce each Lender's respective Commitment. Funds advanced and repaid may not be reborrowed by the Debtor or readvanced by the Lenders. |
| Events of Default: | Each of the following shall be an "Event of Default" under the DIP Facility: |

(a)    the Debtor's failure to pay any amount under the DIP Facility in full when due;

(b)    the Debtor's failure to comply with the covenants contained in the DIP Loan Documents, the Interim Financing Order, or the Final Financing Order, subject to notice and cure periods, where applicable;

(c)    the Debtor's breach of its obligations to comply with the financial covenants set forth above, subject to notice and three-day cure right for up to two (2) occasions if failure results solely from a failure to timely deliver related reporting;

(d)    the Debtor's violation of any of the material terms of the Interim Financing Order;

(e)     the Debtor's failure to obtain entry of the Final Financing Order within thirty (30) days after the Petition Date;

(f)     the occurrence and continuance of any "Event of Default" under the DIP Loan Documents;

(g)     the termination or non-renewal of the DIP Loan Documents as provided for in the Interim Financing Order;

(h)     the conversion of the Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(i)     the appointment of a Trustee pursuant to section 1104 of the Bankruptcy Code in the Case;

(j)     the appointment of an examiner, with expanded powers, under the Bankruptcy Code in the Case;

(k)     the dismissal of the Debtor's Chapter 11 Case;

(l)     the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim Financing Order (and thereafter, the Final Financing Order) without the express prior written consent of the Lenders (and no such consent shall be inferred from any other action, inaction, or acquiescence by either Lender);

(m)     the transfer of venue for the Case from the Bankruptcy Court (as defined below) to any other jurisdiction;

(n)     the filing (and confirmation) of a plan by the Debtor (or any other party) that is inconsistent with the terms of the DIP Facility, Interim Financing Order (and thereafter, the Final Financing Order) or that is not in form and substance reasonably acceptable to the Lenders; unless such Plan and Disclosure Statement provides for the indefeasible payment in full in cash of the Post-Petition Lender Debt to the Lenders on the effective date of such Plan and such effective date shall occur prior to the Maturity Date;

(o)     the Debtor's (i) filing any motion or document in connection with its bankruptcy case that is not consistent in any material respect with the terms of the DIP Facility, the Interim Financing Order (or later, the Final Financing Order), and any documents or pleadings related to the foregoing, including, without limitation, a disclosure statement motion, a proposed disclosure statement and a proposed plan, or (ii) proposing a sale motion or a sale order that does not provide for the payment of the Lenders' claims consistent with the Interim Financing Order (or later, the Final Financing Order) or is not otherwise approved by the Agent;

(p)     the failure of the Debtor to maintain exclusivity to file and seek approval of its Disclosure Statement and Plan;

(q)      the failure of the Debtor to file its Plan, consistent with the terms hereof, on or before thirty (30) days following the Petition Date;

(r)      the failure of the Debtor to commence the hearing on its Disclosure Statement and confirmation of its Plan, on or before one hundred fifteen (115) days following the Petition Date;

(s)      the failure of the Debtor to confirm its Plan and have its Plan become effective, on or before, 120 days following the Petition Date;

(t)      the entry of any order which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code, which order permits any creditor, other than the Agent, to realize upon, or to exercise any right or remedy with respect to, any asset of the Debtor;  or

(u)      the filing by the Debtor or any other party in interest of a motion, complaint or other proceeding seeking to challenge the validity, enforceability, or priority of any of the DIP Liens in favor of the Agent for the benefit of the Lenders, or the Agent's rights and remedies under the Interim Financing Order (or later, the Final Financing Order) or the filing by the Debtor or any other party in interest of a motion, complaint or other proceeding seeking to assert any claim for damages, injunctive relief or seeking any equitable remedy against the Agent or either Lender or any of the Lenders' respective affiliates, related entities or any of any of the foregoing party's respective shareholders, subsidiaries, affiliates, members, managers, directors, officers, employees, professionals or advisors, agents, successors or assigns.

| | |
|---|---|
| <u>Exercise of Remedies</u>: | Upon the occurrence of an Event of Default, |

(1)      Each Lender has no further obligation to make advances under the DIP Facility, other than to fund the Carve-Out that have not previously been advanced, pro-rated for the month in which the date of the Agent's declaration of an Event of Default has occurred, the Lender's respective remaining Commitments shall terminate, and the Debtor shall have no right to use funded advances under the DIP Facility or the proceeds of Collateral, unless otherwise consented to in writing by the Agent in connection with the immediate preservation of the Collateral in amounts approved in writing by the Agent,

