## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------  x
                                                       :
In re:                                                 :      Chapter 11
                                                       :
OUTER HARBOR TERMINAL, LLC,¹                            :      Case No. 16-10283 (LSS)
                                                       :
                                                       :
                          Debtor.                      :
----------------------------------------------------  x
```

### DECLARATION OF HEATHER STACK, CHIEF FINANCIAL OFFICER, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS OF OUTER HARBOR TERMINAL, LLC, DEBTOR AND DEBTOR IN POSSESSION

I, Heather Stack, hereby declare under penalty of perjury:

1.    I am the Chief Financial Officer ("CFO") of Outer Harbor Terminal, LLC, a limited liability company organized under the laws of the State of Delaware (the "Debtor"), and have served in such capacity since October 2014.

2.    I have over 18 years of experience in in the maritime and transportation industries.  Prior to joining the Debtor, I was a business unit controller at CSAA Insurance, an AAA insurer, and prior to that I served as Director and VP at AlixPartners, a financial advisory services firm.  I have also held various management roles in finance and operations at Horizon Lines, a domestic ocean shipping and logistics company, and its predecessor company, Sea-Land Service.  I earned a Bachelor's of Business Administration degree in Finance from The College of William & Mary.

3.    Concurrently with the filing of this declaration (the "Declaration") on the date hereof (the "Petition Date"), the Debtor has filed in this Court a voluntary petition for relief

---

¹    The last four digits of the Debtor's federal tax identification number are 2070.  The Debtor's principal place of business is located at 1599 Maritime Street, Oakland, CA 94607.

under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code").

4.       As discussed further below, the Debtor's bankruptcy filing coincides with the Debtor's ongoing efforts to implement an orderly and efficient wind down of its business and liquidation of its assets (the "Wind Down").  In order to operate effectively during the Wind Down, minimize certain of the potential adverse effects of the commencement of the chapter 11 case, and maximize the value of the Debtor's estate and creditor recoveries, the Debtor has requested certain relief in "first day" motions filed with the Court (collectively, the "First Day Pleadings").  I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of this chapter 11 case and in support of the Debtor's chapter 11 petition for relief and the First Day Pleadings.

5.       Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtor's senior personnel and other employees, my discussions with certain of the Debtor's affiliates who provide certain "shared services" to the Debtor, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

6.       I am familiar with the contents of each First Day Pleading (including the exhibits to such pleadings) and believe the relief sought in each First Day Pleading: (a) will enable the Debtor to operate in chapter 11 with minimal disruptions until its business is fully wound down; (b) is critical to the Debtor's achievement of an orderly and efficient liquidation; and (c) best serves the interests of the Debtor's estate and creditors.  Further, it is my belief that the relief

2

sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above.

7.      Part I of this Declaration is a preliminary statement.   Parts II and III of this Declaration provide an overview of the Debtor's history, business, and capital structure.   Part IV provides an overview of the circumstances leading to the commencement of this chapter 11 case, including a summary description of the Debtor's Wind Down plan.   Part V summarizes the First Day Pleadings and the bases for the relief sought therein.

## I.      Preliminary Statement

8.      Formed in 2009, the Debtor is a privately-owned, limited liability company headquartered in Oakland, California that provides container terminal operations and stevedore services at the Port of Oakland (the "Port"), the fourth largest port on the west coast of the United States.   The Debtor's principal operations consist of: (i) the offloading and onloading of containers from cargo ships that berth at the Port; (ii) loading the offloaded containers on to trucks so that they may delivered from the Port to their ultimate domestic destination; and (iii) providing various logistical services to the Debtor's customers in connection with the foregoing.   The Debtor operates from leased berths and terminal space that are owned by the Port.   The leases are governed by two separate lease agreements, including a 50-year concession agreement that has approximately 44 years remaining on its term.   A map of the Port reflecting the area leased by the Debtor is attached hereto as Exhibit A.

9.      In the last few years, the Debtor has operated at a loss and has had material negative cash flows.   In 2015, the Debtor began to explore potential financing alternatives that would allow the Debtor to fund long-term capital investments that would be necessary for the Debtor to remain competitive in its industry and, in particular, at the Port.   Those efforts, however, did not prove successful.   During this time, as well as on several occasions prior to

2015, the Debtor also approached the Port about a consensual restructuring of or amendments to the Debtor's existing lease and concession arrangements with the Port in order to help make the Debtor a viable enterprise.   While discussions with the Port continued over a period of approximately six months, they did not result in any resolution of the long-term issues facing the Debtor.

10.      In light of the absence of any funding source for the necessary capital expenditures and any comprehensive restructuring of the lease agreements with the Port, and after consultation with the Debtor's advisors, the Debtor's two members ultimately voted to terminate the Debtor's operations at the Port and pursue the formal Wind Down.  As discussed in further detail below, the Debtor commenced the Wind Down on or about January 19, 2016 and intends to continue that process through the chapter 11 case, with the goal of filing a plan of liquidation as promptly as practicable.

11.      The Debtor believes that time is of the essence in the chapter 11 case in order to minimize administrative expenses and, therefore, maximize recoveries for existing stakeholders. Accordingly, it is critical that the Debtor continues the Wind Down and ultimate liquidation of its assets as promptly as possible.  To that end, the Debtor has negotiated the terms of a $3.5 million debtor-in-possession financing facility (the "DIP Facility") that will be provided by the Debtor's members.[2]  The Debtor believes that the proceeds of the DIP Facility, together with collections on outstanding accounts payable from the Debtor's customers and the proceeds realized from de minimis asset sales will provide sufficient liquidity to operate the Debtor throughout the chapter 11 process and pay for the administrative expenses associated with the chapter 11 case.  A copy of an initial 13-week cash flow forecast reflecting the contemplated

---

[2]      The terms of the DIP Facility are described in more detail in Section V(e) below.

