## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| OUTER HARBOR TERMINAL, LLC,[1] | ) | Case No. 16-10283 (LSS) |
| | ) | |
| Debtor. | ) | **Hearing Date: March 16, 2016 at 10:00 a.m. (ET)** |
| | ) | **Objection Deadline: March 9, 2016 at 4:00 p.m. (ET)** |

## DEBTOR'S MOTION FOR AN ORDER APPROVING (I) SETTLEMENT AGREEMENT WITH THE PORT OF OAKLAND, (II) REJECTION OF AGREEMENTS WITH THE PORT OF OAKLAND AND (III) ABANDONMENT OF SURPLUS ASSETS

Outer Harbor Terminal, LLC, the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case, hereby files this motion (the "Motion"), seeking entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**: (i) approving the Settlement Agreement (the "Settlement Agreement"), dated as of February 20, 2016, by and between the Debtor, the Members (as defined below) and the City of Oakland, a municipal corporation, acting by and through its Board of Port Commissioners (the "Port"), attached to the Order as **Exhibit 1** thereto, and (ii) subject to the terms and conditions of the Settlement Agreement, (a) approving the Debtor's rejection of each of the Port Agreements (defined below) as of the Rejection Date (as defined below) and (b) authorizing the Debtor to abandon the Surplus Assets (as defined below) as of the Rejection Date; and (iii) granting certain related relief, as described more fully herein.  In support of this Motion, the Debtor respectfully states as follows:

### Jurisdiction

1.      This court (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[1]      The last four digits of the Debtor's federal tax identification number are 2070.  The Debtor's principal place of business is located at 1599 Maritime Street, Oakland, CA 94607.

The Debtor, the Members and the Port in accordance with the Settlement Agreement consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein are sections 105(a), 363(b)(1), 365, and 554 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

4.    On February 1, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner and no committee has been appointed or designated in this chapter 11 case.

5.    Formed in 2009, the Debtor is a privately-owned, limited liability company headquartered in Oakland, California that provides container terminal operations and stevedore services at the Port of Oakland, the fourth largest port on the west coast of the United States. The Debtor's principal operations consist of: (i) the offloading and onloading of containers from cargo ships that berth at the Port; (ii) loading the offloaded containers on to trucks so that they may be delivered from the Port to their ultimate domestic destination; and (iii) providing various logistical services to the Debtor's customers in connection with the foregoing.  The Debtor operates from leased berths and terminal space that are owned by the Port.

6.    Prior to the Petition Date, following years of the Debtor operating at a loss and sustaining material, negative cash flows, the Debtor's members, HHH Oakland, Inc. and

Terminal Investment Limited SA (collectively, the "Members"), voted to terminate and wind down the Debtor's business operations. The Debtor commenced the wind down on or about January 19, 2016 and intends to continue that process through this chapter 11 case.

7.     Additional information regarding the Debtor's business, assets, capital structure, and the circumstances leading to the filing of this chapter 11 case is set forth in the *Declaration of Heather Stack, Chief Financial Officer, in Support of Chapter 11 Petition and First Day Pleadings of Outer Harbor Terminal, LLC, Debtor and Debtor in Possession* [Docket No. 13] (the "First Day Declaration").

### The Port Agreements and Relevant Background

8.     The Debtor is a party to the following executory contracts and unexpired leases of real and personal property with the Port, each of which the Debtor seeks to reject pursuant to the terms and conditions of the Settlement Agreement:

(i)     Concession Agreement. The Debtor is a party to that certain Port of Oakland Concession and Lease Agreement Berths 20-24, dated as of November 30, 2009, by and between the Port and the Debtor (together with any amendments, supplements, exhibits and/or schedules related thereto, the "Concession Agreement"[2]). The Concession Agreement provides for, among other things, the Debtor's lease from the Port of four berths and related real and personal property at the Port of Oakland ("Berths 20-24") that the Debtor utilizes in the operation of its business to load, unload and process cargo. The premises subject to the Concession Agreement represents the Debtor's principal location for its business, and in addition to providing port facilities, it includes office space for the Debtor's personnel. The Concession Agreement has approximately 44 years left on its term. The current rent due under the Concession Agreement is approximately $2.266 million per month, which translates into approximately $27.2 million on annual basis. The Concession Agreement also provides for annual increases of the rent.

