## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| OUTER HARBOR TERMINAL, LLC, | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 16-10283 (LSS) |
| Debtor. | ) | |
| | ) | D.I. 547 |
| | ) | |
| | ) | |

# REVISED* MEMORANDUM[1]

Before the Court is the Debtor's objection to the proof of claim filed by Kawasaki Kisen Kaisha, Ltd. ("'K' Line"). The Debtor argues that it properly terminated the contract between the parties that forms the basis for the damages asserted in the proof of claim and thus the proof of claim should be disallowed. Because the Court finds that the contract was not terminated, damages may be available to "K" Line. Accordingly, this matter will proceed to the damages phase of the litigation.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

* This Memorandum has been revised in accordance with the Order Granting Motion for Partial Reconsideration, issued May 1, 2017. D.I. 681.
[1] This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052.

## STATEMENT OF FACTS AND BACKGROUND

On February 1, 2016 (the "Petition Date"), Outer Harbor Terminal ("Outer Harbor" or the "Debtor") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code.  Outer Harbor's principal business was providing stevedoring and terminal services to carriers calling at the Port of Oakland, California.

Prepetition, Ports America Outer Harbor, Inc. (a previous Debtor moniker) and "K" Line executed that certain Stevedore and Marine Terminal Services Agreement made as of June 30, 2013 (the "Agreement").[2]  By the Agreement, "K" Line appointed Outer Harbor as the exclusive provider of stevedoring and terminal services at the Port of Oakland to "K" Line's liner services identified in the Agreement (i.e., CALCO-A and CALCO-B) on the terms set forth in the Agreement.  The Agreement commenced on July 1, 2013 and expired on June 30, 2018.

Outer Harbor began operations on January 1, 2010 and lost money every year since that time.[3]  Its attempts to raise capital from outside sources and/or to renegotiate contracts were unsuccessful.[4]  Eventually, Outer Harbor's members voted to wind down the company.[5]  On January 19, 2016, Outer Harbor made the following press release:

> OAKLAND, Calif., Jan. 19, 2016 /PRNewswire/ -- Outer Harbor Terminal (OHT) is developing a cooperative 60-day transition with the Port of Oakland to wind down operations and return the leased terminal property to the Port.
>
> During this transition, OHT intends to run business as usual and to service its customers and vessels for the next 30 days. OHT expects to take an additional 30 days to complete the delivery of import and empty containers and transition out of the terminal. Import and export operations at OHT will be reduced or shifted to other terminals with the objective to maintain service at

---

[2] Debtor Ex. 4.
[3] Hearing 6:9–14.
[4] Hearing 6:15–7:13.
[5] Hearing 9:16–23.

the Port with minimal disruption. OHT will work to achieve a successful wind down with a continued focus on both safety and service delivery.

The Port of Oakland has advised OHT that it is working with Terminal Operators and Carriers to prevent interruption of trade.

OHT is pleased to have been part of the Port of Oakland for the past six years. OHT appreciates sharing the mutual goal with the Port of Oakland for a seamless transition to enable continuity of service.[6]

On that same day, Ports America, the self-described largest stevedore and terminal operating group in the United States, and an indirect parent of Outer Harbor, made its own press release.[7] In its press release, Ports America announced a new strategy and a realignment of its goals: additional investment and expansion of services into new terminals on the North American west coast, including in Los Angeles, Long Beach, the Port of Tacoma and western Canada. This strategy did not include service at the Port of Oakland. The Press Release announced that "the JV partners in Outer Harbor Terminal, LLC (OHT) have decided to change the arrangement with the Port of Oakland by returning back to the port the OHT leased property" and transitioning out of the terminal.[8] "K" Line's agent, "K" Line America, received and reviewed this press release.[9]

Two days later, on January 21, 2016, Outer Harbor communicated its intention to wind down operations directly to "K" Line America via e-mail.[10] The subject line of the e-mail is "Notification of OHT closure." The body of the e-mail reads, in full:

As discussed by phone, per the direction of the shareholders of Outer Harbor Terminal, LLC, we will wind down operations over the next 60 days. It is our intention to work vessels through Feb 19th, then work gates through

---

[6] Debtor Ex. 2.
[7] Debtor Ex. 8.
[8] Debtor Ex. 8.
[9] Hearing 38:6–21.
[10] Debtor Ex. 3. E-mail from Brian Bauer, the Debtor's VP of Operations to David Daly of "K" Line America. The e-mail was also copied to Heather Stack, the Debtor's Chief Financial Officer and witness at the Hearing.