(2)      after three (3) business days' notice from the Agent following the failure to comply with any provisions, covenants, or requirements under the DIP Facility, the Interim Financing Order, or the Final Financing Order (the "<u>Required Notice</u>"), all of the obligations of Debtor under the DIP Facility shall become immediately due and payable,

(3)    after the Required Notice, the Automatic Stay provided for pursuant to Section 362 of the Bankruptcy Code shall be automatically and completely vacated as to each Lender without further order of the Bankruptcy Court,

(4)    the Lenders may by written notice to the Debtor instruct and thereby require the Debtor to file a motion immediately seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the Lenders, and consistent with an approved budget for the Debtor's administrative costs incurred, implementing any such transactions (and with due credit for the Carve-Out to be funded hereunder following the declaration of an Event of Default), as may be agreed upon in writing by the Lenders and the Debtor; and/or

(5)    after the Required Notice, the Agent without further notice, hearing, or approval of the Bankruptcy Court shall be authorized, at its option and subject to applicable law, to take any and all actions and remedies that the Lenders may deem appropriate to proceed against, take possession of, protect, and realize upon the collateral and any other property of the estate of the Debtor upon which the Lenders have been or may hereafter be granted DIP Liens and security interests to obtain repayment of the Post-Petition Lender Debt to the Lenders.

Required Notice shall mean three (3) business days' written notice by Agent of the declaration of an Event of Default, served by overnight delivery service or facsimile or email upon the Debtor, the Debtor's counsel, and the United States Trustee, and Agent shall have the relief set forth above unless the Debtor contests the occurrence of an Event of Default and the Bankruptcy Court determines the same prior to the expiration of such applicable period.

Conditions Precedent:    The commitment of each Lender to provide the DIP Facility shall be conditioned upon satisfaction of the following conditions precedent as well as other conditions customary for transactions of this type:

the Debtor shall file its Voluntary Petition under Chapter 11 of the Bankruptcy Code, on or before February 1, 2016 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

all necessary consents and approvals for the initial funding under the DIP Facility shall have been obtained by both Lenders;

approval by the Lenders of the budget (as amended and approved by the Lenders from time to time, the "Approved Budget"), for the period commencing on the Petition Date, and continuing through the date that is 120 days after the Petition Date, attached hereto as Schedule 1; and, receipt, thereafter, on or before each Wednesday of a comparison of actual disbursements and obligations incurred for the preceding week ending on the preceding Saturday to the

disbursements and requirements scheduled for such week in the Approved Budget and any proposed changes to the Approved Budget; provided, that, notwithstanding anything to the contrary, the financing provided under the Interim Financing Order shall only relate to the period (the "Interim Period") from the Petition Date to the date of the hearing on final approval, which shall be no more than thirty (30) days after the Petition Date;

any other information (financial or otherwise) reasonably requested by the Agent and the Lenders shall have been received by Agent and the Lenders and shall be in form reasonably satisfactory to the Agent and the Lenders and shall not reflect the existence of an Event of Default;

the Agent and the Lenders shall have received post-petition reports in form and in such detail as reasonably requested by the Agent and the Lenders;

each Lender shall have committed to fund its Maximum Commitment; and

if requested by the Agent, execution and delivery of such documentation (to include financing statements, security agreements, and account control agreements with respect to any existing or new bank accounts opened by the Debtor, tax lien and litigation searches, good standing certificate, customary representations, warranties, covenants, events of default, indemnification, instruments, insurance and such other acts as the Agent may reasonably request in order to obtain the Lenders' legal approval to effect the completion of the financing arrangements herein contemplated) reasonably satisfactory in form and substance to the Lenders and their respective counsel.

Each Lender's commitment to lend as stated herein is expressly subject to the entry of all necessary and appropriate Bankruptcy Court orders, which order or orders (the "Orders") must be (i) not subject to any stay, modification, or reversal; and (ii) acceptable to each Lender in its reasonable discretion.