borrowings, receipts and disbursements is attached as an exhibit to the proposed Interim DIP Order (defined below).

## II.    Company Background, Business and Operations

12.    *Formation of Company and Organizational Structure*.    The Debtor, a limited liability company, was founded in 2009 as a single-entity joint venture between (i) HHH Oakland, Inc. ("HHH Oakland"), an indirect subsidiary of Ports America Group, Inc., the largest terminal operator in the United States, and (ii) Terminal Investment Ltd ("TIL"), which operates terminals in various ports in the United States and various countries around the world.  Each of HHH Oakland and TIL holds a 50% membership interest in the Debtor.  The Debtor is not the parent to any other corporate entity, and neither HHH Oakland nor TIL is seeking chapter 11 protection.

13.    *The Debtor's Business Operations*.    The Debtor began operations at the terminal on January 1, 2010 under a fifty-year concession agreement with the Port (the "Concession Agreement") that provides the Debtor with access to 166 acres of terminal space (located at berths 20 to 24 of the Port) and includes four ship-to-shore ("STS") cranes.  As of the Petition Date, the Debtor had approximately 44 years remaining under the term of the Concession Agreement.  The Debtor's current annual rent obligations under the Concession Agreement total approximately $27 million.

14.    In October 2010, the Debtor expanded its operations by taking assignment of an adjacent property lease of berths 25 and 26 at the Port (the "TBCT Lease") from International Transportation Service, Inc.  The TBCT Lease provided the Debtor with access to an additional 44 acres of terminal space and three additional STS cranes.  The TBCT Lease is currently a month-to-month lease that is terminable ninety days after written notice by either the Debtor or the Port.  Prior to the Petition Date, the Port purported to exercise the termination option and

asserted that the TBCT Lease would terminate on or about May 1, 2016. The Debtor's current annual rent and other obligations owed to the Port under the TBCT Lease total approximately $11 million.

15.     The Debtor provides stevedoring services to 23 shipping lines serving Asia, Europe, Central and South America, and Australia. The terminal handles approximately 55 vessel calls each month, discharging and loading primarily containerized cargo. Oversized and heavy lift cargo is handled as well, including non-containerized cargo such as construction materials and yachts. The Debtor's significant customers include: Mediterranean Shipping Company, Maersk, CMA-CGM, Yang Ming, "K" Line, Hamburg Sud, Hapag Lloyd, Pasha Hawaii, China Ocean Shipping Company, United Arab Shipping Company, Hanjin, Mitsui O.S.K. Lines, China Shipping, Polynesian Lines, Pacific International Lines, and Wan Hai Lines.

16.     The Debtor negotiates terminal and stevedoring services individually with each shipping line. The contracts for these services generally vary in length between one to five years. The Debtor also provides its customers with various ancillary services as needed, including line handling, refrigerated container monitoring, and customer equipment repairs.

17.     *Employees and Management*. As of the Petition Date, the Debtor employs approximately 55 employees at its corporate headquarters, almost all of whom work on a full time, salaried basis. The Debtor also utilizes the services of unionized labor for the terminal operations and stevedore services provided at the Port. On average, the Debtor uses approximately 2,600 hours of union personnel on a daily basis, though the actual number is dependent on the level of shipping activity and traffic on a particular day.

18.     The Debtor's senior management consists of myself, as Chief Financial Officer. The Debtor does not employ any other senior level officer. Pursuant to its operating agreement,

the Debtor also has a four-person "Executive Committee", consisting of two designees appointed by each of the Debtor's members.  The Executive Committee acts similar to a board of directors.[3]

19.    In the ordinary course of its business, the Debtor utilizes certain "shared services" that are provided, pursuant to certain arms' length agreements, by certain Ports America entities to the Debtor and various other Ports America companies that provide terminal and stevedore services throughout the country.  These "shared services" include certain accounting, payment processing, general administrative and back office functions.

20.    The Debtor maintains its corporate headquarters in Oakland, California at office space that is located on the premises leased from the Port.  The Debtor does not own any real property.

### III.    Prepetition Capital Structure

21.    As of December 31, 2015, the Debtor's unaudited balance sheets reflected total assets of approximately $ 350 million and total liabilities of approximately $380 million, each reported on a book value basis.  The Debtor's material long-term indebtedness principally consists of its obligations under the Concession Agreement, the TBCT Lease and various leases of equipment used in the Debtor's terminal operations.  As of January 31, 2016, the Debtor's aggregate accounts payable balances totaled approximately $5.9 million and consisted of liabilities to suppliers, vendors, service providers, and lessors.  The Debtor is not a borrower under any long-term term loans or revolving credit facilities, other than equipment financing and capital leases.

---

[3]    Prior to the Petition Date, the Debtor and its Chief Executive Officer (the "CEO") agreed to a mutual termination of the CEO's employment.  Given the contemplated Wind Down, the Executive Committee did not believe the appointment of a new CEO was necessary.

22.     As of the Petition Date, the Debtor was involved in two active and significant litigation matters.  The Debtor is a respondent in an "unfair labor practice" ("ULP") proceeding commenced by the International Association of Machinists ("IAM") against the Debtor in 2013 and currently pending before the National Labor Relations Board ("NLRB") (the "IAM Litigation").  The IAM Litigation stems from an earlier ULP proceeding against another unrelated company, Pacific Crane Maintenance Company ("PCMC").  In that earlier proceeding, the NLRB found that PCMC committed ULP's by recognizing another union, instead of the IAM, as representing its mechanics performing the maintenance and repair work at the terminal prior to the Debtor taking over possession of the terminal in 2010, as well as after the Debtor took over the terminal and continued to use PCMC to do the maintenance and repair work until 2013.  In the current case against the Debtor, the IAM and NLRB contend that, when the Debtor took over the maintenance and repair work from PCMC in 2013, the Debtor became a "successor" to PCMC, was liable for the ULP's committed earlier by PCMC, and was also obligated to recognize the IAM as the representative of its newly hired mechanics in 2013 and since. The Debtor strongly defends its actions as not being ULP's.