(ii)     NEPAA. The Debtor is a party to that certain Non-Exclusive Preferential Assignment Agreement (together with any amendments, supplements,

---

[2]     As used herein, the defined term "Concession Agreement" includes, but is not limited to, that certain First Supplemental Agreement to Concession and Lease Agreement Berths 20-24, dated as of August 2, 2010, by and between the Port and the Debtor.

exhibits and/or schedules related thereto, the "NEPAA"[3]), dated as of March 2, 2004, by and between the Port and International Transportation Service, Inc. ("ITS") pursuant to that certain Assignment and Assumption Agreement (the "A&A Agreement"), dated as of August 2, 2010, by and between ITS and the Debtor.  Pursuant to the A&A Agreement, ITS assigned all of its right, title, and interest in, to and under the NEPAA to the Debtor, and the Debtor assumed all of ITS's duties and obligations under the NEPAA.  The NEPAA provides for, among other things, the Debtor's lease from the Port of two berths and related real and personal property at the Port of Oakland ("Berths 25-26" and together with Berths 20-24, the "Premises") that the Debtor utilizes in the operation of its business to load, unload and process cargo.  The rent due under the NEPAA is approximately $725,000 per month or approximately $8.7 million annually.  The NEPAA has a month-to-month term.  Prior to the Petition Date, the Port purported to exercise the termination option and asserted that the NEPAA would terminate on or about May 1, 2016.

(iii)    Crane Lease.  The Debtor is a party to that certain Crane Lease, dated as of December 31, 2009, between the Port and the Debtor (together with any amendments, supplements, exhibits and/or schedules related thereto, the "Crane Lease"[4]).  Pursuant to the Crane Lease, the Port leases to the Debtor certain cranes located on the Premises under the Concession Agreement that the Debtor uses in the operation of its business to load and unload cargo.[5]

(iv)    Interconnection Agreement.  The Debtor is a party to that certain Generating Facility Interconnection Agreement, dated on or about January 27, 2014, by and between the Port and the Debtor (the "Interconnection Agreement" and, together with the Concession Agreement, the NEPAA and the Crane Lease, the "Port Agreements").  The Interconnection

---

[3]    As used herein, the defined term "NEPAA" includes, but is not limited to, (a) that certain First Supplemental Agreement to Non-Exclusive Preferential Assignment Agreement, dated on or around July 2008, by and between the Port and ITS, (b) that certain Second Supplemental Agreement to Non-Exclusive Preferential Assignment Agreement, dated as of August 2, 2010, by and between the Port and the Debtor, (c) that certain Third Supplemental Agreement to Non-Exclusive Preferential Assignment Agreement, dated as of June 18, 2013, by and between the Port and the Debtor, (d) that certain Fourth Supplemental Agreement to Non-Exclusive Preferential Assignment Agreement, dated as of December 31, 2013, by and between the Port and the Debtor, and (e) that certain Fifth Supplemental Agreement to Non-Exclusive Preferential Assignment Agreement, dated as of July 1, 2015, by and between the Port and the Debtor.

[4]    As used herein, the defined term "Crane Lease" includes, but is not limited to, that certain First Supplemental Agreement to Crane Lease, dated as of August 2, 2010, by and between the Port and the Debtor.

[5]    On August 2, 2010, the Debtor and the Port entered into that certain Crane Transfer Agreement (the "Crane Transfer Agreement"), whereby the Port transferred title to Cranes X402, X403, and X404 (together with certain spare parts thereto) to the Debtor.  In connection with the Crane Transfer Agreement, the Port also executed a Bill of Sale on August 13, 2010, evidencing the transfer of title of Cranes X402, X403, X404 and such spare parts to the Debtor.

Agreement governs, among other things, certain aspects of the Debtor's provision of electrical power to ships docking at the Debtor's terminal and the interconnection of the on-board power generators of such ships to the Port's electricity distribution system. The Debtor's payment obligations under the Interconnection Agreement vary, but typically average approximately $100,000 per month.

9.      On or about February 3, 2016, the Port objected to the Debtor's proposed debtor-in-possession financing ("DIP"), arguing, among other things, that the proposed financing did not provide sufficient funding for the Debtor to make postpetition rent and utilities payments to the Port. The Court subsequently entered an interim DIP order that provided for the amount equal to March rent and estimated utilities to be funded into a segregated account on or before February 29, 2016, with the parties reserving their rights and defenses with respect to the issue of payment of postpetition rent and utilities.

10.      In order to secure certain of the Debtor's obligations under the Port Agreements, affiliates of HHH Oakland, Inc. caused to be issued that certain Letter of Credit (the "Letter of Credit") Reference No. 63653182 issued by Citibank, N.A. ("Citibank") in favor of the Port. On or about February 8, 2016, after allegedly declaring a default under the Port Agreements, the Port drew down the full amount of the Letter of Credit and received the sum of $6,797,962.50 from Citibank on account of such draw (the "LC Draw").