<u>March 18th</u>[]to evacuate remaining customer equipment. [Outer Harbor] expects to have further conversations with your representatives to work out the details of this plan as it relates to your specific vessels and equipment. We appreciate your cooperation during this transition and we will remain in close communication with customers and stakeholders to ensure the best possible outcome.

It is understood that K Line and its partners would like to immediately transition the CALCO A service to another terminal to limit potential disruption to customers. Please accept this notification as release of any contractual obligation for the CALCO A service to call [Outer Harbor].[11]

Notwithstanding the dates outlined in the press releases and the January 21, 2016 e-mail, in order to accommodate "K" Line, Outer Harbor continued to provide services to "K" Line through March 28, 2016; it also continued to serve other liners through this period. Outer Harbor ceased all marine and terminal operations at the Port of Oakland on either April 22 or 29, 2016.[12]

In response to Outer Harbor's announcement that it intended to terminate services at the Port of Oakland, "K" Line took measures, on an emergency basis, to find a substitute provider of services.[13] On or about March 4, 2016, "K" Line signed a contract with a new operator providing stevedoring and marine terminal services at the Port of Oakland.

While it was winding down its operations at the Port of Oakland, Outer Harbor filed its bankruptcy case. The Court set a bar date of April 7, 2016, for proofs of claim filed by general creditors.[14] "K" Line timely filed a proof of claim based on damages stemming from the breach of the Agreement. On November 4, 2016, the Debtor filed an objection (the

---

[11] *Id.*
[12] Hearing 20:13–21:14; Objection 2.
[13] Hearing 48:13–19; *Declaration of John P. Meade, General Counsel, "K" Line America, Inc. in Support of Kawasaki Kisen Kaisha, Ltd.'s Reply to Debtor's Objection to Proof of Claim* (the "Meade Declaration") ¶ 10. Debtor Ex. 7.
[14] D.I. 134, 149.

"Objection")[15] to "K" Line's proof of claim.[16] "K" Line filed a response to the Objection

and the Debtor filed a reply.[17]

The Court held an evidentiary hearing on January 12, 2017 (the "Hearing"), heard

argument and took the matter under advisement. This matter is now ripe for decision.[18]

## ANALYSIS

### *The Parties' Contentions*

The Debtor contends that it terminated the Agreement pursuant to its terms under

§ 7.3(c), thus "K" Line can claim no damages under the Agreement, and therefore, the

proof of claim should be disallowed. Section 7.3 of the Agreement provides:

> **7.3 <u>Termination for Cause – Material Breach</u>**
>
> (c)    Without limiting the foregoing, *either party may immediately terminate this Agreement without notice to the other if: (i) a party* becomes insolvent or *ceases to do business*; (ii) a party seeks relief as a debtor or is the subject of an involuntary petition, not subsequently vacated or dismissed within thirty (30) days, under any applicable bankruptcy law or other law relating to liquidation or reorganization of debtors or consents to or acquiesces in such relief; (iii) a party appoints or consents to the appointment of a receiver or guardian for all or part of its property; (iv) a party [] makes an assignment for the benefit of its creditors; and/or (v) an order is entered by a court of competent jurisdiction finding such party to be bankrupt or insolvent or ordering its liquidation or reorganization or modifying the rights of its creditors or appointing a receiver or custodian for some or all of its property.[19]

The Debtor argues that by virtue of § 7.3, it had an "unequivocal right" to terminate the

Agreement, without notice, once it ceased doing business. And, the Debtor argues, it

---

[15] D.I. 429.

[16] D.I. 429-6.

[17] *Kawasaki Kisen Kaisha, Ltd's Response to Debtor's Objection to Proof of Claim* (the "Response"). D.I. 471. "K" Line concurrently filed the Meade Declaration. *Reply in Further Support of Debtor's Objection to Proof of Claim Filed by Kawasaki Kisen Kaisha Ltd. (Claim No. 22)* (the "Reply"). D.I. 503.

[18] At the Hearing, the parties advised that they wished to put off consideration of damages until after liability is determined. Hearing 4:14–16. Accordingly, this Memorandum does not address damages.

[19] Debtor Ex. 4, at 9 (emphasis added).

exercised that right on January 19, 2016 when it announced to the world that it was going to cease providing services at the Port of Oakland.