Without limiting in any way the Agent's and each Lender's reasonable discretion, such Orders shall provide for the following, among other things:

(a)    that all post-petition indebtedness, liabilities and obligations of the Debtor to the Lenders, whenever and however arising, including without limitation, the loans and all fees, charges and expenses contemplated by this Term Sheet or otherwise incurred, including, but not by way of limitation, fees and expenses of attorneys and other professionals, shall be secured by a first priority lien and security interest in all Collateral, subject to Permitted Encumbrances and the Carve-Out;

(b)     that adequate notice has been given to all necessary parties of the hearings pursuant to which the Bankruptcy Court has entered the Orders;

(c)     upon the entry of the Final Financing Order that no costs, expenses or other charges may be assessed against or attributed to the Lenders or the Collateral pursuant to Bankruptcy Code Sections 506(c) or 552(b) or otherwise; and

(d)     a finding that each Lender has acted in good faith and entitled to all the protections under Bankruptcy Code Section 364(e).

(e)     upon the entry of the Final Financing Order that the Debtor and its estate generally release the Agent and the Lenders in all capacities.

Agent:                    Appointment of Agent.    Each Lender irrevocably appoints HHH Oakland, Inc. as Agent to issue all of Lenders' notices, consents, approvals and waivers, together with any other actions and powers that are specifically delegated to the Agent, by or pursuant to the DIP Loan Documents.  Agent may perform any of its duties hereunder or under the other DIP Loan Documents by or through any one or more sub-agents or attorneys-in-fact appointed by Agent.  The exculpatory provisions set forth in this Term Sheet shall apply to any such sub-agent, or attorney-in-fact and shall apply to their respective activities in connection with the activities as Agent.

Nature of Duties of Agent.   Agent shall not have any duties or obligations except those expressly set forth in this Term Sheet and the other DIP Loan Documents.   Without limiting the generality of the foregoing, (a)  Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (b)  Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except those discretionary rights and powers expressly contemplated by the DIP Loan Documents that Agent is required to exercise in writing by the Lenders, and (c) except as expressly set forth in the DIP Loan Documents, Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Debtor that is communicated to or obtained by Agent or any of its Affiliates in any capacity.  Agent shall not be liable for any action taken or not taken by it, its sub-agents or its attorneys-in-fact with the consent or at the request of the Lenders or in the absence of its own gross negligence or willful misconduct.  Agent shall not be responsible for the negligence or misconduct of any sub-agents or attorneys-in-fact selected by it with reasonable care.  Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof (which notice shall include an express reference to such event being a "Default" or "Event of Default" hereunder) is given to Agent by the Debtor or any Lender, and Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation

made in or in connection with any DIP Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements, or other terms and conditions set forth in any DIP Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any DIP Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in any DIP Loan Document, other than to confirm receipt of items expressly required to be delivered to Agent.  Agent may consult with legal counsel (including counsel for the Debtor) concerning all matters pertaining to such duties.

<u>Lack of Reliance on Agent</u>.  Each Lender acknowledges that it has, independently and without reliance upon Agent or the other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Term Sheet and the DIP Loan Documents.  Each Lender also acknowledges that it will, independently and without reliance upon Agent or the other Lender and based on such documents and information as it has deemed appropriate, continue to make its own decisions in taking or not taking any action under or based on this Term Sheet and the DIP Loan Documents.

<u>Certain Rights of Agent</u>.  If Agent shall request instructions from the Lenders with respect to any action or actions (including the failure to act), Agent shall be entitled to refrain from such act or taking such act unless and until it shall have received instructions from the Lenders, and Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting hereunder in accordance with the instructions of the Lenders where required by the terms of this Term Sheet.

<u>Reliance by Agent</u>.  Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it to be genuine and to have been signed, sent or made by the proper Person.  Agent may also rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person and shall not incur any liability for relying thereon.  Agent may consult with legal counsel (including counsel for the Debtor), independent public accountants and other experts selected by it and shall not be liable for any action taken or not taken by it in accordance with the advice of such counsel, accountants or experts.

<u>Agent in its Individual Capacity</u>.  The Lenders acknowledge that HHH Oakland, Inc. is acting as both Agent and as a Lender.  While serving as Agent HHH Oakland, Inc. shall have the same rights and powers under this Term Sheet and the DIP Loan Documents in its capacity as a Lender as the other Lender and may exercise or refrain from exercising the same

as though it were not Agent; and the terms "Lenders," "each Lender," or any similar terms shall, unless the context clearly otherwise indicates, include Agent in its individual capacity but not its capacity as Agent. HHH Oakland, Inc. agrees to act as Agent as a convenience to the Lenders and without compensation for such services, although HHH Oakland, Inc. will be entitled to reimbursement from the Debtor pursuant to the provisions of the DIP Loan Documents for any costs or expenses incurred by it while acting in its capacity as Agent.