23.     In addition, the Debtor currently is the petitioner in a California proceeding contesting the City of Oakland's purported assessment of approximately $8.9 million in transfer taxes relating to the Debtor's occupation of the premises leased from the Port.

## IV.    Circumstances Leading to Commencement of the Chapter 11 Case

### i.   *The Debtor's Wind Down Plan*

24.     Over the course of the past few months, the Debtor's management, in consultation with the Executive Committee and its legal advisors, worked diligently to develop the Wind Down plan and put the necessary systems in place to manage the process in an orderly manner. Among other things, the Debtor crafted a specific communications plan for customers, vendors,

suppliers, and employees in order to minimize disruptions to the Debtor's business through the Wind Down.

25.    On January 19, 2016, the Debtor publicly announced that it intended to cease business operations and since that time has proceeded to implement the Wind Down.  A copy of the Debtor's press release announcing the Wind Down is attached hereto as <u>Exhibit B</u>.  As of the Petition Date, the Debtor has commenced the Wind Down and has completed approximately one-third of its first stage. A brief summary of the various stages of the Wind Down follows.

26.    <u>Stage 1</u>.  During the first stage of the operational Wind Down, the Debtor intends to continue servicing its customers' ships, including loading and offloading containers.  The Debtor anticipates that it will cease its loading and offloading operations on or about the thirtieth day after the commencement of the Wind Down or approximately February 19, 2016.  The Debtor believes that this will allow for the orderly management of the ships that already are at or are scheduled to arrive soon at the Debtor's terminal.  It also provides the Debtor an opportunity to facilitate the transition of its customers to other terminals or ports and to collect on outstanding receivables from the customers.  As of the Petition Date, the Debtor has completed approximately one-third of Stage 1 of the Wind Down.

27.    <u>Stage 2</u>.  The second stage of the operational Wind Down will focus principally on moving customers' containers out of the Debtor's terminal and commencing the liquidation of assets that are no longer necessary given the Debtor's minimal operational needs.  It is anticipated that Stage 2 will take approximately thirty days following the conclusion of Stage 1.

28.    <u>Stage 3</u>.  The last stage will involve the final wind-down of operations and surrender of the leased premises to the Port.  The Debtor anticipates that this final stage will take

approximately one week, with an anticipated surrender of the premises to the Port on or about the sixtieth day after the Petition Date.

ii.  *The Commencement of the Chapter 11 Case*

29.    Throughout the last few weeks, the Debtor remained hopeful that it could implement the Wind Down out of court on a consensual basis.  To that end, the Debtor engaged in protracted negotiations with the Port regarding a consensual termination of the Concession Agreement, the TBCT Lease and related agreements.  However, just days prior to the Petition Date, in connection with the pending IAM Litigation, the NLRB demanded that the Debtor provide written assurances of its ability to segregate and maintain sufficient assets to satisfy the Debtor's potential liability in connection with that litigation, which the NLRB claimed could be in the "millions of dollars."  The NLRB also set January 29, 2016 as the deadline for the Debtor to respond to its demand.  The Debtor, however, was unable to respond to the NLRB's demand.

30.    Faced with the threat that either the Port or the NLRB potentially would exercise remedies against the Debtor—including the NLRB seeking injunctive relief—that would interfere with the Debtor's ability to continue the Wind Down, the Debtor determined that the safest course of action would be to seek chapter 11 relief and protect the interests of all of the Debtor's stakeholders.  Accordingly, the Debtor's members formally authorized the Debtor to commence this chapter 11 case on January 28, 2016.

31.    In order to complete the Wind Down as expeditiously as possible, the Debtor intends to file motions seeking to implement procedures for the sale of the Debtor's de minimis assets, as well as procedures to assume and assign or reject the Debtor's various executory contracts and leases.  The purpose of these motions is to allow the Debtor to monetize quickly any assets that have any remaining value and minimize the accrual of postpetition administrative

expenses, thereby enhancing recoveries to the Debtor's creditors. The Debtor also is seeking approval of the DIP Facility and use of cash collateral. Additional detail regarding certain of these motions is provided in Part V below.

32.    In addition, the Debtor intends to promptly file a motion seeking to reject the Concession Agreement, the TBCT Lease and certain related equipment leases and contracts with the Port. The Debtor's present intention is to surrender possession of the leased premises to the Port approximately sixty days after the Petition Date. While the Debtor remains open to continued discussions with the Port regarding a consensual termination of the leases and contracts, the Debtor intends to file the rejection motion in order to minimize any postpetition administrative expenses that otherwise might accrue under those agreements.

## V.    First Day Pleadings

33.    Concurrently with its chapter 11 petition, the Debtor is filing a number of First Day Pleadings. I believe that, among other things, the relief requested in the First Day Pleadings is necessary to enable the Debtor to operate with minimal disruption during the pendency of this chapter 11 case and during the implementation of the Wind Down, thereby preserving and maximizing the value of the Debtor's estate. A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below. I have reviewed each of the First Day Pleadings, and the facts set forth therein are true and correct to the best of my knowledge and belief, with appropriate reliance on the Debtor's senior personnel and other employees, certain of the Debtor's affiliates who provide certain "shared services" to the Debtor, and the Debtor's advisors.

**a.    Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Making Electronic Payments and Transfers, (D) Maintain Existing Business Forms, (E) Continue to Use Company Charge Cards and Pay**

**Claims Related Thereto, and (F) Continue Performing Under Existing Shared Services Arrangement with the Debtor's Affiliates and Continue Other Intercompany Transactions, (II) Granting Administrative Expense Priority to Postpetition Intercompany Obligations to Debtor's Affiliates, (III) Waiving the Requirements of Section 345(b); and (IV) Scheduling a Final Hearing (the "<u>Cash Management Motion</u>")**

34.    The Debtor requests entry of interim and final orders (i) authorizing the Debtor to (a) continue operating its existing cash management system, (b) honor bank charges and fees, (c) continue making electronic payments and transfers, (d) maintain existing business forms, (e) continue to use certain company purchase cards in connection with certain purchases made by employees in the ordinary course of business and pay all amounts, including prepetition amounts, relating to the company purchase cards, and (f) continue performing under the existing "shared services" and intercompany arrangements with certain of the Debtor's affiliates, including certain accounting and back office transactions, in the ordinary course of business, (ii) granting administrative expense priority to postpetition intercompany claims of the Debtor's affiliates; (iii) waiving the requirements of section 345(b) of the Bankruptcy Code; and (iv) in the case of the interim order, scheduling a final hearing.

35.    In the ordinary course of its business, the Debtor utilizes a relatively straightforward cash management system that consists of a single bank account and is supported by certain administrative, accounting and back office services provided by certain of the Debtor's affiliates (collectively, the "<u>Cash Management System</u>").  The Cash Management System is used by the Debtor principally to collect, manage, and disburse funds used in its operations.  The Debtor believes that continuing the Cash Management System without interruption is essential to the efficient execution and achievement of the Debtor's ongoing Wind Down process which, in turn, will help maximize the value of the Debtor's estate and creditor recoveries.

36.     I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to ensure the Debtor's smooth transition into bankruptcy and avoid any interruptions to the operation of the Debtor's business.  I believe that authorizing the Debtor to, among other things, continue operating its Cash Management System, maintain existing business forms, and continue intercompany transactions, including the "shared services" arrangement among the Debtor and certain of its affiliates, is essential to the Debtor's operational stability as it implements the Wind Down in an efficient manner.  In my opinion, continued use of the Cash Management System will facilitate the Debtor's chapter 11 case by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of postpetition obligations.  Moreover, I believe that allowing the Debtor to continue intercompany transactions, as well as to continue performing certain other status quo cash management operations, such as maintaining current business forms, will assure that the Debtor's operations will be uninterrupted by the commencement of this bankruptcy, thereby ensuring the efficient administration of this chapter 11 case, and maximizing the value of the Debtor's estate.

37.     I have reviewed the Cash Management Motion and believe that the relief requested therein is in the best interests of the Debtor's estates, its creditors, and all other parties in interest.     Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

> **b. Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, and Other Compensation, and Employee Benefits, and (B) Continue Existing Employee Benefit Plans and Programs, (II) Authorizing Banks and Financial Institutions to Pay all Checks and Electronic Payment Requests Relating to the Foregoing, and (III) Scheduling a Final Hearing (the "<u>Employee Wages Motion</u>")**

13

38.     The Debtor seeks entry of interim and final orders (i) authorizing the Debtor, in its sole discretion, to (a) pay prepetition wages, salaries, and other compensation, employee business expense allowances and reimbursements, third-party payroll processor expenses, and employee benefits, and (b) continue certain of its existing employee benefit plans and programs, (ii) authorizing banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing, and (iii) in the case of the interim order, scheduling a final hearing.

39.     As of the Petition Date, the Debtor employs approximately 55 employees, consisting of 53 full-time salaried and 2 part-time hourly employees (collectively, the "Employees"). The Employees consist of the Debtor's senior management and certain other employees engaged in the administration and operation of the Debtor's business, including a vice president of operations, operations managers, operations superintendents, a director of engineering, finance managers, IT managers, and each of the foregoing's respective staff.  The Employees' valuable skill sets, indispensable institutional knowledge, industry expertise, and overall familiarity and understanding of the Debtor's operations make them key to the success of this chapter 11 case.

40.     In addition, the Debtor uses a unionized workforce in the operation of its terminal, consisting of the following categories of local union members (collectively, the "Union Workers"):  (i) watchmen, (ii) foremen, (iii) longshoremen, and (iv) clerks.  Although the Debtor seeks certain relief with respect to the Union Workers as set forth herein (namely, authority to continue processing payments to PMA (defined below)), the Union Workers are not the Debtor's employees.   Pacific Maritime Association ("PMA") is an organization that supplies and administers maritime labor agreements with the International Longshore and Warehouse Union

("ILWU"), a labor union which primarily represents dock workers on the United States West Coast, on behalf of its member companies, made up of marine terminal operators (including the Debtor) and shipping lines operating on the United States West Coast. The Debtor has no contractual relationship with the Union Workers[4] and does not pay the wages of the Union Workers.

### (i)    Wages and Salaries

41.    In the ordinary course, the Debtor funds its payroll obligations to all of its Employees on a bi-weekly basis on Wednesday through ADP, LLC ("ADP").  ADP then pays Employees their wages, via direct deposit to each of the Employees' personal bank accounts, on the immediately following Friday, which is the last day of that pay period.  Prior to the Petition Date, the Debtor's approximate aggregate bi-weekly gross payroll for all Employees was $190,000.  On January 29, 2016, ADP funded, and the Employees received, regularly-scheduled paychecks for the two-week period ended that day.  In addition, prior to the Petition Date, the Debtor also funded a stub period payroll to ADP for the period of January 30, 2016 through and including February 1, 2016.  In light of the prepetition funding of Employees' wages and salaries (the "Prepetition Wages"), the Debtor does not believe that there are any outstanding Prepetition Wages as of the Petition Date that would need to be funded by the Debtor's estate.

### (ii)    Vacation Pay and Certain Other Paid Time Off

42.    Vacation Policy.  The Debtor provides paid vacation time to all full-time Employees.  Vacation hours begin to accrue in the first pay period after the date of hire and vacation days are granted as follows, in proportion to the amount of time an Employee has worked for the Debtor:  (i) Employees with 0-4 years of service are awarded 10 days per year;

---

[4]    However, the Debtor is a signatory to the ILWU labor contract as a member company of PMA.

(ii) employees with 5-9 years of service are awarded 15 days per year; and (iii) Employees with 10 or more years of service are awarded 20 days per year.  Vacation days roll over and accrue from year to year, though, vacation time will cease to accrue once a maximum of what would normally accrue in eighteen (18) months (including personal holiday time) has been attained (and exceeding the 18-month maximum requires two levels of management approval plus approval of the human resources department).  All accrued but unused vacation time up to the maximum thirty (30) days typically was paid to Employees upon termination of their employment with the Debtor, whatever the reason.  Part-time and temporary Employees are not eligible for paid vacation time.

43.     Sick Days and Floating Holidays.  Full-time Employees accrue sick leave, which covers absence due to illness or injury, at a rate of 1 day per month (12 days per year).  Part-time and temporary Employees are not eligible for paid sick leave.  Unused sick leave may be carried over and accrued up to a maximum of thirty (30) days of paid sick leave.  Sick leave has no cash value and accrued but unused sick leave will not be paid at the end of an Employee's employment with the Debtor.  The Debtor also offers nine (9) paid holidays per year and three (3) paid floating holidays each year for any purpose to all full-time permanent Employees. Maximum accrual of floating holidays is two (2) days, and no further accrual will occur until floating holiday time is taken.

44.     As of the Petition Date, the Debtor's aggregate prepetition obligations to eligible Employees for accrued vacation and floating holidays totaled approximately $317,500.

**(iii)     Business Expense Allowances and Reimbursements**

45.     In the ordinary course of business, the Debtor allows certain of its employees to incur certain reasonable out-of-pocket business expenses in the ordinary course of business, such

as necessary and authorized travel expenses and business entertainment expenses.  Many of these expenses are charged directly to the Debtor's corporate credit cards (the "Credit Cards") issued by American Express through the Debtor's corporate credit card program (the "Credit Card Program").  As of the Petition Date, approximately 21 Credit Cards have been issued.  The Debtor has policies in place that regulate the use of the Credit Cards and the Debtor's corporate headquarters is able, and does, monitor the use of the Credit Cards on a frequent and ongoing basis.  The Debtor estimates that on average, and in the aggregate, approximately $25,000 is charged to the Credit Cards per month.  As of the Petition Date, the total in outstanding prepetition amounts on account of the Credit Cards is approximately $7,000.

46.     In addition, certain business expenses may be paid directly by employees and reimbursed upon review and approval by the Debtor.  As of the Petition Date, the total in outstanding prepetition claims for expense reimbursement is approximately $3,000.

### (iv)     Employee Bonus Programs

47.     The Debtor has historically offered an annual management incentive plan (the "MIP") to all full-time employees to ensure appropriate rewards are provided for achieving goals that support the Debtor's overall business strategy.  The MIP is a discretionary bonus program tied to certain key performance indicators that are reviewed and revised regularly by the Debtor's senior management and human resources department.  As such, the MIP is subject to change from year to year.

48.     In addition, Employees who have a direct impact on operations (i.e., a majority of the Debtor's Employees, but not including finance, IT, or other non-operational personnel) are eligible to receive a quarterly "safety incentive bonus" based on certain targeted safety measures. The safety incentive bonus is paid in the amount of $1,000 per quarter to each Current Employee

when such safety targets have been achieved.  There is a separate safety incentive bonus payable to the vice president of operations upon the completion of safety targets, in the amount of $5,000 annually.

49.    The Debtor funded prior to the Petition Date the substantial majority of amounts owed pursuant to the MIP and the safety incentive bonus to eligible employees employed by the Debtor through year-end 2015.[5]

### (v)    Payroll Taxes, Payroll Funding and Processing Fees

50.    As required by law, the Debtor regularly deducts amounts from the Employees' paychecks for local, state and federal taxes, employee benefits, and employee programs that the Debtor had historically sponsored (the "Payroll Withholding Amounts").  In light of the timing of the payroll funding prepetition, as of the Petition Date, the Debtor believes that there are no Payroll Withholding Amounts currently being withheld.

51.    The Debtor uses ADP to process payroll for the Employees.  ADP does not directly invoice the Debtor for its payroll processing services and, instead, all fees associated with ADP systems and services are paid by affiliates of the Debtor in connection with their "shared services" arrangement with the Debtor.[6]  Because of the funding of payroll immediately prior to the Petition Date, as of the Petition Date, the Debtor does not believe it owes any outstanding amounts to ADP.

52.    The Debtor funds by wire its obligations to PMA for the Union Workers weekly on Tuesday.  Typically, these regular payments include a small portion on account of a fee component to PMA.  Prior to the Petition Date, the Debtor funded estimated union-related wages

---

[5]    The approximate aggregate amount funded in connection with the MIP is $750,000.

[6]    The "shared services" arrangement between the Debtor and certain of its affiliates is more fully described in the Cash Management Motion.

and associated fees to PMA for the period of January 23, 2016 through and including February 1, 2016. Again, because of the timing of such funding, the Debtor does not believe it owes any outstanding amounts to PMA.

### (vi)    Employee Benefit Programs

53.    The Debtor provides eligible, full-time Employees (and their spouses and children to a certain extent), in the ordinary course of business, with a number of employee benefits, including, but not limited to, (i) medical insurance, (ii) dental insurance, (iii) vision insurance, (iv) flexible spending accounts, (v) life insurance, (vi) disability insurance, (vii) 401(k) retirement savings plan, and (viii) workers' compensation, as described in greater detail below.

    i.    Medical Plan:  The Debtor offers preferred provider organization (PPO) plans and high deductible health (HDHP) plans through Aetna, as well as health maintenance organization (HMO) plans through Aetna and Kaiser Permanente. These medical plans are administered by Alliant Insurance Services, to whom the Debtor pays approximately $550 per month in fees for its services.  As of the Petition Date, the Debtor provides insurance coverage to substantially all of its employees, contributes roughly 81% to the cost of the plan they choose, and deducts employee contributions for insurance each payroll cycle.  Historically, this coverage cost the Debtor approximately $57,000 per month in premiums.

    ii.    Dental Plan:  Delta Dental of NJ provides high option and low option dental insurance plans to approximately 50 of the Debtor's employees.  Historically, this coverage cost the Debtor approximately $3,500 per month in premiums.

    iii.    Vision:  Vision Service Plan provides vision insurance coverage to approximately 49 of the Debtor's Employees.  Historically, this coverage cost the Debtor approximately $1,000 per month in premiums.

    iv.    Flexible Spending Accounts: The flexible spending accounts ("FSA") (which consist of the Health Care Spending Account, the Limited-Use Health Care Spending Account, and the Dependent Care Spending Account) offer a tax benefit by allowing Employees to pay for eligible health and dependent care expenses with pretax dollars. For Employees who elect to enroll in one or more accounts under the FSA, an amount each Employee elects is deducted from such Employee's paycheck on a pretax basis and allocated toward such account. Employees may be reimbursed for eligible expenses or use a debit card issued to participating Employees for qualified expenses.  As of the Petition Date,

approximately two Employees participate in the FSA.  Historically, the FSA cost the Debtor a nominal administrative fee of approximately $0 to $20 per month.

v. <u>Life Insurance & AD&D</u>:  The Debtor provides basic life and accidental death and dismemberment ("<u>AD&D</u>") insurance coverage to eligible Employees through Reliance Standard, in an amount two times an Employee's annual earnings, up to a maximum of $350,000.  As of the Petition Date, approximately 52 Employees receive such coverage, which historically cost the Debtor approximately $1,300 per month.  The Debtor also offers business travel AD&D insurance coverage, through The Hartford, that covers Employees while they are traveling on company business, in an amount five times an Employee's annual earnings, up to a maximum of $1,000,000.  Historically, this benefit cost the Debtor approximately $12 per month.

vi. <u>Disability Insurance</u>:  The Debtor offers long-term disability insurance through Reliance Standard, which provides a monthly benefit of 60% of an Employee's pre-disability monthly earnings (capped at $12,500 per month), when an Employee has been injured for more than a 90 day waiting period. Historically, this coverage cost the Debtor approximately $860 per month in premiums.  The Debtor also offers short-term disability insurance through the State of California Disability Insurance program subject to payroll tax withholding, in an amount calculated based on an Employee's tenure with the Debtor.  As of the Petition Date, two of the Employees were on disability leave – one long-term and one short-term.

vii. <u>401(k) Plan</u>:  The Debtor maintains a 401(k) plan for the benefit of the Employees, administered by Principal Financial Group.  The Debtor provides matching contributions of 100% up to 6% of an Employee's salary. The Debtor pays approximately $20,000 in monthly expenses associated with matching contributions and administering the 401(k) plan.

viii. <u>Worker's Compensation</u>:  The Debtor provides worker's compensation insurance to Employees through Ports Insurance Company.  In California, the state administers workers' compensation through the Division of Workers' Compensation.  In addition, certain of the Debtor's Employees are covered by the United States Longshore and Harbor Workers Compensation Act (USL&H), which applies to maritime employees who work on or over navigable waters. Historically, the Debtor contributed approximately $450,000 per month to these workers' compensation programs, which is comprised of approximately $15,000 for state programs and the remainder for USL&H.  As of the Petition Date, there were two individuals receiving workers' compensation benefits.

54. I believe the relief requested in the Employee Wages Motion is necessary and appropriate in order to avoid any unnecessary disruptions to the Debtor's operations and any

resulting deterioration in the value of the Debtor's estate. I believe honoring employee compensation, as well as continuing existing employee benefits for the Debtor's staff, is necessary to ensure the Debtor's smooth transition into bankruptcy and the operational stability needed to conduct the Wind Down in an efficient and effective manner. In the absence of the relief requested, I believe the Debtor would face severe threats to its operations, including employee attrition and turnover, loss of goodwill, and loss of morale, thereby impairing the Debtor's ability to continue operations and reducing the value of the Debtor's estate. Therefore, I believe that such authorization is necessary to keep the Debtor's existing workforce intact in order to maximize the value of the Debtor's estate.

55.     I have reviewed the Employee Wages Motion and believe it is in the best interests of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Wages Motion should be approved.

> ### c. Debtor's Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services; (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Scheduling a Final Hearing (the "Utilities Motion")

56.     The Debtor requests entry of interim and final orders: (i) determining adequate assurance of payment for future utility services; (ii) prohibiting utility companies from altering, refusing, or discontinuing services; (iii) establishing procedures for determining adequate assurance of payment; and (iv) in the case of the interim order, scheduling a final hearing.

57.     In connection with the operation of its business, the Debtor obtains electricity, water, waste disposal, and other similar services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Companies"). To the best of the Debtor's knowledge, there are no defaults or arrearages with respect to the Debtor's undisputed invoices

for prepetition Utility Services.  On average, the Debtor pays approximately $221,500 each month for Utility Services, calculated as a historical average over a twelve-month period ended December 31, 2015.  Accordingly, the Debtor estimates that its cost for Utility Services during the next thirty (30) days (not including any deposits to be paid) will be approximately $221,500.

58.    The Debtor intends to pay postpetition obligations owed to the Utility Companies in a timely manner.  As the Debtor conducts an efficient and orderly wind-down of its operations, the Debtor anticipates eventually discontinuing services from certain of the existing Utility Companies during this chapter 11 case.  To the extent the Debtor still utilizes certain Utility Services and Utility Companies postpetition, the Debtor believes that cash held by the Debtor and cash generated from the collection of accounts receivable will provide sufficient liquidity to pay the Debtor's Utility Services obligations in accordance with prepetition practice.

59.    To provide additional assurance of payment, the Debtor proposes to deposit into a bank account $110,750 (the "Adequate Assurance Deposit"), which represents an amount equal to one-half of the Debtor's approximate monthly payment for all Utility Services, calculated based on the Debtor's historical average expenses over the past twelve months.  The Adequate Assurance Deposit will be held in the segregated account for the duration of this chapter 11 case and may be applied to any postpetition defaults in payment to the Utility Companies. The Adequate Assurance Deposit will be placed into a newly created, segregated account within (20) days after the Petition Date.  I believe and am informed that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future utility services in accordance with prepetition practice (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.

60.     Any Utility Company that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment pursuant to certain procedures set forth in the Utilities Motion (the "Adequate Assurance Procedures").

61.     I have reviewed the Utilities Motion and I believe the relief requested therein is necessary and appropriate because it will ensure that there is a process to address any utility provider that may make a demand to the Debtor for adequate assurance or otherwise threaten to alter, refuse, or discontinue Utility Services.  The uninterrupted continuation of Utility Services is critical to the success of the Wind Down and, therefore, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, creditors, and other parties in interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be approved.

> **d.  Debtor's Motion for Entry of Order (I) Authorizing Debtor to (A) Continue Debtor's Insurance Policies and (B) Pay Certain Obligations in Respect Thereof Postpetition; and (II) Authorizing and Requiring Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing (the "Insurance Motion")**

62.     The Debtor requests entry of a final order: (i) authorizing the Debtor, in its sole discretion, to (a) maintain and continue to honor certain Insurance Policies (defined below) and related agreements and programs (the "Insurance Programs") and (b) pay certain obligations in respect thereof including, without limitation, the payment of all premiums, premium financing payments, claims, deductibles, administrative expenses, taxes, and all other charges and expenses incurred in connection with the Insurance Programs (collectively, the "Insurance Obligations"), on an uninterrupted basis, consistent with the Debtor's practices in effect prior to the commencement of this chapter 11 case, whether such Insurance Obligations relate to the period prior to or after the commencement of this chapter 11 case; and (ii) authorizing and requiring

banks and other financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing.

63.    In the ordinary course of business, the Debtor maintains approximately eleven (11) insurance policies (each an "Insurance Policy," and collectively, the "Insurance Policies"), all of which are administered through Ports Insurance Company Inc. ("PIC"), a captive insurance company that is an affiliate of the Debtor's indirect parent.    Specifically, PIC underwrites directly six (6) Insurance Policies under which the Debtor is a named insured (i.e., coverage for federal workers' compensation, state workers' compensation, cargo and marine general liability, property and terrorism).    In addition, Ports America Group, Inc. ("PAG"), the indirect parent of one of the Debtor's members, commercially purchases five (5) Insurance Policies (the "PAG Policies"), where the Debtor has been included as a named insured (i.e., coverage for state workers' compensation, automobile liability, marine terminal operators and general liability, professional and fiduciary, and domestic property and business interruption).

64.    On a yearly basis, PIC, collectively on behalf of certain affiliates of PAG (including the Debtor), prepays the third party commercial carriers that underwrite the PAG Policies the premiums associated with those policies.    As part of a budgeting process that occurs in the fall of each year, PIC allocates the prepayment amount for the PAG Policies, as well as the premiums PIC charges for the policies it directly underwrites, among the PAG affiliates (including the Debtor) for reimbursement.    On a monthly basis, PAG invoices each relevant PAG affiliate, including the Debtor, for its allocable share of these premiums and collects such amounts for reimbursement to PIC (the "Insurance Premiums").    The Debtor estimates that the aggregate Insurance Premiums for calendar year 2016, together with any associated taxes and fees, totals approximately $8,390,000 (a monthly expense of approximately $699,000).    The

Debtor does not finance any premium payments owed under the Insurance Policies through any third-party premium financing company.

65.     I believe that the relief requested in the Insurance Motion is necessary and appropriate because continuation of the Insurance Programs and payment of the Insurance Obligations are imperative to the Debtor's operations and preserving the value of the Debtor's estate. The failure to maintain the Insurance Policies would have a material adverse effect on the Debtor's businesses and the value of the Debtor's estate available for creditors as it winds down operations. Indeed, it is essential that the Debtor carries the Insurance Policies in its day-to-day operations, or they run the risk of, among other harms, having operations prematurely shut down or incurring financial responsibility, and legal liability, for potential occurrences not covered by insurance. Accordingly, in order to avoid significant interruptions to the Wind Down and to preserve and maximize the value of its estate for its creditors, it is imperative that the Debtor continue carrying its Insurance Policies during this chapter 11 case consistent with its strategic wind-down objectives.

66.     I have reviewed the Insurance Motion and believe that the relief requested therein is in the best interests of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be approved.

> **e. Debtor's Motion for Entry of Interim and Final Orders: (I) Authorizing Debtor to (A) Obtain Post-Petition Financing on a Super-Priority and Senior Secured Basis, (B) Permitting Use of Cash Collateral, (C) Providing Adequate Protection, and (D) Granting Related Relief; (II) Modifying the Automatic Stay; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Motion")**

67.     The Debtor requests entry of interim and final orders (i) authorizing the Debtor to obtain postpetition loans and advances (the "DIP Facility") of up to the aggregate principal

amount of $3.5 million, the full amount of which is available on an interim basis, (ii) approving

terms and conditions of the DIP Facility among the Debtor and HHH Oakland, Inc. and Terminal

Investment Ltd. (each a "Lender" and together the "Lenders") as set forth in that certain Term

Sheet for Senor Secured Post Petition Debtor-in Possession Financing (the "DIP Term Sheet")

attached to the DIP Motion; (iii) granting to the Lenders liens upon the Debtor's property,

pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, as provided in and as

contemplated by the DIP Loan Documents (as defined in the DIP Term Sheet); (v) granting the

Lenders super-priority administrative claims over any and all administrative expenses pursuant

to section 364(c)(1) of the Bankruptcy Code; (vi) modifying the automatic stay in favor of the

Lenders, to the extent necessary and contemplated by the DIP Facility and the DIP Loan

Documents; (vii) granting adequate protection to the Lenders of their interest in "cash collateral"

within the meaning of section 363(a) of the Bankruptcy Code; and (viii) in the case of the interim

order (the "Interim DIP Order"), scheduling a final hearing.

68.    Prior to filing this chapter 11 case, the Debtor negotiated the DIP Facility, which

provides for $3.5 million of availability upon approval by the Bankruptcy Court.  The DIP

Facility will be secured by a first priority lien on the Debtor's unencumbered assets and a junior

lien on the Debtor's assets that are already subject to valid, perfected and unavoidable prepetition

liens.  The DIP Facility also provides for superpriority administrative expense claims.  The DIP

Facility does not contain any priming feature.

69.    The proceeds of the DIP Facility will be used to support the Debtor's Wind Down

as set forth in the Approved Budget (as defined in the DIP Motion).  The DIP Facility proceeds,

among other things, will be used to fund the wages, salaries and benefits of the Debtor's

employees, procure necessary goods and services (and maintain trade terms with the Debtor's

vendors), finance the costs of this chapter 11 case, and meet certain other working capital needs. Payment of such expenses is necessary to ensure that the Debtor is able to wind down its operations in a safe, efficient, and expeditious manner.  While the Debtor's vendors historically have allowed the Debtor to purchase goods on credit, the Debtor's ability to continue this practice is dependent upon it having access to sufficient liquidity to assure business counterparties that the Debtor is not a credit risk notwithstanding the Wind Down.

70.    The Debtor believes that the DIP Facility is the only source of financing available to the Debtor at this time.  Although the Lenders each own 50% of the Debtor's membership interests, the Lenders and the Debtor entered into the DIP Facility after arms' length and good faith negotiations, with both sides represented by sophisticated counsel.  The Debtor identified the Lenders as the most likely source of postpetition financing, given the wind-down nature of the chapter 11 case and the Lenders' detailed knowledge of the Debtor's assets and history.  The Debtor had limited time in advance of its chapter 11 filing to negotiate and document the DIP Facility—and it is extremely unlikely, if not impossible, that a another DIP lender would have been able to complete the necessary due diligence and enter into a DIP facility within the available time period.  Moreover, in light of the fact that the Debtor is winding down its operations, any form of postpetition financing on an unsecured basis would plainly have been unobtainable.

71.    The Debtor has a critical need to access the DIP Facility prior to a final hearing on the DIP Motion in order to continue to implement the Wind Down.  The amount sought prior to the final hearing, as set forth in the proposed Interim DIP Order, represents those amounts necessary to continue the Debtor's Wind Down operations and meet its obligations during the period prior to entry of a final order.

72.     I have reviewed the DIP Motion and believe that the relief requested therein is in the best interests of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the DIP Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  February 1, 2016

 /s/ Heather Stack
Heather Stack
Chief Financial Officer
Outer Harbor Terminal, LLC

**<u>Exhibit A</u>**

**Map of Port**



**<u>Exhibit B</u>**

**Press Release**

 (http://www.prnewswire.com/)    

# Outer Harbor Terminal, LLC today announced it will wind down container operations and transition out of the Port of Oakland, CA

OHT issued the following statement:

OAKLAND, Calif., Jan. 19, 2016 /PRNewswire/ -- Outer Harbor Terminal (OHT) is developing a cooperative 60-day transition with the Port of Oakland to wind down operations and return the leased terminal property to the Port.

During this transition, OHT intends to run business as usual and to service its customers and vessels for the next 30 days. OHT expects to take an additional 30 days to complete the delivery of import and empty containers and transition out of the terminal. Import and export operations at OHT will be reduced or shifted to other terminals with the objective to maintain service at the Port with minimal disruption. OHT will work to achieve a successful wind down with a continued focus on both safety and service delivery.

The Port of Oakland has advised OHT that it is working with Terminal Operators and Carriers to prevent interruption of trade.

OHT is pleased to have been part of the Port of Oakland for the past six years. OHT appreciates sharing the mutual goal with the Port of Oakland for a seamless transition to enable continuity of service.

SOURCE Outer Harbor Terminal, LLC

**Find this article at:**
http://www.prnewswire.com/news-releases/outer-harbor-terminal-llc-today-announced-it-will-wind-down-container-operations-and-transition-out-of-the-port-of-oakland-ca-300206455.html?tc=eml_cleartime

☐ Check the box to include the list of links referenced in the article.