11.      On or about February 9, 2016, the Port filed a motion seeking an order from this Court compelling the Debtor (i) to immediately pay rent for the months of February 2016 and March 2016, or (ii) in the alternative, to immediately assume or reject certain of the Port Agreements [Docket No. 55] (the "Motion to Compel"). In addition, the Port asserts that it is entitled to prepetition damages arising from any rejection of the Port Agreements (any such claim, the "Prepetition Damage Claim").

12.     The Debtor asserts that it and its estate may have certain claims against the Port and certain defenses to the Port's claims, including but not limited to, application of the damages cap set forth in section 502(b)(6) of the Bankruptcy Code and the application of the Debtor's payment of a $60 million upfront fee (as more fully described in the Settlement Agreement, the "Upfront Fee") to further reduce the Port's prepetition and postpetition claims, including the Prepetition Damage Claim. The Port denies the Debtor's claims and has asserted numerous defenses thereto.

### Terms of the Settlement Agreement

13.     As part of the Debtor's wind-down plan, the Debtor intends to continue to accept and process cargo and service ships at the Premises for a limited period of time, after which the Debtor intends to work expeditiously to arrange for the pickup of containers, whether laden with cargo or empty, from the Premises and ultimately surrender the Premises to the Port.  Following months of extensive, arms'-length negotiations, both prior to and after the Petition Date, regarding the terms of the Debtor's surrender of the Premises to the Port and related matters, on February 20, 2016, the Parties executed the Settlement Agreement, which generally provides consideration for the consensual rejection of the Port Agreements, payment of various amounts under the Port Agreements or in connection with the rejection thereof and the surrender of the Premises, the exchange of mutual releases, and the efficient and orderly wind-up and hand-back of the Premises.

14.     The following are the material terms of the Settlement Agreement:[6]

(i)     Effective Date.  The effective date of the Settlement Agreement (the "Effective Date") shall be the date that all of the following have been completed:  (i) the Settlement Agreement has been signed by each of the

---

[6]     This summary of the Settlement Agreement is subject to the full terms and conditions of the Settlement Agreement.  Any inconsistency between this summary and the Settlement Agreement shall be governed by and construed consistent with the Settlement Agreement.

Parties, (ii) the Settlement Agreement has been approved by the Port's Board of Port Commissioners, and (iii) this Court has entered an order (the "Settlement Order") approving the Settlement Agreement and the transactions contemplated thereby on or before March 18, 2016 and such order has become a Final Order (as defined in the Settlement Agreement) on or before April 1, 2016.[7]

(ii)     Acknowledgement of LC Draw and Prior Payments to Port.  The Debtor, on behalf of itself and its estate, and the Members for purposes of the Settlement Agreement only acknowledge and agree that (i) the LC Draw and all prior payments by the Debtor to the Port under any of the Port Agreements (collectively, the "Prior Payments"), including, but not limited to, the Upfront Fee, were valid and proper, (ii) the Port may retain the funds received from the LC Draw and is permitted to apply the LC Draw towards any claims of the Port under any of the Port Agreements, including, but not limited to, any claims of the Port arising from the rejection of the Port Agreements as provided for in the Settlement Agreement, (iii) none of the Prior Payments is subject to avoidance pursuant to applicable law, and (iv) the Debtor and its Members have no basis to seek return or disgorgement of, and the Port has no obligation to return or disgorge, any of the Prior Payments.

(iii)    Payment of Postpetition Obligations; Waiver of April 2016 Rent.

a.  By no later than the third business day following the date on which the Settlement Order becomes a Final Order, the Debtor shall pay to the Port: (i) an aggregate amount of $2,990,987.50 as rent (exclusive of utilities) under the Concession Agreement and the NEPAA for the month of February 2016 and (ii) an aggregate amount of $2,990,987.50 as rent (exclusive of utilities) under the Concession Agreement and the NEPAA for the month of March 2016.  In addition, the Debtor shall pay to the Port all utility charges due under the Port Agreements in connection with the Debtor's occupation of the Premises during February 2016 and March 2016 within five business days of the Port providing detailed invoices to the Debtor for actual usage, which invoices shall be provided promptly.  The foregoing amounts to be paid are collectively referred to herein as the "Postpetition Obligations".  The Postpetition Obligations may be satisfied in part by application of the Segregated Rent (as defined in the interim order approving the DIP [Docket No. 52] (the "Interim DIP Order")).

---

[7]    As of the filing of this Motion, the first two conditions to the Effective Date, namely, execution of the Settlement Agreement by the Parties and the approval of the Settlement Agreement by the Port's Board of Commissioners, have been satisfied.

b.  Provided that the Debtor continues to service vessels through March 31, 2016, the Port acknowledges and agrees to waive any rent or utility charges under any of the Port Agreements or otherwise for any occupation by the Debtor of the Premises during the period of April 1, 2016 to April 29, 2016.

c.  In the event that the Debtor fully and finally surrenders to the Port and the Port agrees to accept any portion of the Premises prior to March 31, 2016 and the Debtor has completed the Clean-Up Obligations (as defined in the Settlement Agreement), the Debtor shall be entitled to a certain refund of the payment made on account of rent attributable to March 2016.

(iv)  <u>Members' Payment</u>.  By no later than the third business day following the date the Settlement Order becomes a Final Order, the Members shall fund into an account maintained by an escrow company selected by the Port an aggregate amount of $5,100,000 (the "<u>Members' Payment</u>").  The Members' Payment will be released from escrow upon the Port's certification that certain conditions precedent to the Rejection Date have been satisfied.  Upon the Rejection Date, the Port shall have no further claims arising under or in connection with any of the Port Agreements, including any claim for damages from any rejection or termination of any of the Port Agreements against any of the OHT Parties (as defined in the Settlement Agreement) (other than the Prepetition Damage Claim).

(v)  <u>Rejection of Port Agreements</u>.  The Debtor shall vacate the Premises by no later than 11:59 p.m. PST on April 29, 2016 (the "<u>Rejection Date</u>").  Provided that all conditions precedent set forth in the Settlement Agreement (the "<u>Conditions Precedent</u>") have been satisfied, each of the Port Agreements shall be deemed rejected as of the Rejection Date.  Also upon the Rejection Date, (a) the Debtor shall be deemed to have abandoned Cranes X402, X403, and X404, and (b) the Debtor shall leave in place and shall be deemed to have abandoned the property and equipment identified on "Exhibit A" to the Settlement Agreement (the foregoing subsections (a) and (b) collectively, the "<u>Surplus Assets</u>"), all free and clear of all liens, claims and encumbrances by or of the Debtor or either of the Members.

a.  The Conditions Precedent are:

i.  The Port's timely receipt of the Postpetition Obligations in cash or by electronic transfer;

ii.  The Port shall have delivered to the Debtor a written acknowledgement that the Debtor has completed the Clean-Up Obligations;[8]

iii.  The Debtor shall have fully and finally surrendered possession of all the Premises to the Port; and

iv.  The Port shall have timely received the Members' Payment in cash or by electronic transfer.

(vi)  Storage Lease.  The Port agrees to allow the Debtor to lease up to five acres of land for the purpose of temporarily storing certain equipment.

(vii)  Releases.  Upon the Rejection Date, the Parties shall provide broad, mutual releases of any and all Claims (as defined in the Settlement Agreement), subject to certain exceptions, that each releasing Party has ever had, may now have, or may later assert relating to the Port Agreements and their prior dealings.

(viii)  Bankruptcy Court Matters.

a.  The Parties shall refrain from taking, joining in, or supporting any action, or filing, joining or supporting any motions or pleadings in the chapter 11 case, that are inconsistent with the terms of the Settlement Agreement.  The Port shall not object to final approval of the Debtor's motion seeking approval of the DIP [Docket No. 12], so long as the proposed form of the final order approving the DIP is not inconsistent with this Agreement.

b.  The Members, in their capacities as postpetition lenders to the Debtor, and the Debtor, agree that, solely with respect to the Port, the Investigation Period set forth in the Interim DIP Order or any subsequent interim or final order approving the DIP, shall be extended to the earlier of (i) June 30, 2016 or (ii) the Rejection Date; provided, however, that if the Settlement Order is not entered by the Bankruptcy Court by March 18, 2016 or does not become a Final Order by April 1, 2016, the Investigation Period, solely with respect to the Port, shall be extended to May 31, 2016.

c.  The Port agrees that it will adjourn the Motion to Compel until a hearing date no earlier than April 1, 2016, provided, further that (i) if the Settlement Order is entered by March 18, 2016, the Port agrees to further adjourn the Motion to Compel until a hearing date no earlier

---

[8]  In connection with the Settlement Agreement, the Debtor will need to remove certain equipment and other personal property (including certain equipment leased from entities that may be affiliated with the Debtor) from the Premises prior to surrender, and the Debtor may incur modest costs in connection with such removal.

than April 11, 2016 and (ii) if the Rejection Date occurs as contemplated by this Agreement, the Port will be deemed to have withdrawn the Motion to Compel with prejudice.

(ix)  <u>Plan Support; Treatment of Prepetition Claim</u>.  In the event the Debtor files any plan of liquidation in this chapter 11 case, such plan (i) may impair the Prepetition Damage Claim, (ii) may separately classify and provide that, in full and final satisfaction of the Prepetition Damage Claim, the Port shall receive the aggregate amount of one dollar ($1.00) (the "<u>Prepetition Damage Claim Treatment</u>"), and (iii) shall not otherwise be inconsistent with the terms of the Settlement Agreement (any such plan, an "<u>Acceptable Plan</u>").  Upon the satisfaction of the Conditions Precedent, the Port (a) shall support and be deemed to vote to accept any Acceptable Plan and (b) shall accept the Prepetition Damage Claim Treatment as full and final satisfaction of the Prepetition Damage Claim.

(x)   <u>Waiver of Abandonment Notice</u>.  The Debtor (a) agrees that any property of the Debtor remaining on the Premises after the Rejection Date (the "<u>OHT Property</u>") shall be deemed abandoned by the Debtor as of the Rejection Date and the Port may dispose of the same (or any part thereof) in any manner that the Port determines, as a matter of the Port's sole discretion, to be appropriate; and (b) waives and quitclaims all rights to require the Port to (i) store or sell the OHT Property (or any parts thereof) and (ii) give the Debtor notice of the Port's sale or disposal (or plans to sell or dispose) of the OHT Property (or any part thereof).  Subject to the Rejection Date, the Port waives and releases any claims against the Debtor or the Members resulting from such abandonment.

15.    The Settlement Agreement represents a comprehensive resolution of the various outstanding disputes among the Parties, which will allow the Debtor to avoid burdensome and costly litigation and conclude its wind down plan and this chapter 11 case efficiently and expeditiously.  In particular, the Settlement Agreement allows for an orderly surrender of the Premises and provides certainty to all parties regarding the expected condition of the Premises at the time of the surrender.  In addition, the settlement locks in a de minimis recovery on what could have been significant prepetition claims by the Port against the estate.  Indeed, the Debtor estimates that the Port's claim for rejection damages could have dwarfed all other claims asserted against the estate even with the application of the statutory cap in section 502(b)(6).

Furthermore, the Debtor's position that the Upfront Fee could be used to offset the Port's claims is vigorously disputed by the Port and the outcome of this dispute is far from certain.  Even if the Debtor prevailed in arguing that the Upfront Fee could be applied to reduce the Port's claims, the Port's position is that the Upfront Fee could only be used to offset its total pre-petition damage claim resulting from the rejection of the Port Agreements.  If the Port were to prevail on these arguments, the Port's remaining prepetition rejection damage claims against the Debtor's estate, even if capped by section 502(b)(6), would likely be the largest claims in the case, thereby significantly diluting recoveries to other creditors.  Thus, in exchange for, among other things, waiving the estate's claims against the Port, the Debtor is able to ensure that the Port's prepetition claims, whatever they are, will have virtually no effect on distributions to other creditors.

16.    Lastly, by resolving the disputes regarding the Postpetition Obligations to the Port, the Debtor has been able to revise its proposed DIP budget accordingly to ensure that the Postpetition Obligations are timely paid and to settle the Port's objections to the DIP.  The Debtor expects to submit the revised budget, along with the proposed final form of the DIP order agreed to by the parties, in advance of the March 1, 2016 final hearing on the proposed DIP financing.

17.    Accordingly, the Debtor submits that the Settlement Agreement is in the best interest of the Debtor's estate, its creditors, and all parties in interest and should, therefore, be approved.

### Relief Requested

18.    By this Motion, the Debtor seeks entry of the Order (i) approving the Settlement Agreement, (ii) subject to the terms and conditions of the Settlement Agreement, approving the

Debtor's rejection of each of the Port Agreements and abandonment of the Surplus Assets, as of

the Rejection Date, and (iii) granting certain related relief, as described more fully herein.

**Basis for Relief**

I.   **The Court Should Approve the Agreement Under Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019**

   A. **The Settlement Agreement Is Fair and Reasonable and in the Best Interests of the Debtor's Estate and Creditors Under Section 105**

19.     Section 105(a) provides, in pertinent part, that the "[c]ourt may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions" of the

Bankruptcy Code.  11 U.S.C. § 105(a).

20.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of a

settlement that the debtor is party to and provides that "[o]n motion by the [debtor-in-possession]

and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R.

Bankr. P. 9019(a).   Taken together, section 105(a) and Bankruptcy Rule 9019(a) grant a

bankruptcy court with the power to approve a proposed compromise and settlement when it is in

the best interests of the debtor's estate and its creditors.  See In re Marvel Entm't Grp., Inc., 222

B.R. 243, 249 (D. Del. 1998); In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997).  The Third

Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a

bankruptcy estate, [c]ompromises are favored in bankruptcy."   Myers v. Martin (In re Martin),

91 F.3d 389, 393 (3d Cir. 1996) (second alteration in original) (internal quotation marks omitted)

(quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993); see also In re World Health

Alts., Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding that settlements are "generally

favored in bankruptcy").   Furthermore, the decision to accept or reject a compromise or

settlement is within the sound discretion of the Court.  In re Capmark Fin. Grp. Inc., 438 B.R.

12

471, 515 (Bankr. D. Del. 2010); In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D.

Del. 2004).

21.    Before approving a settlement under Bankruptcy Rule 9019, a court must

determine whether "the compromise is fair, reasonable, and in the interest of the estate."  In

Marvel Entm't Grp., Inc., 222 B.R. at 249 (quoting In re Louise's, Inc., 211 B.R. at 801).

Fundamental to the process of evaluating proposed settlements is "the need to compare the terms

of the compromise with the likely rewards of litigation."  Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 425 (1968).  The court need

not be convinced that the settlement is the best possible compromise in order to approve it.  In re

Coram Healthcare Corp., 315 B.R. at 330.  Rather, the court's obligation is to "canvass the issues

and see whether the settlement falls below the lowest point in the range of reasonableness."

Travelers Cas. & Sur. Co. v. Future Claimants Representative, Civ. No. 07-2785, 2008 WL

821088, at *5 (D. N.J. Mar. 25, 2008) (citing Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re

Jasmine, Ltd.), 258 B.R. 119 (D.N.J. 2000)); see also In re Coram Healthcare Corp., 315 B.R. at

330.

22.    When determining whether a settlement falls within the range of reasonableness,

courts in this district generally consider the following four factors (the "Martin Factors"):

"(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the

complexity of the litigation involved, and the expense, inconvenience and delay necessarily

attending it; and (4) the paramount interest of the creditors."  In re Martin, 91 F.3d at 393 (citing

In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals,

Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331

B.R. 176, 198 (Bankr. D. Del. 2005).

23.     The Debtor respectfully submits that the Settlement Agreement more than adequately satisfies the standard for approval under Bankruptcy Rule 9019.  The Settlement Agreement is proposed in the Debtor's business judgment as a good faith means to mitigate the risk of litigation and potential claims against the Debtor that may arise from rejecting the Port Agreements, including regarding the applicability of the Letter of Credit to the Port's prepetition claims or the Postpetition Obligations.  See, e.g., Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc., 324 F.3d 197 (3d Cir. 2003) (declining to decide whether proceeds from letter of credit reduce landlord's allowable claim under section 520(b)(6), not merely landlord's actual damages).  Although the Debtor believes that it has meritorious arguments against the Port's assertion that the Letter of Credit and Upfront Fee must be applied to any prepetition rejection damages claim, the Port strongly disputes the Debtor's arguments, and the Debtor has concluded that the risks inherent in such litigation are significant enough that the benefits of settlement outweigh any harm to the estate of not proceeding with litigation.  By entering into the Settlement Agreement, the Debtor will avoid the burdensome costs and unnecessary delay inherent in litigation, which would impede the Debtor's ability to efficiently and expeditiously implement the wind down of its operations and conclude this chapter 11 case.  In addition, the Settlement Agreement provides for the waiver of all claims the Port could potentially assert against the Debtor's estate or, alternatively, locks in a de minimis recovery for the Port's prepetition claims, which will significantly improve recoveries for the Debtor's other unsecured creditors.  Furthermore, the Settlement Agreement allows for the orderly transfer of the Premises back to the Port, which will allow the Port to re-let such premises quickly and efficiently, thereby further mitigating any damages suffered by the Port.

24.     In light of the foregoing reasons, the Debtor firmly believes that entry into the Settlement Agreement represents a prudent exercise of its business judgment and fairly reflects the risk of litigating the parties' disputes on the merits.  The Debtor believes that the Settlement Agreement, which is the product of extensive arms'-length negotiations, is in the best interests of its estate, its creditors, and all parties in interest because it provides a mean by which the Debtor may limit the estate's exposure to rejection damages and other claims while removing any risk and cost associated with litigation against the Port.

**B. Entry Into the Settlement Agreement is a Sound Exercise of the Debtor's Business Judgment Under Section 363 of the Bankruptcy Code**

25.     Under section 363(b)(1) of the Bankruptcy Code, the debtor-in-possession may use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(1)(1).  Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction.  See In re Martin, 91 F.3d at 394-95.

26.     In determining whether to authorize the use or transfer of estate property under section 363(b)(1), the Court must find that such use or transfer is supported by a "sound business purpose."  In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991).  A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 (quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).  In addition, a debtor

15

must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in exchange. <u>See In re Decora Indus., Inc.</u>, 2002 WL 32332749, at *2; <u>In re Del. & Hudson Ry. Co.</u>, 124 B.R. at 176.

27.    The business judgment rule under section 363(b)(1) shields a debtor from judicial second-guessing.   <u>See Abbotts Dairies of Pa., Inc.</u>, 788 F.2d 143, 149-50 (3d Cir. 1986) (applying good faith standard to transaction by debtor); <u>Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").   "In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'"   <u>In re Montgomery Ward Holding Corp.</u>, 242 B.R. at 153.   Where a debtor "articulates a reasonable basis for its business decisions . . . , courts will generally not entertain objections to the debtor's conduct." <u>In re Johns-Manville Corp.</u>, 60 B.R. at 616.

28.    The Debtor believes that entry into the Settlement Agreement represents a proper exercise of its business judgment in that it will reduce the Debtor's potential exposure to rejection damage claims and avoid the cost, risk, and delay of potential litigation.   In exchange for, among other things, the release of claims, the Debtor will receive significant benefits from entering into the Settlement Agreement, including, among other things, a mutual release from the Port, the Port's agreement to support any future plan of liquidation proposed by the Debtor, and a resolution regarding the treatment of the Prepetition Claim (which will be allowed in a nominal amount of $1.00).   <u>See In re Distributed Energy Sys. Corp.</u>, No. 08-11101, 2008 WL 4641350, at *3 (Bankr. D. Del. Oct. 17, 2008) (finding consideration including release as adequate within the "broad range of proper business judgment"); <u>see also In re Spa Chakra</u>, No. 09-17260, 2010 WL

779270, at *6 n.10 (Bankr. S.D.N.Y. Mar. 5, 2010) (recognizing benefits to estate through reduction of aggregate amount of claims); In re Bakalis, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) (finding trustee exercised reasonable business judgment in reducing estate's risk exposure).

29.    In addition, causing the Members to agree to make payment of the Members' Payment pursuant to the Settlement Agreement constitutes a reasonable exercise of the Debtor's business judgment.  Specifically, the Members' Payment will be made directly to the Port. Therefore, unlike a payment made by the Debtor through some form of financing, payment of the Members' Payment will not have priority over, or affect the recoveries of, the Debtor's other general unsecured creditors.

30.    Accordingly, the Debtor submits that the relief requested in the Motion is in the best interests of the Debtor's estate,  its creditors, and other parties in interest and will, among other things, allow the Debtor's estate to realize significant benefits including the mitigation of potentially significant rejection claims that could be asserted by the Port.

**II.    The Court Should Approve the Debtor's Rejection of the Port Agreements Pursuant to the Settlement Agreement and Section 365 of the Bankruptcy Code as a Sound Exercise of the Debtor's Business Judgment.**

31.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The decision to assume or reject an executory contract is a matter within the "business judgment" of the debtor.  See Nat'l Labor Relations Bd. v. Bildisco & Bildisco (In re Bildisco), 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test.") (citing 2 COLLIER ON BANKRUPTCY ¶ 365.03 (15th ed. 1981))); In re Trans World Airlines, Inc., 261 B.R. 103, 121 (Bankr. D. Del. 2001) (noting that business judgment standard is "widely accepted" in context of rejecting executory contracts).  Application of the business judgment

standard requires a court to approve a debtor's business decision unless the decision "is the product of bad faith, whim, or caprice." In re Caribbean Petroleum Corp., 444 B.R. 263, 268 (Bankr. D. Del. 2010) (quoting In re Trans World Airlines, Inc., 261 B.R. at 121).  Further, "[t]his provision allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 741 (5th Cir. 1996) (citation and internal quotation marks omitted); see also LR.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir. 2000) (citing Stewart Title, 83 F.3d at 741).

32.     Rejection of an executory contract is appropriate where such rejection would benefit the estate.  Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 39-40 (3d Cir. 1989).  Upon finding that a debtor has exercised its sound business judgment in determining that rejection of certain contracts is in the best interests of its creditors and all parties in interest, a court should approve the rejection under section 365(a) of the Bankruptcy Code.  Comput. Sales Int'l, Inc. v. Fed. Mogul (In re Fed. Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); see also In re Wheeling-Pittsburgh Steel Corp., 59 B.R. 129, 136 (Bankr. W.D. Pa. 1986) (discussing deference accorded by court to debtors' decision to assume or reject executory contract, which "should be granted as a matter of course") (quoting Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981)).

33.     In light of the facts of this chapter 11 case, the Debtor has plainly satisfied the "business judgment" standard for rejecting the Port Agreements.  The Port Agreements are financially burdensome and the Debtor will have no ongoing need for the Premises or related services or equipment provided under the Port Agreements following the surrender of the Premises to the Port.  The continued performance by the Debtor of its obligations under the Port

Agreements would therefore unnecessarily and substantially deplete the value of the Debtor's estate.  In addition, the Debtor believes that the rent obligations under the Port Agreements are at or above the market rate that other terminal operators could negotiate with the Port and does not believe that there is any value that would be recognized by the Debtor's estates by attempting to assume and assign any of the Port Agreements.  Furthermore, the rejection of the Port Agreements is an integral component of the overall settlement between the Debtor and the Port, in part because the settlement will result in the transfer of the Premises back to the Port so that it can re-let the premises as soon as possible. Accordingly, the rejection of the Port Agreements is a sound exercise of the Debtor's business judgment.

34.    Accordingly, the rejection of the Port Agreements, particularly in the context of the Settlement Agreement, is plainly a sound exercise of the Debtor's business judgment and should be approved by the Court.  Absent the relief requested herein, the Debtor would continue to incur administrative rent and other obligations under the Port Agreements, despite the fact that it would have no continuing operations or productive use for the Premises.

III.    **Abandonment of Certain Equipment to the Port Is Justified**

35.    Section 554(a) of the Bankruptcy Code provides that, after notice and a hearing, a debtor-in-possession "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." See Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (stating that a debtor "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

36.    Subject to the terms and conditions of the Settlement Agreement, the Debtor submits that the abandonment of Surplus Assets as of the Rejection Date is appropriate under the circumstances because such equipment and property is of little or no value to the estate.  In

19

addition, the cost that would be incurred with dismantling such equipment and preparing it to be sold would outweigh any benefit that the Debtor would receive upon such sale and, therefore, such property is burdensome to the Debtor's estate.  Furthermore, the abandonment of the Surplus Assets is part of the overall settlement reached among the parties, and the Port has agreed that the Debtor may abandon such equipment and property and leave it on the Premises and the Port may dispose of the same in any manner that it determines is appropriate.

### Notice

37.     The Debtor shall provide notice of this Motion on the date hereof via first class mail to:  (i) the Office of the U.S. Trustee for the District of Delaware; (ii) the holders of the 20 largest unsecured claims on a consolidated basis; (iii) the Port and its counsel, (iv) any banking or financial institutions that hold the Debtor's accounts; and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002(i).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

38.     The Debtor has not previously sought the relief requested herein from this or any other Court.


WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

Dated:  February 24, 2016
Wilmington, Delaware

Respectfully submitted,

**RICHARDS, LAYTON & FINGER, P.A.**

/s/ Marisa A. Terranova Fissel
Mark D. Collins (No. 2981)
Marisa A. Terranova Fissel (No. 5396)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                terranova@rlf.com

-and-

**MILBANK, TWEED, HADLEY & MᶜCLOY** LLP
Gregory A. Bray (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Haig M. Maghakian (admitted *pro hac vice*)
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone:      (213) 892-4000
Facsimile:      (213) 629-5063
Email:          gbray@milbank.com
                tkreller@milbank.com
                hmaghakian@milbank.com

-and-

Dennis F. Dunne
Samuel A. Khalil
28 Liberty Street
New York, NY 10005
Telephone:      (212) 530-5000
Facsimile:      (212) 530-5219
Email:          ddunne@milbank.com
                skhalil@milbank.com

*Proposed Counsel to Debtor and Debtor in Possession*