"K" Line has myriad counterarguments in its Response. It first argues that the Debtor did not terminate the Agreement. It contends that neither of the press releases nor the January 21, 2016 e-mail was a termination of the Agreement, but rather, the statements contained in those communications constituted an intention to breach the Agreement.[20] It next argues that the Debtor's reading of § 7.3 is unreasonable on its face as it permits a party who voluntarily ceases to do business to terminate an agreement; further, such an ability to terminate would make the contract illusory.[21] "K" Line further argues that § 7.3 is an impermissible *ipso facto* clause, and that the Debtor has breached its obligation of good faith and fair dealing under the Agreement.[22] "K" Line also suggests that the contract could not terminate postpetition without court approval. Finally, K Line argues that, in any event, there is not a waiver of direct damages in § 7.3, and that § 7.4 of the Agreement specifically preserves all rights to damages upon termination.[23] During the Hearing, "K" Line added the argument that the Debtor, a debtor-in-possession, has not yet ceased doing business.[24]

The Debtor's strongest reply is that the Agreement is plain on its face and that it permits a party to terminate the contract because of its own voluntary decision to cease doing business.[25] The Debtor reminds the Court that it may not rewrite the Agreement even if "K" Line made a bad deal.[26] The Debtor also argues that a contract may expire

---

[20] Response 2–3.
[21] Response 15–16.
[22] Response 16–19.
[23] Response 7–8. Certain other arguments are not mentioned herein.
[24] Hearing 111:10–114:22.
[25] Reply 2.
[26] Reply 5–6.

postpetition by its own terms and "[t]hat is precisely what happened here."[27]  Finally, the

Debtor argues that it should not be prejudiced because it provided notice of its intention to

cease to do business when, under the Agreement, it had no requirement to do so.[28]

***Outer Harbor Did Not Terminate the Agreement***

 The Agreement is governed by California law.[29]  In California, the "interpretation of

a contract is a judicial function."[30]  "The language of a contract is to govern its

interpretation, if the language is clear and explicit, and does not involve an absurdity."[31]

"When a contract is reduced to writing, the intention of the parties is to be ascertained from

the writing alone, if possible . . . ."[32]  "In interpreting an unambiguous contractual provision

[a court is] bound to give effect to the plain and ordinary meaning of the language used by

the parties."[33]

 Section 7.3 of the Agreement is not ambiguous.  Section 7.3(c) as written allows for

immediate termination of the Agreement by either party, without notice to the other, upon

the happening of various events, including, as argued here, the cessation of business.  The

Court need not reach the question of the commercial practicality of this provision nor

whether the Debtor's interpretation is absurd because the Debtor presented no evidence that

it, in fact, terminated the Agreement.

---

[27] Reply 13.

[28] Reply 16.

[29] *See* Agreement § 21.8.

[30] *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126–27 (Cal. Ct. App. 2008) (citing *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging*, 69 Cal.2d 33, 39–40 (Cal. 1968)).

[31] CAL. CIV. CODE § 1638.  When the "contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further."  *Shaw v. Regents of Univ. of Cal.*, 67 Cal. App. 4th 44, 53 (Cal. Ct. App. 1997) (citation omitted).

[32] CAL. CIV. CODE § 1639.

[33] *Coast Plaza Doctors Hosp. v. Blue Cross of Cal.*, 83 Cal. App. 4th 677, 684 (Cal. Ct. App. 2000).

First, as the Debtor admitted, "there is no specific document in the record" terminating the Agreement under § 7.3(c), or otherwise.[34]

Second, nowhere in the two press releases or the January 21, 2016 e-mail does the Debtor state that it is terminating the Agreement. Rather, each of those communications announces that Outer Harbor is winding down its operations, will not be providing services after a stated period and/or will be transitioning out of the Port of Oakland. Those communications do not purport to terminate the Agreement or any other contract based on the cessation of business. Nor could they. The earliest the Debtor ceased doing business was April 22, 2016. Therefore, the earliest date upon which the Debtor could exercise its right to terminate the Agreement was April 22, 2016.

Third, termination under § 7.3(c) is not self-executing. Each of the stated events (i.e., cessation of business, insolvency, bankruptcy), permits a party to terminate the Agreement; the happening of the event does not automatically terminate the Agreement nor cause the Agreement to expire by its terms.[35] Nor does the Agreement provide that the Debtor can terminate the Agreement effective some date in the future at which time it will meet one of the stated conditions. The timing of permitted cancellation under § 7.3(c) is unambiguous: either party may *immediately* terminate *when* it meets one of the stated conditions, not before.

Fourth, although the Debtor argued that it was permitted to terminate the Agreement without notice, the Debtor's witness Ms. Stack did not testify that the Debtor

---

[34] Hearing 62:14–15.
[35] There is nothing illogical in requiring a party—either Outer Harbor or "K" Line—to act to terminate the Agreement upon the happening of a stated event. It is not hard to imagine that were the Agreement an over market contract rather than an under market one, Outer Harbor may have chosen to subcontract or assign the contract as permitted by the Agreement. Agreement § 5.2.

did so nor did the Debtor's counsel really advance that argument at the Hearing. Thus, whether the Agreement would permit the Debtor to not only terminate without notice, but without any outward manifestation or communication of termination, is an issue the Court need not decide.[36]

The above analysis leaves the Debtor to argue that ""K" Line somehow conceded that it had received notice of termination of the Agreement. It argues that the following two statements, one in "K" Line's previous motion to file certain documents under seal and one in the Meade Declaration, support this proposition:

- "The Debtor announced termination of services under the [Agreement] on January 21, 2016 forcing 'K' Line to contract with a substitute provider of stevedore and marine terminal services in order to continue its operations at the Port of Oakland, California."[37]

- "The announced intention to terminate services forced 'K' Line to contract with a substitute provider of stevedore and marine terminal services in order to continue its operations at the Port of Oakland, California."[38]

Assuming, *arguendo*, that the Court should consider these statements in interpreting the Agreement, even a cursory review of them show that "K" Line has made no concession regarding termination of the Agreement. Rather, what "K" Line acknowledged in the above two statements is Outer Harbor's stated intention to cease providing services at the Port of Oakland and under the Agreement; "K" Line did not acknowledge that the Agreement had been terminated. In advancing this argument, the Debtor is conflating termination of services at the Port of Oakland or even termination of services under the

---

[36] At argument, "K" Line's counsel conjured up the image of Johnny Carson's Carnac the Magnificent psychically terminating the Agreement. Hearing 107:9–15.
[37] *Motion of Kawasaki Kisen Kaisha, Ltd. Pursuant to 11 U.S.C. § 107(b), Bankruptcy Rule 9018 and Local Rule 9018-1 to File Under Seal Certain Documentation in Support of its Proof of Claim* ¶ 8. Debtor Ex. 9, D.I. 194.
[38] Meade Declaration ¶ 10.

Agreement with termination of a contract. These two concepts are not synonymous. Further, Outer Harbor did not even specifically announce that it was going to cease to do business.[39]

Finally, the Debtor argues that, in the circumstances here, the Debtor would be penalized if the Court found that the Agreement were not terminated pursuant to its terms such that "K" Line could assert damages. The Debtor points to "special efforts" made to assist "K" Line (and others) with its transition to a different operator.[40] In the Debtor's view the two press releases, the January 31, 2016 e-mail, and its "special efforts" were attempts to work with their customers until they could transition to other operators and to "try to help out those other operators just as much as they could. And [the Debtor] shouldn't be penalized for doing that."[41]

Even assuming the Debtor's motives may have been laudably benevolent in intent, and may have concurrently mitigated damages to some extent, those efforts do not alter the termination provision of the contract. Just as the Court cannot rewrite the Agreement to save "K" Line from a bad bargain, it cannot rewrite the Agreement to save the Debtor from any perceived penalty resulting from its choice to be a good corporate citizen.[42] As discussed above, the Agreement gave Outer Harbor the ability to terminate the Agreement when it ceased to do business—not at any time before then or in the fashion the Debtor

[39] Once again, the Debtor conflates two concepts—terminating services at the Port of Oakland and ceasing to do business. If Outer Harbor serviced another port in addition to the Port of Oakland, query whether the Debtor could equate the two?
[40] See Hearing 11:15–13:4. "K" Line sought unsuccessfully to elicit from the Debtor's witness Ms. Stack what the precise "special efforts" were, beyond continued performance. Hearing 17:20–21:20.
[41] Hearing 53:8–13.
[42] The Ports of America press release, in which it states that it operates in forty-two ports and eighty locations, suggests that the Debtor's choice to accommodate liners, such as "K" Line, a Japanese registered fully integrated global transportation company with annual revenues of $5–6 billion, was not simply altruistic.

claims it did.  Outer Harbor could have simply ceased doing business, terminated the

Agreement, and argued that "K" Line had no damages because the Agreement was

terminated pursuant to its terms.[43]  It did not do so.  Outer Harbor has cited no case law for

the proposition that because it chose to work with its customers to ensure a smooth

transition to another operator at the Port of Oakland, it has greater rights under the

Agreement or at common law.


## CONCLUSION

As the Objection is premised on the Debtor's termination of the Agreement and the

Court has found that the Agreement was not terminated, it is necessary to address "K"

Line's asserted damages.  The parties should contact the Court's courtroom deputy to

schedule a status conference regarding further proceedings to resolve this dispute.


Dated:  May 1, 2017

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

---

[43]  The Court is not making any determination that such an argument is legally correct, and "K"
Line has argued, among other things, that § 7.4 of the Agreement preserves any damages even in the
face of a termination in accordance with the Agreement.