Agent May File Proofs of Claim.

      (a)      Agent shall be entitled and empowered:

           (i)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the DIP Facility that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of Lenders and Agent allowed; and

           (ii)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same.

      (b)      Each Lender hereby authorizes the Debtor to make such payments to Agent and to reimburse Agent for any expenses, disbursements or advances incurred, or made, by Agent and its agents and counsel.

Nothing contained herein shall be deemed to authorize Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan affecting the Post-Petition Debt or the rights of any Lender or to authorize Agent to vote in respect of the claim of any Lender in any such proceeding.

No Third Party Beneficiaries. This is an agreement solely among Agent and Lenders and shall survive the indefeasible payment in full of the Post-Petition Debt. This section of the Term Sheet does not confer any rights or benefits upon the Debtor or any other person, and the Debtor shall not have any standing to enforce the agency provisions hereof. As between the Debtor and Agent, any action that Agent may take hereunder or under any DIP Loan Document or with respect to the Post-Petition Debt shall be conclusively presumed to have been authorized and directed by Lenders.

"Last In-First Out" provisions. Each Lender's ratable interest in the DIP Liens shall be equal so long as each Lender funds 50% of each advance under the DIP Facility. In the event either Lender funds none, or less than all, of any advance under the DIP Facility, then the Lender that funds its such committed advance in full (and in such funding Lender's sole option that funds up to the other Lender's committed advance) shall be treated as having made a "last in-first out" advance in the aggregate

amount of such advance, with such amount having priority in recovery and return in full, over the Lenders' equal ratable interests in DIP Facility advances; provided, however, that such right of recovery is on a non-recourse basis, except to the Debtor, its estate and the Collateral, and such Lender fudning a "last in-first out" advance shall not have a direct claim against the other Lender for the amount of such "last in-first out" advance.  Each subsequent "last in-first out" advance, if any, shall have priority over all prior advances, such that the Lender funding the last such "last in-first out" advance shall have first priority in recovery of and return on such last "last in-first out" advance; provided, however, that such right of recovery is on a non-recourse basis, except to the Debtor, its estate and the Collateral, and such Lender fudning a "last in-first out" advance shall not have a direct claim against the other Lender for the amount of such "last in-first out" advance.

In the event either Lender funds an advance for the other Lender, the Lenders' aggregate Maximum Commitments shall remain unchanged, however, such funding Lender's Maximum Commitment shall increase, and the Maximum Commitment of the Lender not so funding shall decrease in like amounts.

| | |
|---|---|
| Governing Law: | New York. |
| DIP Loan Documents | The DIP Facility documents will be in form and substance mutually acceptable to each Lender and the Debtor and will contain representations and warranties; conditions precedent; affirmative, negative and financial covenants; indemnities; and events of default and remedies as set forth herein, or if not specifically set forth herein, in form and substance acceptable to the Lenders.  All relevant documents, such as transaction documents, security agreements, pledge agreements, subordination agreements, intercreditor agreements, and other material agreements, will be in form and substance reasonably acceptable to the Agent and the Lenders.  All orders of the Bankruptcy Court approving or authorizing the DIP Facility, and all other material motions filed in the Chapter 11 Case and orders entered by the Bankruptcy Court with respect thereto, will be in form and substance reasonably acceptable to the Agent and the Lenders.  Notwithstanding anything to the contrary herein, the Lenders may elect to consider this Term Sheet as a binding commitment to lend and a loan and security agreement binding on and enforceable against the Debtor, together with the terms and conditions, and upon the entry, of the Interim Financing Order (and later, the Final Financing Order), in accordance with the terms and conditions set forth herein and in the Lender-approved and Bankruptcy Court-entered Interim Financing Order and the Final Financing Order, on an interim or a final basis, and together with any note and other instrument and document required by Lenders to be executed and delivered by the Debtor. |

Intending to be legally bound hereby, for and in consideration of the mutual covenants, terms and conditions set forth herein above, which consideration the parties acknowledge is good and sufficient, the undersigned parties agree to the provisions of this Term Sheet.

OUTER HARBOR TERMINAL, LLC

_____
By:
Name:
Title:

HHH OAKLAND, INC., As Agent and Lender

_____
By:
Name:
Title:

TERMINAL INVESTMENT, LTD., S.A., as Lender

_____
By:
Name:
Title: